# EXHIBIT A

*Execution Version*

## AMENDED AND RESTATED PURCHASE AGREEMENT

## BY AND AMONG

## DYNAMIC ENERGY, INC.,

## CM ENERGY HOLDINGS, LP

## AND

**solely with respect to Article 5 and Article 8, BLUESTONE RESOURCES INC.**

## DATED JANUARY 27, 2017, EFFECTIVE DECEMBER 22, 2016



EXHIBIT
*A*

KE 44886194

**Table of Contents**

**Page**

**ARTICLE 1 DEFINITIONS AND INTERPRETATION**...................................................1
Section 1.1   Definitions.........................................................................................1
Section 1.2   Interpretation....................................................................................11

**ARTICLE 2 PURCHASE AND SALE OF ASSETS**...................................................12
Section 2.1   Purchase and Sale of Assets...........................................................12
Section 2.2   Excluded Assets...............................................................................13
Section 2.3   Assumed Liabilities .........................................................................14
Section 2.4   Retained Liabilities .........................................................................15
Section 2.5   Purchase Price..................................................................................16
Section 2.6   [Reserved]........................................................................................17
Section 2.7   [Reserved]........................................................................................17
Section 2.8   Earn-Out...........................................................................................17
Section 2.9   Closing..............................................................................................21
Section 2.10  Closing Deliveries...........................................................................21
Section 2.11  Allocation of Purchase Price..........................................................24
Section 2.12  Allocation of Additional Costs ......................................................24

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES  OF THE SELLER**..................24
Section 3.1   Corporate Status..............................................................................24
Section 3.2   Corporate Authorization .................................................................25
Section 3.3   Binding Effect..................................................................................25
Section 3.4   Financial Statements .......................................................................25
Section 3.5   No Breach; Approvals......................................................................25
Section 3.6   Absence of Certain Changes...........................................................26
Section 3.7   Agreements.......................................................................................27
Section 3.8   Undisclosed Liabilities....................................................................27
Section 3.9   Capital Commitments ......................................................................27
Section 3.10  Permits..............................................................................................28
Section 3.11  Taxes.................................................................................................28
Section 3.12  ERISA ..............................................................................................29
Section 3.13  Employment and Labor....................................................................31
Section 3.14  Rights in Properties; Liens..............................................................32
Section 3.15  Equipment and Other Personalty ....................................................34
Section 3.16  Sufficiency of the Assets .................................................................34
Section 3.17  Environmental Matters.....................................................................34
Section 3.18  Insurance ..........................................................................................35
Section 3.19  Compliance with Law ......................................................................36
Section 3.20  Litigation and Judgments.................................................................36
Section 3.21  No Undisclosed Relationship...........................................................36
Section 3.22  No Brokers ........................................................................................36

i

Section 3.23    Customers and Suppliers.................................................36
Section 3.24    No Other Representations and Warranties.............................36

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER..........37**
Section 4.1    Status.................................................................37
Section 4.2    Authorization........................................................37
Section 4.3    Binding Effect.......................................................37
Section 4.4    No Breach; Approvals.................................................37
Section 4.5    No Brokers...........................................................38
Section 4.6    Financing............................................................38
Section 4.7    Permit Blocking......................................................38
Section 4.8    Legal Proceedings....................................................39
Section 4.9    Independent Investigation............................................39

**ARTICLE 5 COVENANTS ..........................................................39**
Section 5.1    Conduct Of Business..................................................39
Section 5.2    Filings..............................................................40
Section 5.3    Commercially Reasonable Efforts......................................41
Section 5.4    Notification.........................................................42
Section 5.5    Inspection...........................................................42
Section 5.6    Publicity............................................................42
Section 5.7    Expenses.............................................................43
Section 5.8    Records..............................................................43
Section 5.9    Discussions with Other Purchasers....................................44
Section 5.10   Cooperation Regarding Excluded Assets and Retained Liabilities ..........44
Section 5.11   Employee Matters.....................................................44
Section 5.12   Non-Solicitation of Employees........................................47
Section 5.13   Non-disparagement....................................................47
Section 5.14   Confidentiality......................................................47
Section 5.15   [Reserved]...........................................................47
Section 5.16   Supplement to Seller Disclosure Schedule ............................47
Section 5.17   Tax Matters..........................................................48
Section 5.18   Segregation and Removal of Excluded Assets ..........................49
Section 5.19   Certain Payments or Instruments Received from Third Parties...............49
Section 5.20   Release; Acknowledgements ...........................................50
Section 5.21   Financing............................................................50
Section 5.22   Consent Decree. .....................................................50
Section 5.23   Payment of Liabilities...............................................51
Section 5.24   Access by Seller.....................................................52
Section 5.25   Wind Up and Dissolution..............................................52
Section 5.26   Sufficient Capital...................................................52
Section 5.27   Asset Sales; Distributions...........................................52
Section 5.28   Interim Period Marketing.............................................53
Section 5.29   Services Agreements..................................................54

**ARTICLE 6 CONDITIONS ........................................................54**

Section 6.1    Conditions to Each Party's Obligations under this Agreement ..................54
Section 6.2    Conditions to Obligations of the Seller under this Agreement ..................55
Section 6.3    Conditions to Obligations of the Purchaser under this Agreement............55

**ARTICLE 7 TERMINATION**..........................................................................................**57**
Section 7.1    Termination by Mutual Consent ...............................................................57
Section 7.2    Termination by the Seller or the Purchaser...............................................57
Section 7.3    Termination by the Seller..........................................................................57
Section 7.4    Termination by the Purchaser ...................................................................58
Section 7.5    Effect of Termination................................................................................58

**ARTICLE 8 INDEMNIFICATION** ...............................................................................**58**
Section 8.1    Survival......................................................................................................58
Section 8.2    Indemnification..........................................................................................59
Section 8.3    Procedures..................................................................................................59
Section 8.4    Limitations on Indemnification Obligations.............................................61
Section 8.5    Exclusive Remedy .....................................................................................62

**ARTICLE 9 GENERAL PROVISIONS**..........................................................................**62**
Section 9.1    Notices.......................................................................................................62
Section 9.2    Assignment; Binding Effect.......................................................................64
Section 9.3    No Third Party Beneficiaries .....................................................................64
Section 9.4    Entire Agreement .......................................................................................65
Section 9.5    Amendments...............................................................................................65
Section 9.6    Governing Law ..........................................................................................65
Section 9.7    Headings.....................................................................................................65
Section 9.8    Waiver........................................................................................................65
Section 9.9    Severability ................................................................................................65
Section 9.10   Jurisdiction.................................................................................................65
Section 9.11   No Presumption .........................................................................................66
Section 9.12   Disclosure Schedules .................................................................................66
Section 9.13   Further Assurances.....................................................................................66
Section 9.14   No Recourse ...............................................................................................66
Section 9.15   Counterparts...............................................................................................67
Section 9.16   No Consequential or Punitive Damages ....................................................67
Section 9.17   Waiver of Trial by Jury..............................................................................67
Section 9.18   Specific Performance .................................................................................67

**SCHEDULES**
Seller Disclosure Schedules
Purchaser Disclosure Schedules

**EXHIBITS**
Exhibit A – Areas of Operations
Exhibit B – Ancillary Guarantee
Exhibit C – Form of Assignment and Assumption of Contracts
Exhibit D – Form of Assignment and Assumption of Leased Real Property
Exhibit E – Form of Bill of Sale
Exhibit F – [Reserved]
Exhibit G – Form of Deed
Exhibit H – Form of Escrow Agreement
Exhibit I – Form of Sublease of Ettenger Lease
Exhibit J – Form of Joint Use Agreement
Exhibit K – Form of Permit Operating Agreement
Exhibit L – Terms of Transition Services Agreement
Exhibit M – Form of Earn-out Security Agreement

## AMENDED AND RESTATED PURCHASE AGREEMENT

This AMENDED AND RESTATED PURCHASE AGREEMENT (including the Exhibits and Disclosure Schedules hereto, this "Agreement") is made as of January 27, 2017, but effective as of December 22, 2016 (the "Effective Date"), by and among Dynamic Energy, Inc., a West Virginia corporation (the "Seller"), CM Energy Holdings, LP, a Delaware limited partnership (the "Purchaser"), and, solely with respect to ARTICLE 5 and ARTICLE 8, Bluestone Resources Inc., a Delaware corporation ("Seller Parent"). The Seller, the Purchaser and Seller Parent may also be referred to herein as the "Parties" and each individually as a "Party."

## RECITALS

WHEREAS, the Seller, Frontier Coal Company, a Delaware corporation ("Frontier"), National Resources, Inc., a West Virginia corporation ("NRI"), the Purchaser and, solely with respect to Article 5 and Article 8 thereof, Seller Parent, were parties to that certain Purchase Agreement, dated as December 22, 2016 (the "Prior Agreement");

WHEREAS, the Seller owns and operates certain assets held in connection with its operations in Wyoming County, West Virginia, which operations cover the areas generally depicted on Exhibit A attached hereto; and

WHEREAS, the Parties, Frontier and NRI, desire to amend and restate the Prior Agreement in its entirety in the form of this Agreement, pursuant to which the Seller will sell to the Purchaser the Business for the consideration and on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing, and of the representations, warranties, covenants, and agreements contained herein, the Prior Agreement is hereby amended and restated in its entirety as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions**.

(a)    As used in this Agreement, the following terms have the meanings set forth below:

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, charge, complaint, grievance, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "*control*," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership

**Section 9.4      Entire Agreement**.  This Agreement, the other Transaction Documents and any other agreements contemplated hereby constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior written or oral agreements and understandings among the Parties with respect thereto, including the Prior Agreement.  No addition to or modification of any provision of this Agreement shall be binding upon any Party hereto unless made in writing and signed by all Parties.

**Section 9.5      Amendments.**  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

**Section 9.6      Governing Law.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAW.

**Section 9.7      Headings.**  Headings of the Articles and Sections of this Agreement are for the convenience of the Parties only, and shall be given no substantive or interpretative effect whatsoever.

**Section 9.8      Waiver.**  Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by the Party waiving such term or condition.  No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

**Section 9.9      Severability.**  Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable, and the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the fullest extent possible.

**Section 9.10      Jurisdiction.**  Each Party irrevocably submits to the exclusive jurisdiction of the state and federal courts located in the State of Delaware, and the related appellate courts for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each Party agrees to commence any such action, suit or proceeding either in the state or federal courts located in the State of Delaware. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction in this Section 9.10.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the aforementioned courts and the related appellate courts, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in

any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 9.11   No Presumption.   Each Party has agreed to the use of the particular language in the provisions of this Agreement, and any questions of doubtful interpretation shall not be resolved by any rule or interpretation against the draftsman, but rather in accordance with the intention of the Parties with respect thereto, having due regard to the benefits and rights intended to be conferred upon the Parties and the limitations and restrictions upon such rights and benefits intended to be provided.

Section 9.12   Disclosure   Schedules.   Notwithstanding anything to the contrary contained elsewhere, Seller Disclosure Schedule and Purchaser Disclosure Schedule dated as of the date of this Agreement shall constitute the "Seller Disclosure Schedule" and the "Purchaser Disclosure Schedule" for purposes of the Agreement, and the Parties acknowledge and agree that in the event of any inconsistency between the statements in the body of this Agreement and those in the Seller Disclosure Schedule and/or the Purchaser Disclosure Schedule (each a "Disclosure Schedule"), the statements in the body of this Agreement will control. If any Disclosure Schedule discloses in any section or schedule thereof an item or information and it is reasonably apparent that such item or information also relates to another section or schedule of such Disclosure Schedule, such item or information shall be deemed to have been disclosed in such other section or schedule of such Disclosure Schedule, notwithstanding the omission of a cross-reference to such other section or schedule.

Section 9.13   Further Assurances.   Each Party shall, at any time and from time to time on and after the Closing Date, upon request by any other Party, take or cause to be taken such actions and execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments, documents, transfers and conveyances as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

Section 9.14   No Recourse.   This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement may only be brought against an entity that is expressly named herein as a Party and then only with respect to the specific obligations set forth herein with respect to such Party.  Except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement and not otherwise), no past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or the respective Affiliates of the Seller or the Purchaser (such Persons, the "Non-Recourse Persons") shall have any liability (whether in contract or tort) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of the Seller or the Purchaser under this Agreement (whether for indemnification or otherwise) or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement other than claims for fraud or intentional misrepresentation. The Non-Recourse Persons are express third-party beneficiaries of this Section 9.14 and should be entitled to enforce the provisions hereof.

# EXHIBIT B

*Execution Version*

# SUBLEASE AGREEMENT

This **Sublease Agreement** (this "**Agreement**") is made, entered into and effective as of the 27th of January, 2017 (the "**Effective Date**"), by and between **CM Energy Properties, LP**, a Delaware limited partnership ("**Sublessor**") and **Dynamic Energy, Inc.**, a West Virginia corporation ("**Sublessee**") (each a "**Party**", and collectively the "**Parties**").

Pursuant to that certain Lease dated March 20, 1957, among E. Lloyd Ettenger, Jean S. Ettenger, Robert L. Ettenger, III, Helen M. Ettenger, Mary Ann Thompson and Edward E. Thompson, lessors, and Elmer E. Blizzard and Roy Nestor, lessees, as assigned, amended, supplemented, or otherwise modified from time to time, including by (i) Supplemental Lease Agreement dated April 12, 1965, among the same parties; (ii) Contract dated August 15, 1969, among Robert L. Ettenger, III, Helen M. Ettenger, Mary Ann Thompson and Edward E. Thompson, lessors, and Elmer E. Blizzard, Roy B. Nestor and Eloise Worrell, assignors, and Island Creek Coal Company, lessee; (iii) Agreement dated September 4, 1969, among Robert L. Ettenger, III, Helen M. Ettenger, Mary Ann Thompson and Edward E. Thompson, lessors, and Island Creek Coal Company, lessee; (iv) agreement dated December 23, 1969, from Elmer E. Blizzard and Roy Nester to Island Creek Coal Company; (v) Lease Agreement dated March 31, 1982, between Island Creek Coal Company, assignor, and Coal Mountain Coal Company, assignee; (vi) Lease Agreement dated May 31, 1985, between Coal Mountain Coal Company, Inc., assignor, and Island Creek Coal Company, assignee; (vii) Supplemental Lease Agreement dated December 1, 1990, among First Citizens Bank and Helen M. Ettenger Soutter, as Co-Trustees under the Will of Robert L. Ettenger, III, Helen Ettenger Soutter, Mary Anne Thompson and Edward E. Thompson, lessors, and Island Creek Coal Company, Lessee; (viii) Assignment dated January 21, 1991, between Island Creek Coal Company, assignor, and Laurel Run Mining Company, assignee; (ix) Assignment dated August 30, 2004, between Laurel Run Mining Company, assignor, and Bluestone Coal Corporation, assignee; (x) Supplemental Lease Agreement made as of the 14th day of November 2005 by and between First Citizens Bank and Helen M. Ettenger Soutter, as Co-Trustees under the Will of Robert L. Ettenger, III, Helen Ettenger Soutter, individually and in her own right, and Mary Anne Thompson and Edward Thompson, Jr., her husband and Dynamic, and (x) Assignment of Leases dated as of the Effective Date, between Dynamic as assignor and CM Energy Properties, LP as assignee (the "**Lease**" and, the lessors thereunder, the "**Lessors**"), Sublessor is the lessee of certain coal reserves located in Wyoming County, West Virginia, as more particularly described in the Lease and within the area generally depicted on the map attached hereto as **<u>Exhibit A</u>** (the "**Leased Coal Property**").

Sublessee desires to sublease from Sublessor all of Sublessor's interests, rights and privileges to coal and coal minerals (including coalbed methane) in the Gilbert Seam of coal and all splits thereof (the "**Subleased Coal**") leased to Sellers under the Lease and within the area generally depicted on the map attached hereto as **<u>Exhibit B</u>**, including but not limited to the areas covered by Gilbert Haul Road Permit # O301313, Gilbert Deep Mine Permit # U302212, and Coal Mtn No. 1 Permit # S402096. (the "**Subleased Coal Property**"), subject to the terms and conditions of this Agreement. The Leased Coal Property other than the Subleased Coal Property is herein referred to as the "**Retained Coal Property**".

KE 45403252

EXHIBIT
B

**NOW, THEREFORE**, in consideration of the above recitals, and for other valuable consideration, the receipt, sufficiency and mutuality of which are hereby acknowledged, the parties herby agree as follows:

1.      <u>Definitions</u>.

(a)      "**Gross sales price**" means the total gross amount received for coal upon sale thereof to the first arms length purchaser f.o.b. railroad cars, barges, trucks or other means of transportation after all crushing, sizing, washing, preparation, tippling and any other processing has been completed, regardless of who owns or operates any such processing facilities.

(b)      "**Foreign coal**" means any coal other than the leased coal and any other substances mined, made, manufactured, acquired or taken from any lands other than Subleased Coal Property.

(c)      Capitalized terms not otherwise defined herein shall have the meaning ascribed them in the Amended and Restated Purchase Agreement among CM Energy Holdings, LP, Sublessee and Bluestone Resources, Inc., and dated as of January 27, 2017, but effective as of December 22, 2016 (the "**Purchase Agreement**").

2.      <u>Sublease; Compliance with Laws</u>.  On and pursuant to the terms of this Agreement, from and after the date hereof Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor all of Sublessor's interests, rights and privileges in and to the Subleased Coal Property.  Sublessee hereby assumes and agrees to perform and observe each and every provision, obligation, covenant, condition, and limitation contained of Sublessor set forth in the Lease that relate to the Subleased Coal Property, as if such provisions, obligations, covenants conditions and limitations were set forth at length herein.  Sublessor subleases unto Sublessee only such rights and privileges in the Subleased Coal Property as Sublessor holds.  Sublessee acknowledges receipt of a copy of the Lease, has read and examined same, and hereby agrees that all operations in the exercise of Sublessee's mining rights under this Agreement shall be in compliance with all the terms, conditions and obligations of the Lease in all material respects.

Sublessee shall conduct its operations in a skillful, efficient and workmanlike manner, in accordance with approved methods and practices of modern mining, and in strict compliance in all material respects with the Lease and this Agreement and all applicable laws and regulations. Sublessee shall expeditiously secure all necessary permits and licenses and provide the necessary bond(s) for the production of the Subleased Coal Property hereunder, and shall be fully responsible therefor and shall fulfill all obligations in relation thereto as required by the State of West Virginia and the United State of American and any local governmental body. If at any time Sublessee shall not conduct operations as provided herein and loss of coal which Sublessee is obligated to mine or loss of coal of Sublessor is likely to result or be threatened, Sublessor shall have authority to determine where and in what particular those provisions herein are being violated, and, in the event of a failure by Sublessee to begin to take reasonable steps to cure such violation within ten (10) days of receipt of written notice from Sublessor specifying such violation, to enter the Subleased Coal Property and force stoppage of the work at such place until Sublessee shall comply with the said provisions herein; and Sublessee shall pay to Sublessor the

full amount of tonnage royalties, at the rate provided in Section 5 herein, on the estimated tonnage of coal lost which Sublessee is obligated to mine or that may remain unmined by reason of failure of Sublessee to conduct operations as required herein, in the same manner as if said coal had been mined and removed; and Sublessee shall compensate Sublessor for any and all other coal of Sublessor that is lost by reason of the failure of Sublessee to conduct operations as required herein.

Should Sublessee do or omit to do any act on the Subleased Coal Property which (a) creates or could reasonably contribute to the creation of any condition constituting a common law nuisance or an environmental hazard in violation of Applicable Environmental Laws, (b) causes the pollution of land, air or water in contravention of any Applicable Environmental Laws or (c) requires continuing expenditures in order to comply with Applicable Environmental Laws (each, an "**Environmental Condition**," and more than one, collectively, "**Environmental Conditions**"), Sublessee agrees to remove from the Subleased Coal Property or otherwise abate the Environmental Conditions. As used in this Agreement, the term "**Applicable Environmental Laws**" shall include without limitation the following:   the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act of 1976, as amended by the Used Oil Recycling Act of 1980, the Solid Waste Disposal Act Amendments of 1980, and the Hazardous and Solid Waste Amendments of 1984, the Federal Water Pollution Control Act, the Federal Clean Air Act, the Federal Toxic Substances Control Act, the Federal Hazardous Materials Transportation Act, the West Virginia Water Pollution Control, Hazardous Waste and Solid Waste Disposal Acts, the West Virginia Underground Storage Tank Act, the West Virginia Air Pollution Control Act, the West Virginia Surface Coal Mining and Reclamation Act and any other applicable federal, state or local environmental laws or regulations, whether currently in effect or enacted after the date hereof, as amended.

3. **Sublessor's Representations and Warranties; Disclaimer**. Sublessor represents and warrants that (i) it has full right and authority to enter into this Agreement; and (ii) the execution of this Agreement by Sublessor will not cause a breach or cause an event of default of any other agreement to which it is a party.  Sublessor covenants that Sublessee shall have quiet enjoyment of the Subleased Coal Property during the term of this Agreement against all persons claiming an interest in the Subleased Coal Property by, through or under Sublessor. Should Sublessor receive a notice of default under the Lease, Sublessor shall, as promptly as reasonably practicable forward a copy of such notice to Sublessee. Pertaining to Sublessee's compliance with the Lease, Sublessor shall have all rights and remedies of the Lessors, as Sublessor, under the Lease. SUBLESSEE HEREBY ACKNOWLEDGES THAT THE SUBLEASED COAL PROPERTY IS SUBLEASED "AS IS," "WHERE IS" AND "WITH ALL FAULTS AND THAT SUBLESSOR EXPRESSLY DISCLAIMS ALL WARRANTIES OF CONDITION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE FOREGOING, SUBLESSEE ACKNOWLEDGES THAT EXCEPT AS PROVIDED HEREIN, SUBLESSOR AND ITS RESPECTIVE RELATED PARTIES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE SUBLEASED COAL PROPERTY MAY BE PUT, (B) ANY PAST OR FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT HAVE RESULTED OR MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE SUBLEASED OF THE

3

SUBLEASED COAL PROPERTY, (C) THE SUBLEASED COAL PROPERTY PRIOR TO THE DATE SUBLESSOR ACQUIRED THE SUBLEASED COAL PROPERTY, (D) THE MINEABILITY OR MERCHANTABILITY OF THE SUBLEASED COAL, OR (E) THE CONDITION, QUALITY AND QUANTITY OF THE SUBLEASED COAL.

      4.    **Term**. This Agreement commences of the date hereof, subject to earlier termination as provided herein, and shall be extended, upon the same terms and provisions, but subject to the full payment of all royalties, rentals, and other payments due under this Agreement, for successive one (1) year periods until the earlier of (i) whenever during said original term or any extension thereof Sublessee shall have mined and removed all of said coal and shall have paid all royalties, rentals and other payments due then Sublessee's obligation to mine coal and make payment of minimum annual rental hereunder and (ii) one day prior to the expiration or termination of the Lease; *provided*, however, that when Sublessee completes mining operations on the Subleased Coal Property, and has mined all mineable and merchantable coal, Sublessee shall have the right to renew this Agreement for such additional one (1) year terms as it may deem reasonable and necessary, not to exceed nine (9) additional one (1) year terms, for an annual payment of Three Thousand Dollars ($3,000.00) which shall be in lieu of and not in addition to the rentals provided herein,

      5.    **Royalties**.

      (a)    <u>Tonnage Royalties.</u> Sublessee shall pay Sublessor tonnage royalties for all coal produced from the Subleased Coal Property at the following rates:

      (i)    For each ton of coal produced from the Subleased Coal Property by any method of mining the minimum per ton royalty shall be Zero Dollars and Eighty Seven Cents ($0.87)

      (ii)    For each ton of coal produced from the Subleased Coal Property by any method of mining other than the auger or highwall mining methods, the per ton royalty rate shall be Three and One Half Percent ($3^{1}/_{2}\%$) of gross sales price when gross sales price is greater than Twenty Five Dollars ($25.00) per ton and less than or equal to Forty Dollars ($40.00) per ton,

      (iii)    For each ton of coal produced from the Subleased Coal Property by any method of mining other than the auger or highwall mining methods, the per ton royalty rate shall be Four Percent (4%) of gross sales price when gross sales price is greater than Forty Dollars ($40.00) per ton and less than or equal to Fifty Dollars ($50.00) per ton,

      (iv)    For each ton of coal produced from the Subleased Coal Property by any method of mining other than the auger or highwall mining methods, the per ton royalty rate shall be Five Percent (5%) of gross sales price when gross sales price is greater than Fifty Dollars ($50.00) per ton.

4

> (v)    For each ton of coal produced from the Subleased Coal Property by the auger or highwall mining methods the royalty rate shall be the, greater of Zero Dollars and Eighty Seven Cents ($0.87) or Six Percent (6%) of gross sales price.

Tonnage royalties shall be payable, without demand or setoff, five (5) days in advance of the date tonnage royalties are due under the Lease.

(b)    <u>Minimum Royalties.</u> Sublessee shall annually pay to Sublessor an annual minimum royalty of Ten Thousand Dollars and No Cents ($10,000.00) for the remainder of this Agreement, unless Sublessor and Sublessee thereafter mutually agree that the reserves of Subleased Coal have been reduced to a level that will not reasonably allow Sublessee, through diligent mining efforts, to mine sufficient coal to produce annual tonnage royalties of at least $10,000.00 in which event the annual minimum royalty shall be further reduced by reasonable mutual agreement. All such annual minimum royalties shall be payable each year in 12 equal monthly installments five (5) days in advance of  the first day of each calendar month of the applicable sublease year unless the annual minimum royalty for the applicable sublease year shall already be satisfied by production royalties. Sublessee shall have the right during the sublease year for which the minimum royalty is paid as aforesaid to recoup any portion of said minimum royalty not previously recouped against tonnage royalties which would otherwise be due and payable to Sublessor for and during that sublease year. If any minimum royalty payment is not fully recouped during the sublease year for which such payment is made then Sublessee shall have the right to recoup the unrecouped portion ("**excess minimum**") thereof as follows: If, in any sublease year following the lease year for which the excess minimum royalty is paid, Sublessee shall have first paid in advance the full minimum royalty for that sublease year and shall also have mined sufficient coal to fully recoup such minimum royalty for that sublease year, then during the remainder of such sublease year (i.e. after recouping the full minimum royalty for that lease year) Sublessee shall have the right to recoup such excess minimum royalty against tonnage royalties thereafter otherwise payable to Sublessor during such sublease year to the extent such excess minimum royalty has not been previously recouped. No payment of tonnage royalties for any lease year in excess of the minimum royalty for that sublease year shall be credited against any minimum royalty for any other lease year in the future. Said excess minimum can only be recouped within three (3) years from the date in which it is originally paid (i.e. the three years following the year in which the excess minimum was paid).

(c)    So long as this Agreement is in effect, Sublessee shall be responsible for paying all reasonable costs and expenses associated with maintaining any road located on the Subleased Coal Property as a coal haul road based upon and to the extent of Sublessee's proportionate use of any road.

(d)    Any late payment for any royalty or wheelage payment due hereunder shall be subject to a late charge of one and one-half percent (1.5%) per month of the amount of such overdue royalties, installment or other monies due from the date that the same were due and payable, until such overdue amount has been paid. Acceptance of such late charge by Sublessor shall, in no event, constitute a waiver of Sublessee's default(s), if any, with respect to such overdue amount(s), nor prevent Sublessor from exercising any of its other rights and/or remedies granted hereunder or available to Sublessor at law or at equity.

6.     **Wheelage**.   Sublessee shall have the right (to the extent of Sublessor's ownership rights) to transport foreign coal into, over, through or under the Subleased Coal Property, in consideration of which Sublessee agrees to pay to Sublessor on each payment date wheelage royalties of Zero Dollars and Five Cents ($0.05) per ton for each and every ton of foreign coal which is so transported by Sublessee or others acting by authority of Sublessee during the calendar month immediately preceding the payment date.

7.     **Lien for Rent**. The rents and royalties herein mentioned and provided to be paid shall be deemed, treated and considered as rent reserved upon contract for the Subleased Coal Property, and Sublessors shall have for the collection thereof all of the rights and remedies of a landlord for the collection of rent reserved upon contract under the present or future laws of the State of West Virginia.

It is agreed that Sublessors shall have a lien for said rent or royalty, not only upon all of the improvements and property of Sublessees upon the Subleased Coal Property, but also upon this Agreement and the subleasehold estate hereby created, and if any installment of said rentals or royalties shall remain unpaid for 60 days after the same becomes due and payable, all of the property of Sublessees upon the Subleased Coal Property and this Agreement and the subleasehold estate hereby created, or so much thereof as may be necessary, may be distrained and sold to pay such rentals or royalties, and in addition thereto Sublessors shall have the right if they do so desire to enforce by suit or action in any court of competent jurisdiction the lien hereby given them.  Sublessors shall also have the right of re-entry by reason of any rental, royalty or other payment being in arrears or by reason of any breach of any condition, covenant or agreement herein contained to be kept or performed by Sublessees, in the same manner and with the same effect as is now or may hereafter be provided under the laws of the State of West Virginia.  All of the provisions herein contained for the collection of rentals and royalties or concerning the remedy of Sublessors in the event of breach by Sublessees of any condition, covenant or agreement herein contained, shall be deemed cumulative and not exclusive and shall not deprive Sublessors of any of their other legal or equitable remedies.

8.     **Force Majeure**.   It is further agreed that in the event of unavoidable delay by reason of failure on the part of Norfolk Southern, or other carrier, to furnish the necessary transportation, or by reason of a general strike among the employees of Sublessees, their contractors or subcontractors, or by reason of fire, flood or other disaster or any Act of God, or by reason of the market condition of coal becoming such that Sublessees are unable to mine said coal at a profit, or any other unavoidable cause whereby Sublessees shall be prevented from operating their said mines, the Sublessees shall give notice to Sublessors of the existence of any such condition.  If the existence of such condition is substantiated, Sublessees shall be released from payment of minimum royalty during the bona fide continuance of such condition.

9.     **Books and Records**. Sublessee shall keep and cause to be kept for a period of ten (10) years accurate records showing the amount of Subleased Coal mined by Sublessee from the Subleased Coal Property and such other information as may be reasonably requested by Sublessor from time to time to insure compliance with the terms of the Lease and this Agreement.  Sublessors shall have the right at all reasonable times to inspect the books and accounts of Sublessees containing their statements, accounts or memoranda of the coal mined from the Subleased Coal Property, and insofar as Sublessees can give such authority Sublessors

6

shall have the right to inspect the books, papers and accounts of any railroad or transportation company or companies relative to or showing the amount of coal shopped by Sublessees from the Subleased Coal Property. Sublessors shall have the further right to inspect Sublessee's mines and mine maps, and to take measurements of the coal mined upon said premises, and of the entries, rooms and other operations of Sublessee upon said premises, provided, however, that Sublessee's operations shall not be unreasonably interfered with thereby.

10.    **Maps; Mine Plans**. Sublessee shall employ at all times an experienced and competent mining engineer whose duty it shall be to make and keep accurate and complete maps of the Subleased Coal Property and mine workings on the Subleased Coal Property on an appropriate scale, which shall show projections and mine development, and which shall be in conformity in all respects with the Lease and this Agreement and with the applicable requirements of the mining laws of the State of West Virginia and of the United States of America. Such maps shall at all times be accessible to Sublessor, its agents or representatives, at their sole risk and expense, for inspection; and correct copies of the same shall be furnished to Sublessor upon request.

Sublessee shall furnish to Sublessor (and, if required under the Lease, the Lessors) on January 15, April 15, July 15 and October 15 of each calendar year mine progress maps of seams or splits of seams, on a scale of not more than four hundred feet (400') to the inch showing for each month (utilizing differing colors for each month's production) in the preceding calendar quarter the progress of Sublessee's operation on the Subleased Coal Property sufficient to compute volumes of coal removed in the preceding quarter. Such map shall be made by a competent registered professional mining engineer as the work progresses and shall conform in all respects with the requirements of applicable mining law. Such progress maps shall clearly show all property lines, lease lines, surface improvements and such natural topography as may require protection. Coal measurements shall be taken and shown on such progress maps at intervals not exceeding 300 feet. Sublessee shall also provide to Sublessor (and, if required under the Lease, the Lessors) electronic copies of any such maps, plans or drawings.

On an annual basis prior to January 20 of each calendar year or at such time as Sublessee shall make substantial changes in the operations being conducted on the Subleased Coal Property, Sublessee shall develop and submit to Sublessor (and, if required under the Lease, the Lessors) a projected mine plan ("**Mine Plan**") for Sublessee's operation on the Subleased Coal Property for the then calendar year. Each Mine Plan shall include the recovery of all of the mineable and merchantable coal in the area of the Subleased Coal Property to which the Mine Plan is applicable, which is recoverable with good mining practices and techniques in use on the date mining operations are conducted pursuant to this Agreement and the Lease and shall comply with all of the provisions of this Agreement and the Lease.

In addition to the above, with regard to Sublessee's Mine Plans, Sublessee shall comply with all other requirements of the Lease.

11.    **Default and Remedies**. In the event Sublessee shall fail to perform or observe any of the terms, obligations, covenants and agreements herein contained to be performed or observed by Sublessee, and such failure shall continue, or Sublessee shall fail to remedy the condition produced by such failure, for a period of thirty (30) days after Sublessors shall have

given written notice of such default to Sublessees, then in either such event, at the election of Sublessors, this Agreement and the leasehold estate hereby created and all right of Sublessees hereunder shall become forfeited and cease and determine, and Sublessors shall have the right to re-enter the Subleased Coal Property, to exclude Sublessees therefrom, and to hold said premises as of Sublessors' former estate   therein, anything herein contained to the contrary notwithstanding; and a waiver of any particular cause or forfeiture shall not prevent the forfeiture and cancellation of this Agreement for any other cause of forfeiture or for the same cause occurring at any subsequent time.

12.    **Removal of Equipment**.   At any termination of this Agreement, except by forfeiture, Sublessees shall have the right within 90 days after such termination to remove from the Subleased Coal Property any houses, buildings, tipples, structures, fixtures, improvements, machinery, rails and other equipment, appliances or property which shall have been erected or placed thereon by Sublessees; but if within such 90 day period Sublessees shall not have removed same, then upon the expiration of such 90 days the same shall become and be the property of Sublessors.

13.    **Intentionally omitted**.

14.    **Taxes**.  Sublessee shall pay promptly when due all taxes assessments including, but not limited to, excise, license, sales, gross sales, privilege or severance taxes that may be legally imposed by any governmental authority upon or with respect to (a) Sublessee's interest in this Agreement or the subleasehold estate hereby created; (b) all personal property placed upon the Subleased Coal Property by Lessee; (c) all coal produced hereunder and all products produced therefrom; (d) the production, severance, processing, cleaning, loading, storing, preparation, transportation or use of coal from or on the Subleased Leased Coal Property; or (e) the exercise of any right or privilege in connection with Sublessee's operations hereunder, and if any such taxes be paid by Sublessor, in its discretion, then Sublessee shall promptly repay to Sublessor, with interest, the amount thereof promptly upon demand._Notwithstanding the foregoing, Sublessee shall have the right, at its expense, to challenge in good faith, by legal and proper means, in the name, place and stead of Sublessor (if necessary), the amount, validity, and equality of any such taxes; provided, however, that Sublessee shall at all times protect Sublessor's title to the Subleased Coal Property from tax liens, tax sales or any other encumbrances or impairments resulting directly or indirectly from any such challenge, and Sublessee shall be responsible for any interest, penalty or similar charges incurred as a result of any such challenge.

Sublessee shall remain current on all obligations to appropriate governmental authorities, including timely payment of federal black lung taxes, federal reclamation taxes, federal unemployment compensation taxes, federal withholding and social security taxes, state severance or business and occupation taxes, state black lung compensation taxes, state unemployment compensation taxes, state workers' compensation taxes, state withholding taxes, personal property taxes and all obligations similar to any of the above and also including ongoing compliance with the conditions of any and all applicable bonds, including bonds required by mining authorities and any state wage or employment bonds and of any state license to operate.

15.   **Insurance**. Sublessee agrees to maintain such insurance with an insurance company authorized to do business in West Virginia and acceptable to Sublessor as will fully protect both Sublessee and Sublessor from any and all claims under applicable workers compensation acts or employer's liability laws, and from any and all other claims of whatever kind or nature or the damage to property or for personal injury, including death, made by anyone whomsoever that may arise from operations, or any aspect related thereto, carried on either by Sublessee, Sublessor, or by anyone directly or indirectly engaged or employed by either of them. Such policies shall include, but not be limited to the following: general liability (third party bodily injury and property damage coverage) (at least $2,000,000 limit of liability, per occurrence), and commercial automobile liability coverage (at least $2,000,000 limit of liability, per occurrence), including hired/non-owned automobile liability coverage (at least $2,000,000 limit of liability, per occurrence). All insurance required in this Agreement shall name Sublessor and Sublessee as co-insureds, with loss payable as their respective interests may appear, and all such insurance shall contain a provision for notice from the insurance company to Sublessor of any overdue or unpaid premiums and 15 days advanced notice from the insurance company to Sublessor of any proposed cancellation. Sublessee agrees to provide Sublessor with a true and accurate copy of aforementioned insurance policies upon procurement, and/or true and accurate certificates of insurance, and further agrees to provide renewal policies and/or renewal certificates, declaration sheets, riders or other documents that verify continued coverage or changes in coverage upon a quarterly basis or upon request of Sublessor. The indemnification provisions of this paragraph shall survive termination of this Agreement.

16.   **Indemnity**. Sublessee covenants and agrees to indemnify, defend and save harmless Sublessor from and against any and all claims, demands, actions, causes of action, by or on behalf of any person, firm, corporation, or governmental body for damages, injuries, death, penalties, fines, assessments, or otherwise, caused by, arising out of, resulting from, or as a consequence of the acts or omissions of Sublessee in the course of its operations on the Subleased Coal Property or in any manner pertaining to the use and enjoyment of the Subleased Coal Property pursuant to this Agreement and from and against any arid all costs, counsel fees, expenses, and liabilities incurred in or about any such claim or action brought thereon, all of which costs, counsel fees, expenses and liabilities shall be reimbursed to Sublessor by Sublessee immediately upon notification from Sublessor to Sublessee that the same have been incurred. Sublessee hereby guarantees and agrees to indemnify, defend and save harmless Sublessor and, as required under the Lease, Lessors, and their respective officers, agents and employees, from the payment of or any liability for benefits which may be required under the Black Lung Benefits Act (30 U.S.C. 901, et seq.) and under any laws or regulations of the State of West Virginia, arising from any mining operations hereunder, and Sublessee agrees that during the primary period and renewals, if any, of this Agreement, it will furnish annually to the Lessors and Sublessor evidence of financial responsibility for such black lung benefits under applicable federal and state laws, as well as regulations issued thereunder.

17.   **Workers' Compensation**. Sublessee further covenants and agrees that all employees of Sublessee performing work on the Subleased Coal Property pursuant to the rights granted in this Agreement will be fully covered by or insured at all times by Worker's Compensation, and to that end Sublessee shall comply with all applicable Worker's Compensation laws, rules and regulations and shall make all necessary contributions and/or premium or other payments.

18.     **Notices**.

Any notice required or permitted to be given hereunder shall be sufficient if in writing and sent by personal delivery, facsimile transmission, overnight courier service (with proof of service), electronic mail, or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

if to the Sublessor:

CM Energy Properties, LP
P.O. Box 67
Abingdon, VA 24212
Facsimile: 276.623.7482
Attention: Scott Kiscaden
e-mail address: scottkiscaden@gmail.com

with a copy which shall not constitute notice to:

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, TX 77002
Facsimile: 713-835-3601
Attention:  Andrew Calder, P.C.
            William J. Benitez
e-mail address: andrew.calder@kirkland.com
                william.benitez@kirkland.com

if to the Sublessee:

Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke VA, 24011
Facsimile: (540) 301-5919
Attention: James C. Justice III, Executive Vice President
e-mail address: jcj3@bluestoneindustries.com
with a copy which shall not constitute notice to:

Frost Brown Todd LLC
250 West Main Street
Suite 2800
Lexington, KY 40507
Facsimile: (859) 231-0011
Attention: Paul Sullivan
e-mail address: psullivan@fbtlaw.com

or to such other address as any Party shall specify by written notice. Any such notice shall be deemed to have been delivered and received (a) in the case of personal delivery, on the date of

10

such delivery, (b) in the case of facsimile or electronic mail, on the date sent if confirmation of receipt is received and such notice is also promptly mailed by registered or certified mail (return receipt requested and first-class postage prepaid) or by nationally-recognized overnight courier who guarantees next business day delivery, (c) in the case of a nationally-recognized overnight courier who guarantees next Business Day delivery, on the next Business Day after the date when sent and (d) in the case of registered or certified mail, on the third Business Day following that on which the mail containing such communication is posted.

19.   **Miscellaneous**.

(a)   Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be further subleased, transferred, encumbered or otherwise assigned by the Sublessee (whether by operation of law or otherwise) without the prior written consent of the Sublessor (which shall not be unreasonably withheld), and any attempted assignment in violation of the foregoing shall be null and void ab initio; provided, however, that Sublessee may assign all or any portion of this Agreement to (i) any Affiliate of Sublessee without the consent of Sublessor. Subject to the foregoing, no assignment shall relieve Sublessee from any obligations hereunder. Upon any such permitted assignment, the references in this Agreement to Sublessee shall also apply to such assignee, unless the context otherwise requires. Subject to the preceding provisions of this Section 19, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective permitted successors and assigns.

(b)   Relationship of the Parties.  The Parties agree not to hold themselves out as partners, joint venturers, employees, agents, representatives or of one another, and that the relationship between them is that of sublessor and sublessee.

(c)   No Third Party Beneficiaries.  Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties hereto any claims, rights, remedies, obligations or liabilities under or by reason of this Agreement. It is expressly agreed that no employee of any of the Parties to this Agreement or other Person shall have any rights or remedies pursuant to this Agreement, and no Person is intended to be a third party beneficiary hereunder.

(d)   Entire Agreement.  This Agreement, the Purchase Agreement, the other Transaction Documents (as defined in the Purchase Agreement) and any other agreements contemplated hereby or thereby constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior written or oral agreements and understandings among the Parties with respect thereto. No addition to or modification of any provision of this Agreement shall be binding upon any Party hereto unless made in writing and signed by all Parties.

(e)   Amendments.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

(f)   Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES SHALL BE GOVERNED BY, AND CONSTRUED IN

11

ACCORDANCE WITH, THE LAW OF THE STATE OF WEST VIRGINIA WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAW.

      (g)   Headings. Headings of the Articles and Sections of this Agreement are for the convenience of the Parties only, and shall be given no substantive or interpretative effect whatsoever.

      (h)   Waiver. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

      (i)   Severability. Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable, and the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the fullest extent possible.

      (j)   Jurisdiction. Jurisdiction for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby shall be as provided in Section 9.10 of the Purchase Agreement.

      (k)   No Presumption. Each Party has agreed to the use of the particular language in the provisions of this Agreement, and any questions of doubtful interpretation shall not be resolved by any rule or interpretation against the draftsman, but rather in accordance with the intention of the Parties with respect thereto, having due regard to the benefits and rights intended to be conferred upon the Parties and the limitations and restrictions upon such rights and benefits intended to be provided.

      (l)   Further Assurances. Each Party shall, at any time and from time to time on and upon reasonable request by any other Party, take or cause to be taken such actions and execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and documents, as may be reasonably required to carry out the provisions hereof and give effect to this Agreement.

      (m)   No Recourse. This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement may only be brought against an entity that is expressly named herein as a Party and then only with respect to the specific obligations set forth herein with respect to such Party. Except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement and not otherwise), no past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent,

12

attorney or the respective Affiliates of the Sellers or the Purchaser (such Persons, the "**Non-Recourse Persons**") shall have any liability (whether in contract or tort) for any one or more of the covenants, agreements or other obligations or liabilities of any one or more of the Sellers or the Purchaser under this Agreement (whether for indemnification or otherwise) or for any claim based on, in respect of, or by reason of, the transactions contemplated in this Agreement other than claims for fraud or intentional misrepresentation. The Non-Recourse Persons are express third-party beneficiaries of this Section 19(m) and shall be entitled to enforce the provisions hereof.

(n)     Counterparts. This Agreement may be executed in two or more counterparts (including by electronic means), each of which shall be deemed to be an original, but all of which together shall be deemed to be one and the same instrument.

(o)     No Consequential or Punitive Damages. No Party shall be liable to any other Party for any special, indirect, consequential or punitive damages arising out of a breach by such Party of this Agreement, in each case, that are not the natural, probable or reasonably foreseeable result of such breach.

(p)     Waiver of Trial by Jury. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(q)     Remedies. In the event any Party fails to comply with any of the terms, covenants or conditions of this Agreement, the other Parties suffering such default shall be entitled to seek damages, injunctive relief and, subject to the limitations in Section 19 (o), any other remedies available at law or in equity. If it becomes necessary for any Party to file a suit to enforce this Agreement or any provisions contained herein, the Party prevailing in such action shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees and court costs incurred by such prevailing Party in such suit.

(r)     Specific Performance. The Parties hereto hereby agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages. Accordingly, the Parties hereto acknowledge and hereby (a) agree that, in the event of any breach or threatened breach by

13

the Sellers or the Purchaser of any of their respective covenants or obligations set forth in this Agreement, the Sellers and the Purchaser shall be entitled to an injunction or injunctions to prevent or restrain breaches or threatened breaches of this Agreement by the other party (as applicable), and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other party under this Agreement and (b) waive any requirement for security or the posting of any bond in connection with any such remedy. The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by any Party, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any Party, under this Agreement. The Parties hereto further agree that (x) by seeking the remedies provided for in this Section 19 (r) a party shall not in any respect waive its right to any other form of relief that may be available to a party under this Agreement (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this 19 (r) are not available or otherwise are not granted and (y) nothing set forth in this Section shall limit any party's right to pursue any other remedies under this Agreement that may be available then or thereafter.

(s)    Notwithstanding anything to the contrary set forth herein, this Agreement shall be subject to the terms, conditions and restrictions set forth in that certain Joint Use and Cooperation Agreement between the parties dated as of the Effective Date.

20.    **Memorandum of Agreement**.

For purposes of putting third parties on notice of this Agreement, the Parties shall be entitled to file of record in the Clerk's Office of Wyoming County, West Virginia, a memorandum of agreement substantially in the form of that Memorandum of Agreement attached hereto as **Exhibit C** and incorporated herein for all purposes.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement with all necessary right and authority to bind them, effective as of the Effective Date.

SUBLESSEE:

DYNAMIC ENERGY, INC.

By: _____

Name: James C. Busbee III

Title: Exec. VP

*Signature Page to Sublease Agreement*

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement with all necessary right and authority to bind them, effective as of the Effective Date.

**SUBLESSOR**:

**CM ENERGY PROPERTIES, LP**

By: CM Energy GP, LLC, its general partner

By: _____

Name:  Rahman D'Argenio

Title:   Chairman

Exhibit A



**Exhibit B**



**Exhibit C**

<u>MEMORANDUM OF AGREEMENT</u>

**THIS MEMORANDUM OF AGREEMENT** (this "**Memorandum**"), dated effective as of the [●] day of January 2017 (the "**Effective Date**"), is by and among **DYNAMIC ENERGY, INC.**, a West Virginia corporation with an address of 302 S. Jefferson Street, Roanoke VA, 24011 ("**Sublessee**"), and **CM ENERGY PROPERTIES, LP**, a Delaware limited partnership, with an address of P.O. Box 67, Abingdon, VA 24212 (the "**Sublessor**"). Sublessor and Sublessee may also be referred herein as the "**Parties**" and each as a "**Party**".

WHEREAS, the Parties entered into that certain Sublease Agreement dated as of the Effective Date (the "**Agreement**"); and

WHEREAS, the Parties have agreed to record this Memorandum to give notice of the Agreement.

Now therefore, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    <u>Base Lease</u>.  Pursuant to that certain Lease dated March 20, 1957, among E. Lloyd Ettenger, Jean S. Ettenger, Robert L. Ettenger, III, Helen M. Ettenger, Mary Ann Thompson and Edward E. Thompson, lessors, and Elmer E. Blizzard and Roy Nestor, lessees, and recorded in **Deed Book 177, Page 375** in the Office of the Clerk of Wyoming County, West Virginia, as assigned, amended, supplemented, or otherwise modified from time to time, including by (i) Supplemental Lease Agreement dated April 12, 1965, among the same parties; (ii) Contract dated August 15, 1969, among  Robert L. Ettenger, III, Helen M. Ettenger, Mary Ann Thompson and Edward E. Thompson, lessors, and Elmer E. Blizzard, Roy B. Nestor and Eloise Worrell, assignors, and Island Creek Coal Company, lessee; (iii) Agreement dated September 4, 1969, among Robert L. Ettenger, III, Helen M. Ettenger, Mary Ann Thompson and Edward E. Thompson, lessors, and Island Creek Coal Company, lessee; (iv) agreement dated December 23, 1969, from Elmer E. Blizzard and Roy Nester to Island Creek Coal Company, and recorded in **Assignment Book 6, Page 13** in the Office of the Clerk of Wyoming County, West Virginia; (v) Lease Agreement dated March 31, 1982, between Island Creek Coal Company, assignor, and Coal Mountain Coal Company, assignee; (vi) Lease Agreement dated May 31, 1985, between Coal Mountain Coal Company, Inc., assignor, and Island Creek Coal Company, assignee; (vii) Supplemental Lease Agreement dated December 1, 1990, among First Citizens Bank and Helen M. Ettenger Soutter, as Co-Trustees under the Will of Robert L. Ettenger, III, Helen Ettenger Soutter, Mary Anne Thompson and Edward E. Thompson, lessors, and Island Creek Coal Company, Lessee; (viii) Assignment dated January 21, 1991, between Island Creek Coal Company, assignor, and Laurel Run Mining Company, assignee; (ix) Assignment dated August 30, 2004, between Laurel Run Mining Company, assignor, and Bluestone Coal Corporation, assignee, and recorded in **Assignment Book 13, Page 327** in the Office of the Clerk of Wyoming County, West Virginia;  (x) Supplemental Lease Agreement made as of the 14th day of November 2005 by and between First Citizens Bank and Helen M. Ettenger Soutter, as Co-Trustees under the Will of Robert L. Ettenger, III, Helen Ettenger Soutter, individually and in her own right, and Mary Anne Thompson and Edward Thompson, Jr., her husband and Dynamic, and (x) Assignment of Leases dated as of the Effective Date, between Sublessor as

assignor and Sublessee as assignee (the "**Lease**"), Sublessor is the lessee of certain coal reserves located in Wyoming County, West Virginia, as more particularly described in the Lease and within the area generally depicted on the map attached hereto as **Exhibit A** (the "**Leased Coal Property**").

2.     Sublease.  On and pursuant to the terms of the Agreement, Sublessor subleased to Sublessee, and Sublessee subleased from Sublessor all of Sublessor's interests, rights and privileges in and to coal and coal minerals (including coalbed methane) in the Gilbert Seam of coal and all splits thereof leased to Sublessor under the Lease and within the area generally depicted on the map attached hereto as **Exhibit B**, including but not limited to the areas covered by Gilbert Haul Road Permit # O301313, Gilbert Deep Mine Permit # U302212, and Coal Mtn No. 1  Permit #S402096 (the "**Subleased Coal Property**").

3.     Term.  The term of the Agreement (the "**Term**") commenced on the Effective Date and shall continue for such one (1) year periods as may be necessary for Sublessee to mine and remove all of the mineable and merchantable coal from the Subleased Coal Property.  When Sublessee completes mining operations on the Subleased Coal Property, and has mined all mineable and merchantable coal, Sublessee has the right to renew the Agreement for such additional one (1) year terms as it may deem reasonable and necessary, not to exceed nine (9) additional one (1) year terms.

4.     No Conveyance.  It is understood and agreed that the rights created or granted pursuant to the Agreement are not intended to be, and do not constitute, a conveyance of any real or personal property of any Party hereto.

5.     Notice.  Any notice should be sent to the Parties at the following addresses:

if to Sublessee:

Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke VA, 24011
Facsimile: (540) 301-5919
Attention: James C. Justice III, Executive Vice President
e-mail address: jcj3@bluestoneindustries.com

with a copy which shall not constitute notice to:

Frost Brown Todd LLC
250 West Main Street
Suite 2800
Lexington, KY 40507
Facsimile: (859) 231-0011
Attention:  Paul Sullivan
e-mail address: psullivan@fbtlaw.com

if to Sublessor:

2

CM Energy Properties, LP
P.O. Box 67
Abingdon, VA 24212
Facsimile: 276.623.7482
Attention: Scott Kiscaden
e-mail address: scottkiscaden@gmail.com

with a copy which shall not constitute notice to:

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, TX 77002
Facsimile:  713-835-3601
Attention:  Andrew Calder, P.C.
            William J. Benitez
e-mail address: andrew.calder@kirkland.com
                william.benitez@kirkland.com

6.     <u>Agreement Terms Incorporated</u>.  The Parties hereby incorporate by reference all of the terms, conditions and covenants contained in the Agreement, and the parties agree to observe, conform to and comply with all of the terms, covenants, and conditions of the Agreement.  Any terms capitalized but not defined herein shall have the definitions set forth in the Agreement.

7.     <u>Conflict</u>.  The execution and delivery of this Memorandum is not intended to, and shall not, change, modify, amend or enlarge the Agreement.  To the extent that there is any conflict between the terms of the Agreement and this Memorandum, the terms of the Agreement shall control.

8.     <u>Notice of Agreement</u>.  The Parties have executed this Memorandum for the purpose of giving notice to whomsoever it may concern of the Agreement and reference is hereby made to the Agreement for a statement of the rights, privileges and obligations created thereunder.

9.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which is an original, but all of which together shall constitute one and the same instrument.

**[Signatures appear on the next page.]**

3

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Memorandum as of the date first set forth above.

**DYNAMIC ENERGY, INC.**

By: _____

Name: _____

Title: _____

STATE OF _____

COUNTY OF _____

The foregoing Memorandum of Agreement was subscribed, sworn to and acknowledged before me this the _____ day of _____, 2017, by _____, as _____ of Dynamic Energy, Inc., a West Virginia corporation, for and on behalf of the corporation.

My Commission expires _____.

_____
NOTARY PUBLIC

*Signature Page to Memorandum of Sublease*

**CM ENERGY PROPERTIES, LP**

By: _____

Name: _____

Title: _____

STATE OF _____

COUNTY OF _____

     The foregoing Memorandum of Agreement was subscribed, sworn to and acknowledged before me this the _____ day of _____, 2017, by _____, as _____ of CM Energy Properties, LP, a Delaware limited partnership, for and on behalf of the company.

     My Commission expires _____.

_____

NOTARY PUBLIC

PREPARED WITHOUT BENEFIT OF TITLE EXAMINATION BY:

_____

_____

_____

_____

*Signature Page to Memorandum of Sublease*

**Exhibit A**



**Exhibit B**



# EXHIBIT C



CM Energy Properties, LP

August 28, 2018

Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke VA  24011

Attention : James C. Justice III, Exécutive Vice-Président
E-mail : jcj3@bluestoneindustries.com

cc:  Frost Brown Todd LLC
      250 West Main Street
      Suite 2800
      Lexington, KY  40507
      Attn:  Paul Sullivan
      e-mail:  psullivan@fbtlaw.com

              Re:  Sublease Agreement effective 27th of January 2017 by and between CM
              Energy Properties, LP and Dynamic Energy, Inc.  (Agreement)

Dears Sirs:

In reference to the written notice dated June 20, 2018 (copy attached), we have not
received certain materials and payments required under the provisions of the Agreement
including but not limited to:

1.  Minimum royalties of $10,000 to be paid monthly five days prior to the month plus
    late charges of 1.5% as described in Section 5 of the Agreement;
2.  Maps and Mine Plans in accordance with Section 10 of the Agreement; and
3.  Proof of Insurance as described in Section 15 of the Agreement;

You therefore have not met the requirements of this agreement under Section 11. **Default
and Remedies** of the Agreement by which you had 30 days after receiving written notice to
comply, so in accordance with Section 11, the Sublessor elects that all rights of Sublessee
shall become forfeited and cease and determine.

Sincerely,

Roy West

Roy West
Chief Financial Officer

cc. Scott Kiscaden

EXHIBIT
tabbies
C



CM Energy Properties, LP

June 20, 2018

Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke VA 24011

Attention : James C. Justice III, Exécutive Vice-Président
E-mail : jcj3@bluestoneindustries.com

cc: Frost Brown Todd LLC
    250 West Main Street
    Suite 2800
    Lexington, KY 40507
    Attn: Paul Sullivan
    e-mail: psullivan@fbtlaw.com

                    Re: Sublease Agreement effective 27th of January 2017 by and between CM
                    Energy Properties, LP and Dynamic Energy, Inc. (Agreement)

Dears Sirs:

We have not received certain materials and payments required under the provisions of the
Agreement including but not limited to:

1. Minimum royalties of $10,000 to be paid monthly five days prior to the month plus
   late charges of 1.5% as described in Section 5 of the Agreement;
2. Maps and Mine Plans in accordance with Section 10 of the Agreement; and
3. Proof of Insurance as described in Section 15 of the Agreement;

Kindly remedy this situation as soon as possible to be in compliance with the terms of the
Agreement. Note that under Section 11 of the Agreement you have 30 days after receiving
this written notice.

Sincerely,

Roy West

Roy West
Chief Financial Officer

cc. Scott Kiscaden

# EXHIBIT D

| | |
|---|---|
| **From:** | Sullivan, Paul |
| **To:** | "steve.ball@bluestoneindustries.com" |
| **Cc:** | "Jay Justice"; Hallos, Jeff |
| **Date:** | Friday, November 16, 2018 12:44:47 PM |
| **Attachments:** | image003.png |
| | image005.png |
| | image007.png |

Steve:  As we discussed we did not receive notice of lease cancellation, either by email or letter, in June of this year from Roy West, Dynamic Energy. Since Jay did not receive that notice I would suspect foul play on their part.  To avoid any silly claim in the future by Dynamic that a copy sent to me is somehow notice to you, you should instruct them that FBT be removed from being copied.  As we are no longer engaged, we are not reviewing and resending their notices to you.  Thanks.

Paul

Paul Sullivan
**Attorney at Law**

Lexington Financial Center | 250 W. Main Street | Suite 2800
Lexington, KY 40507-1749

859.244.3211  Direct
859.231.0000  Main
859.913.3007  Mobile
859.231.0011  Fax

psullivan@fbtlaw.com | frostbrowntodd.com

NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email or by calling Frost Brown Todd LLC at (513) 651-6800 (collect), so that our address record can be corrected.



EXHIBIT
D

# EXHIBIT E

**Dynamic Energy, Inc.**
302 S. Jefferson Street
Roanoke, Virginia 24011

August 31, 2018

Via email at rwest@cmenergylp.com and Overnight Delivery via UPS

CM Energy Properties, LP
Attn: Roy West-Chief Financial Officer
200 George Street
Beckley, WV 25801

Re:   Sublease Agreement effective 27th of January 2017 by and between CM
Energy Properties, LP and Dynamic Energy, Inc. ("Sublease")

Dear Roy:

I am in receipt of your letter dated August 28, 2018 regarding the Sublease. I will first note that Dynamic has not seen any prior notice relating to this issue including the June 20th letter you reference in your August 28th letter. Therefore, Dynamic is treating this as the first notice under the Sublease. As for the other issues raised in your August 28th letter, I will address them in order.

The minimum royalty is $10,000 annually. Your letter seems to imply the minimum royalty is $10,000 monthly. We have wired $21,304.17 to the following account, CM Energy Operations, LP, Acct: 0000256077426 (BB&T). This payment represents the minimum payments due for 2017 and 2018 plus 1.5% per month late charges for all payments that were due February 2017 through August 2018.

As CM Energy is aware there has been no mining by Dynamic on the subleased premises. The mine maps referred to in the second paragraph of Section 10 are specifically described as mine progress maps. As there has been no mining there are no mine progress maps to provide.

The final issue raised is proof of insurance. A certificate of insurance showing evidence of coverage is attached hereto.

The alleged election of CM Energy to forfeit and cease the rights of Dynamic to the Sublease is both premature and without basis. Dynamic did not receive prior notice of these issues and now that Dynamic has received notice the issues have been cured well within the cure periods set forth in the Sublease. Therefore, Dynamic respectfully requests that CM Energy confirm that all defaults under the Sublease have been cured.

Thank you for your attention and cooperation with this matter.

Best regards,

James C. Justice III
President

EXHIBIT
E

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
8/31/2018

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Jennifer Burchette |
|---|---|
| Scott Insurance - Lynchburg<br>1301 Old Graves Mill Road<br>Lynchburg VA 24502 | PHONE (A/C, No, Ext): 434-832-2137 / FAX (A/C, No): 434-455-8839 |
| | E-MAIL ADDRESS: jburchette@scottins.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED    JUSTFAM-01 | INSURER A : Starr Indemnity & Liability Company (A) | 38318 |
| Dynamic Energy, Inc.<br>White Sulphur Springs, WV 24986 | INSURER B : Lexington Insurance Company (A) | 19437 |
| | INSURER C : Aspen Specialty Insurance (A) | 10717 |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER: 1342611597    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| B | COMMERCIAL GENERAL LIABILITY | Y | Y | 023627439 | 6/1/2018 | 6/1/2019 | EACH OCCURRENCE | $ 10,000,000 |
| | CLAIMS-MADE [ ] OCCUR [X] | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 10,000,000 |
| | [X] POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 10,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | 1000198801181 | 6/1/2018 | 6/1/2019 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | [X] ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | [ ] OWNED AUTOS ONLY [ ] SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | [X] HIRED AUTOS ONLY [X] NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | [ ] UMBRELLA LIAB [ ] OCCUR | | | | | | EACH OCCURRENCE | $ |
| | [ ] EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED [ ] RETENTION $ | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY     Y / N | | Y | 100 0003255 00 | 6/1/2018 | 6/1/2019 | [X] PER STATUTE [ ] OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)    N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C | Property | | | PR008MK18 | 6/22/2018 | 6/22/2019 | Limit | 250,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Certificate Holder is additional insured as respects liability if required by written contract. A waiver of subrogation applies in favor of the Certificate Holder if required by written contract.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CM Energy Properties, LP | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>*Karen Jones* |

ACORD 25 (2016/03)

© 1988-2015 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT F

CM Energy Properties, LP



September 6, 2018

Dynamic Energy, Inc.
302 S. Jefferson Street018
Roanoke VA  24011

Attention : James C. Justice III, Exécutive Vice-Président
E-mail : jcj3.@bluestoneindustries.com

cc: Frost Brown Todd LLC
    250 West Main Street
    Suite 2800
    Lexington, KY  40507
    Attn:  Paul Sullivan
    e-mail: psullivan@fbtlaw.com

Re: Sublease Agreement effective 27th of January 2017 and between CM Energy Properties, LP and Dynamic
Energy, Inc. ("Sublease")

Dear James:

By letter dated June 20, 2018, Dynamic Energy, Inc. ("Dynamic") was provided with written notice of its failure
to comply with the terms of the Sublease.  Our records clearly show that the notification letter was timely
received by Dynamic and its counsel Frost Brown Todd LLC.  Nevertheless, Dynamic failed to remedy or
otherwise respond to the breach within the 30 day cure period.  Although no notice was thereafter required,
CM Energy Properties, LP ("CM Properties") notified you by letter dated August 27, 2018 that CM Properties
had elected to terminate the Sublease.

In that the Sublease is no longer in effect, Dynamic's efforts to cure the defaults as set forth in your letter of
August 31, 2018 have come too late.  Based upon your letter, we understand that a $21,304.17 payment was
wire transferred into an account of CM Energy Operations, LP ("CM Operations").  We have requested that CM
Operations refund the payment to Dynamic.  It is my understanding that CM Operations is wire transferring the
$21,304.17 to the Dynamic account from which it came today.  If for any reason Dynamic does not receive the
payment, please let me know and I will follow-up with CM Operations.

If you have any questions concerning CM Properties' position with respect to this matter, please feel free to
contact me.

Sincerely,

Roy West

Roy West
Chief Financial Officer

cc. Scott Kiscaden

EXHIBIT
tabbies*
F

# EXHIBIT G

# Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke, Virginia 24011

September 7, 2018

Via email at rwest@cmenergylp.com and Overnight Delivery via UPS

CM Energy Properties, LP
Attn: Roy West-Chief Financial Officer
200 George Street
Beckley, WV 25801

Re:   Sublease Agreement effective 27th of January 2017 by and between CM Energy Properties, LP
and Dynamic Energy, Inc. ("Sublease")

Dear Roy:

I am in receipt of your letter dated September 6, 2018 regarding the Sublease.  I must say I am quite surprised by your letter.  Last Friday, after Dynamic received and responded to your letter dated August 28, 2018 (not received until August 30, 2018) Jay Justice exchanged communications with Rahman D'Argenio wherein he advised him the issues with the Sublease had been fixed and Mr. D'Argenio thanked Jay for getting those items cleaned up.

You make a bare reference that your records clearly show the June 20, 2018 letter was timely received but I can assure you that is not the case.  First, other than the copy that was attached to your August 28, 2018 letter we have not seen a hard copy of the letter.  Second, on the face of the letter it sets forth the letter was emailed to jcj3@bluestoneindustries.com.  This simply did not happen.  We have investigated incoming emails to that email address and no such email was ever received.

Based on the foregoing we reiterate our position that the first notice we received of this issue was on August 30, 2018 when we received your letter dated August 28, 2018.  The following day we cured the outstanding issues by providing the proof of insurance and wiring the minimum royalty payments for 2017 and 2018.  As no mining has occurred there are no mine progress maps to provide.  As stated above, the actions of Dynamic to cure the defaults were acknowledged by Rahman D'Argenio.

Almost a week has gone by since our actions to cure the defaults were tendered and accepted by CM Energy. To now act as though the defaults were not cured and accepted by CM Energy is without basis.  Additionally, and for argument's sake only, even if the June 20th letter had been received, CM Energy's actions in accepting Dynamic Energy's tender to cure the defaults under the Sublease on August 31, 2018 eliminated any outstanding defaults under the lease.  CM Energy cannot simply act as though the tender by Dynamic and the acceptance by CM Energy did not happen.

Therefore, Dynamic disagrees with the assertion that the Sublease has been terminated as there simply is no basis for termination because Dynamic cured the defaults within the timeframe allowed under the Sublease.

Best regards,

Stephen W. Ball
Vice President & General Counsel

EXHIBIT
G
tabbies®

# EXHIBIT H



CM Energy Properties, LP

September 10, 2018

Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke VA  24011

Attention:  Stephen W. Ball
E-mail: steve.ball@bluestoneindustries.com

cc: Frost Brown Todd LLC
     250 West Main Street
     Suite 2800
     Lexington, KY  40507
     Attn: Paul Sullivan
     E-mail: psullivan@fbtlaw.com

Re: Sublease Agreement effective 27th of January 2017 and between CM Energy Properties, LP and Dynamic
Energy, Inc. ("Sublease")

Dear Steve:

We are confused by Jay Justice's effort to communicate with Mr. D'Argenio concerning the
termination of the Sublease with Dynamic Energy, Inc. ("Dynamic"). Mr. D'Argenio is not
involved with the daily operations of CM Energy Properties, LP ("CM Properties") and
accordingly was not familiar with the situation at the time of Mr. Justice's unsolicited
communication to him. We understand, however, that Mr. D'Argenio has made this fact clear
to Mr. Justice via an email of September 7th. We request that all future communications
concerning the termination be directed to Scott Kiscaden or me.

Dynamic's defense to the Sublease's termination appears to be based upon its assertion that
it did not receive the June 20, 2018 notice of default ("Notice of Default"). As CM Properties
has copies of the signed return receipts for the Notices of Default, this assertion appears to
be erroneous.

Dynamic's assertion that CM Properties accepted tender of a cure payment is also erroneous.
Dynamic wire transferred $21,304.17 into an account of CM Energy Operations, LP ("CM
Operations"). CM Operations is a company separate and distinct from CM Properties.
Dynamic initiated the wire transfer on a Friday prior to a holiday weekend without notifying
CM Properties (or even CM Operations) that a wire was being made to the account.
Accordingly, neither CM Properties nor CM Operations was in a position where it could reject
the wire transfer.  Promptly after learning that a wire transfer had been made into CM
Operations' account, steps were taken to re-wire the funds back to Dynamic.  As such, CM
Properties never received or accepted any funds tendered by Dynamic.  Furthermore,
Dynamic attempted to cure the default after the Sublease was terminated and not within any
grace or cure period provided under the Sublease.

EXHIBIT

tabbies®

H

Our position is and remains that the Sublease is terminated.

If you have any questions, please feel free to contact me.

Sincerely,

Roy West
Chief Financial Officer

cc. Scott Kiscaden