# EXHIBIT B

*Execution Version*

**AMENDED AND RESTATED PURCHASE AGREEMENT**

**BY AND AMONG**

**DYNAMIC ENERGY, INC.,**

**CM ENERGY HOLDINGS, LP**

**AND**

**solely with respect to Article 5 and Article 8, BLUESTONE RESOURCES INC.**


**DATED JANUARY 27, 2017, EFFECTIVE DECEMBER 22, 2016**

**Table of Contents**

**Page**

**ARTICLE 1 DEFINITIONS AND INTERPRETATION**...........................................................1
    Section 1.1    Definitions.................................................................................1
    Section 1.2    Interpretation............................................................................11

**ARTICLE 2 PURCHASE AND SALE OF ASSETS**.............................................................12
    Section 2.1    Purchase and Sale of Assets.....................................................12
    Section 2.2    Excluded Assets ........................................................................13
    Section 2.3    Assumed Liabilities ..................................................................14
    Section 2.4    Retained Liabilities ...................................................................15
    Section 2.5    Purchase Price ..........................................................................16
    Section 2.6    [Reserved]................................................................................17
    Section 2.7    [Reserved]................................................................................17
    Section 2.8    Earn-Out...................................................................................17
    Section 2.9    Closing .....................................................................................21
    Section 2.10    Closing Deliveries...................................................................21
    Section 2.11    Allocation of Purchase Price....................................................24
    Section 2.12    Allocation of Additional Costs ................................................24

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES  OF THE SELLER**..................24
    Section 3.1    Corporate Status.......................................................................24
    Section 3.2    Corporate Authorization ..........................................................25
    Section 3.3    Binding Effect..........................................................................25
    Section 3.4    Financial Statements ................................................................25
    Section 3.5    No Breach; Approvals...............................................................25
    Section 3.6    Absence of Certain Changes ....................................................26
    Section 3.7    Agreements...............................................................................27
    Section 3.8    Undisclosed Liabilities.............................................................27
    Section 3.9    Capital Commitments ..............................................................27
    Section 3.10    Permits ....................................................................................28
    Section 3.11    Taxes.......................................................................................28
    Section 3.12    ERISA......................................................................................29
    Section 3.13    Employment and Labor............................................................31
    Section 3.14    Rights in Properties; Liens.......................................................32
    Section 3.15    Equipment and Other Personalty .............................................34
    Section 3.16    Sufficiency of the Assets .........................................................34
    Section 3.17    Environmental Matters.............................................................34
    Section 3.18    Insurance .................................................................................35
    Section 3.19    Compliance with Law..............................................................36
    Section 3.20    Litigation and Judgments.........................................................36
    Section 3.21    No Undisclosed Relationship...................................................36
    Section 3.22    No Brokers...............................................................................36

i

Section 3.23   Customers and Suppliers........................................................36
Section 3.24   No Other Representations and Warranties.................................36

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER..........37**
Section 4.1   Status..................................................................................37
Section 4.2   Authorization.......................................................................37
Section 4.3   Binding Effect......................................................................37
Section 4.4   No Breach; Approvals............................................................37
Section 4.5   No Brokers...........................................................................38
Section 4.6   Financing.............................................................................38
Section 4.7   Permit Blocking....................................................................38
Section 4.8   Legal Proceedings.................................................................39
Section 4.9   Independent Investigation......................................................39

**ARTICLE 5 COVENANTS .............................................................................39**
Section 5.1   Conduct Of Business.............................................................39
Section 5.2   Filings ................................................................................40
Section 5.3   Commercially Reasonable Efforts ...........................................41
Section 5.4   Notification.........................................................................42
Section 5.5   Inspection...........................................................................42
Section 5.6   Publicity.............................................................................42
Section 5.7   Expenses.............................................................................43
Section 5.8   Records...............................................................................43
Section 5.9   Discussions with Other Purchasers..........................................44
Section 5.10   Cooperation Regarding Excluded Assets and Retained Liabilities ..........44
Section 5.11   Employee Matters ................................................................44
Section 5.12   Non-Solicitation of Employees................................................47
Section 5.13   Non-disparagement ..............................................................47
Section 5.14   Confidentiality....................................................................47
Section 5.15   [Reserved]..........................................................................47
Section 5.16   Supplement to Seller Disclosure Schedule ...............................47
Section 5.17   Tax Matters.........................................................................48
Section 5.18   Segregation and Removal of Excluded Assets ..........................49
Section 5.19   Certain Payments or Instruments Received from Third Parties.................49
Section 5.20   Release; Acknowledgements ..................................................50
Section 5.21   Financing............................................................................50
Section 5.22   Consent Decree. ..................................................................50
Section 5.23   Payment of Liabilities ..........................................................51
Section 5.24   Access by Seller ..................................................................52
Section 5.25   Wind Up and Dissolution.......................................................52
Section 5.26   Sufficient Capital ................................................................52
Section 5.27   Asset Sales; Distributions .....................................................52
Section 5.28   Interim Period Marketing.......................................................53
Section 5.29   Services Agreements............................................................54

**ARTICLE 6 CONDITIONS .............................................................................54**

Section 6.1    Conditions to Each Party's Obligations under this Agreement .................54
Section 6.2    Conditions to Obligations of the Seller under this Agreement ..................55
Section 6.3    Conditions to Obligations of the Purchaser under this Agreement............55

**ARTICLE 7 TERMINATION.................................................................................................57**
Section 7.1    Termination by Mutual Consent .......................................................................57
Section 7.2    Termination by the Seller or the Purchaser.....................................................57
Section 7.3    Termination by the Seller...................................................................................57
Section 7.4    Termination by the Purchaser ...........................................................................58
Section 7.5    Effect of Termination..........................................................................................58

**ARTICLE 8 INDEMNIFICATION .......................................................................................58**
Section 8.1    Survival.................................................................................................................58
Section 8.2    Indemnification ...................................................................................................59
Section 8.3    Procedures............................................................................................................59
Section 8.4    Limitations on Indemnification Obligations ...................................................61
Section 8.5    Exclusive Remedy ..............................................................................................62

**ARTICLE 9 GENERAL PROVISIONS..................................................................................62**
Section 9.1    Notices ..................................................................................................................62
Section 9.2    Assignment; Binding Effect...............................................................................64
Section 9.3    No Third Party Beneficiaries .............................................................................64
Section 9.4    Entire Agreement ................................................................................................65
Section 9.5    Amendments ........................................................................................................65
Section 9.6    Governing Law ....................................................................................................65
Section 9.7    Headings ...............................................................................................................65
Section 9.8    Waiver...................................................................................................................65
Section 9.9    Severability ..........................................................................................................65
Section 9.10   Jurisdiction...........................................................................................................65
Section 9.11   No Presumption ...................................................................................................66
Section 9.12   Disclosure Schedules .........................................................................................66
Section 9.13   Further Assurances..............................................................................................66
Section 9.14   No Recourse .........................................................................................................66
Section 9.15   Counterparts ........................................................................................................67
Section 9.16   No Consequential or Punitive Damages ..........................................................67
Section 9.17   Waiver of Trial by Jury......................................................................................67
Section 9.18   Specific Performance .........................................................................................67

**SCHEDULES**
Seller Disclosure Schedules
Purchaser Disclosure Schedules

**EXHIBITS**
Exhibit A – Areas of Operations
Exhibit B – Ancillary Guarantee
Exhibit C – Form of Assignment and Assumption of Contracts
Exhibit D – Form of Assignment and Assumption of Leased Real Property
Exhibit E – Form of Bill of Sale
Exhibit F – [Reserved]
Exhibit G – Form of Deed
Exhibit H – Form of Escrow Agreement
Exhibit I – Form of Sublease of Ettenger Lease
Exhibit J – Form of Joint Use Agreement
Exhibit K – Form of Permit Operating Agreement
Exhibit L – Terms of Transition Services Agreement
Exhibit M – Form of Earn-out Security Agreement

## AMENDED AND RESTATED PURCHASE AGREEMENT

This AMENDED AND RESTATED PURCHASE AGREEMENT (including the Exhibits and Disclosure Schedules hereto, this "Agreement") is made as of January 27, 2017, but effective as of December 22, 2016 (the "Effective Date"), by and among Dynamic Energy, Inc., a West Virginia corporation (the "Seller"), CM Energy Holdings, LP, a Delaware limited partnership (the "Purchaser"), and, solely with respect to ARTICLE 5 and ARTICLE 8, Bluestone Resources Inc., a Delaware corporation ("Seller Parent").  The Seller, the Purchaser and Seller Parent may also be referred to herein as the "Parties" and each individually as a "Party."

### RECITALS

WHEREAS, the Seller, Frontier Coal Company, a Delaware corporation ("Frontier"), National Resources, Inc., a West Virginia corporation ("NRI"), the Purchaser and, solely with respect to Article 5 and Article 8 thereof, Seller Parent, were parties to that certain Purchase Agreement, dated as December 22, 2016 (the "Prior Agreement");

WHEREAS, the Seller owns and operates certain assets held in connection with its operations in Wyoming County, West Virginia, which operations cover the areas generally depicted on Exhibit A attached hereto; and

WHEREAS, the Parties, Frontier and NRI, desire to amend and restate the Prior Agreement in its entirety in the form of this Agreement, pursuant to which the Seller will sell to the Purchaser the Business for the consideration and on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing, and of the representations, warranties, covenants, and agreements contained herein, the Prior Agreement is hereby amended and restated in its entirety as follows:

### ARTICLE 1
### DEFINITIONS AND INTERPRETATION

**Section 1.1     Definitions**.

(a)      As used in this Agreement, the following terms have the meanings set forth below:

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, charge, complaint, grievance, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.  For the purposes of this definition, "*control*," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership

of voting securities, by contract or otherwise, and the terms "*controlling*" and "*controlled*" have meanings correlative to the foregoing.

"Ancillary Guarantee" means that certain Limited Guarantee, dated as of the Closing Date, from James C. Justice II to the Purchaser, for a maximum face amount of up to $25,000,000 in support of the Seller's obligations under Section 2.8(b) of this Agreement to make Reverse Earn-out Payments, in the form of Exhibit B attached hereto.

"Asset Taxes" means ad valorem, property, excise, severance, production, sales, real estate, use, occupation, personal property and similar Taxes based upon the operation or ownership of the Assets, the conduct of the Business or the receipt of proceeds therefrom, but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"Assignment and Assumption of Contracts" means that certain Assignment and Assumption of Contracts, dated as of the Closing Date, by and between the Seller and the Purchaser, substantially in the form of Exhibit C attached hereto.

"Assignment and Assumption of Leased Real Property" means that certain Assignment and Assumption of Leased Real Property, dated as of the Closing Date, by and between the Seller and the Purchaser, substantially in the form of Exhibit D attached hereto.

"Bill of Sale" means that certain Bill of Sale, dated as of the Closing Date, by and between the Seller and the Purchaser, substantially in the form of Exhibit E attached hereto.

"Business" means the coal production, development and delivery assets of the Seller in Wyoming County, West Virginia generally referred to as the "Coal Mountain" properties, including the Leases set forth on Section 3.14(a) of the Seller Disclosure Schedule and the Seller's steam and met/coking coal mining assets, reserves and logistics located in such county, but excluding the operations and assets of the Seller's Affiliates described in Section 1.1(a) of the Seller Disclosure Schedules and identified as such on the map attached as Annex A to Section 1.1(a) of the Seller Disclosure Schedules.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Roanoke, Virginia.

"Business Material Adverse Effect" means any event, circumstance, change or effect that would be reasonably expected to have a material adverse effect on (A) the Business, Assets or Assumed Liabilities taken as a whole or (B) the ability of the Seller to consummate the transactions contemplated by this Agreement, except to the extent (in the case of clause (A) above only) that such material adverse event, circumstance, change or effect arises from or relates to: (i) any change with respect to (x) the coal mining industry generally that does not disproportionately affect the Assets or the Business; or (y) the coal mining industry in Central Appalachia that does not disproportionately affect the Assets or the Business, including, in each case, changes in market prices for coal, costs of coal production or costs or availability of transportation; (ii) any change in interest rates, commodities prices, or economic, business or financial market conditions that do not disproportionately affect the Assets or the Business; (iii) changes in any Laws (including any change in the interpretation or implementation of any Law) or in accounting rules or standards; (iv) any act of terrorism or war (whether declared or

2

undeclared), or the outbreak of hostilities, or any other international or domestic calamity or crisis; (v) changes in general economic or business conditions; (vi) any action taken or not taken with the prior written consent of the Purchaser or required or expressly permitted by the terms of this Agreement; or (vii) the failure of the Business to meet internal or external projections or forecasts or any changes in reserve estimates or classifications (unless due to a circumstance which would separately constitute a Business Material Adverse Effect).

"Calculation Period" means any calendar quarter or portion thereof.

"Claims" means all claims, charges, disputes, grievances, demands, causes of action, proceedings, judgments, losses, damages of property or personal injury, including death, liabilities, liens, obligations, interest, penalties, costs, expenses and fees (including attorneys' fees and costs whether suit is instituted or not), orders, deficiency, assessments, fines, forfeitures, of whatever kind or nature whether known or unknown, liquidated or contingent.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement between Energy Capital Partners II, LLC and Southern Coal Corporation dated September 2, 2014, as amended from time to time.

"Consent Decree" means that certain Consent Decree, lodged on September 30, 2016 and entered on December 12, 2016 in Civil Action No. 7:16-cv-00462-GEC with the United States District Court for the Western District of Virginia, by and between the United States of America; the State of Alabama, ex rel. Luther Strange, in his official capacity as the Attorney General of Alabama; Alabama Department of Environmental Management; the Commonwealth of Kentucky, Energy and Environment cabinet; the State of Tennessee, ex rel. Herbert H. Slatery III, in his official capacity as the Attorney General and Reporter of Tennessee; and the Commonwealth of Virginia, as Plaintiffs, and Southern Coal Corporation; Justice Coal of Alabama, LLC; A & G Coal Corporation; Four Star Resources LLC; Infinity Energy, Inc.; Kentucky Fuel Corporation; Sequoia Energy, LLC; Virginia Fuel Corporation; National Coal, LLC; Premium Coal Company, Incorporated; Sand H Mining Inc.; Airway Resources, L.L.C.; Baden Reclamation Company; Black River Coal, LLC; Chestnut Land Holdings, LLC; Meg-Lynn Land Company, Inc.; Nine Mile Mining, Inc.; Canepatch Mining Co., Inc.; Bluestone Resources Inc.; Dynamic Energy, Inc.; Greenthorn, LLC; Justice Highwall Mining, Inc.; National Resources, Inc.; NUF AC Mining Company, Inc.; Pay Car Mining, Inc.; Second Sterling Corp.; and Newgate Development of Beckley LLC, as Defendants, as it may be amended or otherwise modified.

"Contract" means any contract, lease (including the Leases), license, evidence of indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement, or other legally binding arrangement.

"Data Room" means the electronic documentation site established by Merrill Corporation on behalf of the Seller containing the documents set forth in the index included in Section 1.1(b) of the Seller Disclosure Schedules.

"Deed" means that certain Deed, dated as of the Closing Date, by and between the Seller and the Purchaser, substantially in the form of Exhibit G attached hereto, which shall reserve certain rights to the Seller with respect to Gilbert Seam of coal in, on or under the Real Property and/or Leased Real Property, including all real and personal property interests relating thereto.

"Environmental Claim" means any order, Action, suit, Claim, investigation or other legal proceeding by any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Substance; or (b) any actual or alleged non-compliance with or other obligation or liability arising from any Environmental Law or term or condition of any Permit required under or issued pursuant to Environmental Law.

"Environmental Law" means any Law enacted or in effect as of or prior to the Closing Date concerning: (i) the environment, including any Law related to pollution, contamination, cleanup, preservation, protection, and reclamation of the environment; (ii) public or worker health and safety; or (iii) any disposal, Release or threatened Release of, or exposure of any Person to, any Hazardous Substance, including the investigation, monitoring, clean up, removal, treatment, or any other action to address such Release or threatened Release. Environmental Laws shall include, but not be limited to, the Surface Mining Control and Reclamation Act of 1977, as amended, 30 U.S.C. § 1201 et seq. ("SMCRA"), the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. ("CERCLA"), the Resources Conservation and Recovery Act of 1976, as amended, 42 U.S.C. § 6901 et seq., the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq., the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq., the Federal Water Pollution Act, as amended, 33 U.S.C. § 1251 et seq., the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, as amended, 42 U.S.C. § 300F et seq., the Federal Hazardous Materials Transportation Law, 49 U.S.C. § 5101 et seq, and the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq.

"Environmental Liabilities" means any Claims, judgments, orders, injunctions, verdicts, awards, settlements, damages, fines, penalties, costs (including response, investigative, remedial, or inspection costs), obligations, losses or liabilities arising from, under, or in connection with (a) any Environmental Laws, or (b) a claim by any private Person or Governmental Authority arising out of any exposure of any Person or property to Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time or any successor statute, together with the regulations thereunder.

"Escrow Agent" means JPMorgan Chase Bank, N.A.

"Escrow Agreement" means the Escrow Agreement among the Purchaser, the Seller, Frontier, NRI and the Escrow Agent, to be executed and delivered at the Closing in the form of Exhibit H attached hereto.

4

"Escrow Amount" means the sum of (a) Eleven Million Five Hundred Thousand Dollars ($11,500,000), to be deposited with the Escrow Agent and held in escrow pursuant to the Escrow Agreement plus (b) the amount determined to be escrowed at Closing pursuant Section 6.3(e) and Section 6.3(i), if any.

"GAAP" means United States generally accepted accounting principles applied on a consistent basis.

"Governmental Authority" means any federal, state, municipal, local, or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, court, tribunal, arbitrator, or arbitral body.

"Hazardous Substance" means (a) any substance or material (including petroleum) that is designated or defined (either by inclusion on a list or by reference to characteristics), or regulated by any Governmental Authority, as hazardous, toxic or dangerous, or as a pollutant, contaminant, or waste, under any Environmental Law, and (b) any substance for which liability or standards of conduct may be imposed under any Environmental Law or with respect to which any Environmental Law or Governmental Authority requires environmental investigation, monitoring or remediation.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Income Taxes" means any income, capital gains, franchise or similar Taxes.

"Independent Accountant" means Deloitte LLP or any Affiliate thereof; provided that if Deloitte LLP or any of its Affiliates are unable to serve, then the Independent Accountant shall be a nationally recognized firm of certified public accountants appointed by the Purchaser and the Seller.

"Joint Use Agreement" means that certain Joint Use Agreement, dated as of the Closing Date, by and between the Seller and the Purchaser, substantially in the form of Exhibit J attached hereto.

"Law" means any constitutional provision, statute, code, ordinance, common law, rule, and regulation promulgated by any Governmental Authority and any written decree, injunction, judgment, order, ruling, assessment, or writ of any Governmental Authority.

"Leased Real Property" means the real property leased, subleased or controlled by easement, license or other agreement in whole or in part by the Seller and related to the Business.

"Leases" means all leases and leasehold estates, licenses, mining rights, subsidence rights, easements, rights-of-way, options, consents, waivers or other rights or interests in and to real property, or the coal or other minerals therein and thereunder, or access thereto or the right to mine, remove and transport same, in each case, related to the Real Property or the Leased Real Property.

"Lien" means any lien, encumbrance, security interest, pledge, mortgage, hypothecation, charge, lease, restriction on transfer of title, bailment (in the nature of a pledge or for purposes of security), deed of trust, grant of a power to confess judgment, conditional sales and title retention agreement (including any lease or license in the nature thereof), claim, easement, encroachment, right of way, condition, equitable interest or other similar encumbrance, except for any restriction arising under any applicable securities Law.

"Mechel" means Caroleng Investments (SPV) Ltd.

"Mechel Purchase Agreement" means that certain Transaction Agreement by and between Bluestone Resources Inc. and Caroleng Investments (SPV) Ltd., dated as of February 12, 2015.

"Multiemployer Plan" means a multiemployer plan as defined in Sections 3(37) and/or 4001(a)(3) of ERISA.

"Net Average Realized Price" means the average realized price (FOB mine) per ton of metallurgical coal actually sold in an arm's length transaction on the met market by the Business for which payment is actually received during the relevant fiscal quarter, net of any royalties and production Taxes which are calculated as a percentage of sales price; *provided, however*, that, if any such sale is made to an Affiliate of the Purchaser, the Net Average Realized Price shall be calculated based on the terms of a subsequent sale of the underlying coal to the first Person that is not an Affiliate of the Purchaser.

"NRP Lease" means that certain Amended, Consolidated and Restated Coal Mining Lease dated April 29, 2015, between WPP LLC and Dynamic Energy, LLC and commonly referred to as Lease 9868, as may be amended from time to time, including by amendment dated September 25, 2015.

"Pardee Lease" means that certain Deed of Lease between Pardee Minerals LLC and Dynamic Energy, LLC, effective as of January 1, 2016, as may be amended from time to time.

"Pardee ROW" means that certain Agreement, dated as of May 18, 1979, by and between Big Bear Mining Company and Consolidation Coal Company, as Grantor, and Appalachian Power Company, as may be amended from time to time.

"Pension Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is or was at any time subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA.

"Permit" means any permit, license, approval, waiver, consent, variance, grant, exemption, registration, operating certificate, order, or other authorization issued by or from any Governmental Authority.

"Permit Operating Agreement" means that certain Permit Operating Agreement, dated as of the Closing Date, by and between the Seller and the Purchaser, substantially in the form of Exhibit K attached hereto.

"Permitted Liens" means (a) Liens for Taxes which are not yet due and payable or Liens set forth on Section 1.1(c) of the Seller Disclosure Schedule for Taxes which are being contested in good faith by appropriate proceedings (and for which adequate reserves have been established in accordance with GAAP or which will be paid at or before Closing), (b) landlord's, mechanic's, materialmen's, warehousemen's, repairmen's, carriers' and similar Liens incurred in the ordinary course of business consistent with past practice but which are not currently the subject of collection or execution efforts (or for which there is not any right of collection or execution currently existing (e.g., as a result of a trade payable becoming past due)), (c) easements and other imperfections of title that do not materially interfere with the present or contemplated use of the Purchased Real Property or the Purchased Leased Real Property in the operation of the Business, (d) all electric, telephone, sanitary sewer, storm sewer, water and utility lines, pipelines, service lines and facilities now located on, over or under the Purchased Real Property or the Purchased Leased Real Property, but only to the extent such utilities do not materially interfere with the present or contemplated use of the Real Property or the Leased Real Property in the operation of the Business, (e) all existing public and private roads and streets (whether dedicated or undedicated), and all railroad lines and rights of way affecting the Purchased Real Property or the Purchased Leased Real Property, (f) Liens listed on Section 1.1(c) of the Seller Disclosure Schedule securing obligations relating to surety bonds or reclamation obligations incurred in the ordinary course of business, and (g) Liens (other than Liens in respect of Taxes) in existence on the Effective Date listed on Section 1.1(c) of the Seller Disclosure Schedule, and any renewals of such Liens, *provided* that any such renewal does not increase the amount of indebtedness or extend to any additional property or assets.  The Liens set forth on Section 1.1(d) of the Seller Disclosure Schedule are not Permitted Liens.

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust, or other entity or organization, including any government and any agency or instrumentality thereof.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Prep Plant Closing" means the "Closing", as such term is defined in the Prep Plant PSA.

"Prep Plant PSA" that certain Purchase Agreement, dated on or around the date hereof, by and among Frontier, NRI, the Prep Plant Purchaser and, solely with respect to Articles 5 and 8 thereof, Seller Parent, as may be amended from time to time.

"Prep Plant Purchaser" means CM Energy Facilities, LP, a Delaware limited partnership.

"Prep Plant Purchaser Indemnitees" means the "Purchaser Indemnitees", as such term is defined in the Prep Plant PSA.

"Prep Plant Seller Indemnitees" means the "Seller Indemnitees", as such term is defined in the Prep Plant PSA.

"Purchased Contracts" means the Assets that are Contracts.

"Purchased Leased Real Property" means the Assets that are Leased Real Property.

7

"Purchased Permits" means the Assets that are Permits.

"Purchased Real Property" means the Assets that are Real Property.

"Purchaser Disclosure Schedule" means the disclosure schedule delivered to the Seller by the Purchaser concurrently with the execution hereof.

"Purchaser Material Adverse Effect" means any effect, change, event, condition, development or circumstance that materially and adversely affects the ability of the Purchaser to consummate the transactions contemplated by this Agreement or fulfill the conditions to Closing set forth in ARTICLE 6.

"Real Property" means the real property or real property interests owned in whole or in part by the Seller related to the Business.

"Records" means any and all of the books, records, contracts, agreements, files (including copies of personnel files relating to Transferred Employees to the extent permitted by Applicable Law), invoices, market research, customers, distributor and supplier lists, promotional materials and other papers, whether in hard copy or computer format, related to the Business or the Assets existing on the Closing Date (including any information relating to any Tax imposed on the Business or the Assets), and all increases and additions thereto after the Closing Date relating to periods prior to the Closing Date.

"Reference Date" means the date for which the balance sheet included in the Interim Financial Statements is prepared.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, presence, emptying, dumping, migrating, escape or leaching into the environment, whether intentional or unintentional.

"Representative" means with respect to any Person, any and all directors, officers, members, managers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Seller Disclosure Schedule" means the disclosure schedule delivered to the Purchaser by the Seller concurrently with the execution hereof.

"Seller Group" means collectively, the Seller, Seller Parent and their respective direct and indirect subsidiaries.

"Seller Taxes" means with respect to the Seller, any of its direct or indirect owners or Affiliates, or any combined, unitary or consolidated group of which any of the foregoing is or was a member, (i) all Income Taxes imposed by any applicable Law, (ii) Asset Taxes allocable to the Seller pursuant to Section 5.17(a), (iii) Transfer Taxes allocable to the Seller pursuant to Section 5.17(e), (iv) any Taxes imposed on or with respect to the ownership or operation of the

Excluded Assets and (v) any and all Taxes (other than the Taxes described in clauses (i)-(iv) of this definition) imposed on or with respect to the ownership or operation of the Assets for any Pre-Closing Tax Period.

"Straddle Period" means any taxable period beginning on or before and ending after the Closing Date.

"Sublease of Ettenger Lease" means that certain Sublease of Ettenger Lease, dated as of the Closing Date, by and among the Seller and the Purchaser, substantially in the form of Exhibit I attached hereto.

"Tax" or "Taxes" means (i) all federal, state, local or foreign net income, adjusted gross income, alternative or add-on minimum, excise, gross receipts, ad valorem, sales or use, occupation, premium, environmental (including taxes under Section 59A of the Code), disability, registration, value added, estimated, employment-related (including employee withholding or employer payroll, FICA and FUTA), franchise, profits, gains, personal property, real property, capital stock, severance, production, transfer, license, intangibles or other taxes, fees, stamp taxes, duties, levies or similar assessments, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority with respect thereto; (ii) any liability for the payment of any amounts of the type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period; and (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) of this definition as a result of any express or implied obligation to indemnify any other Person or as a result of any obligations under any agreements or arrangements with any other Person with respect to such amounts and including any liability for taxes of a predecessor entity.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement, including any schedule or attachment thereto, and including any amendment thereof, filed or required to be filed with a Governmental Authority in connection with the determination, assessment or collection of Taxes.

"Transaction Documents" means this Agreement, the Assignment and Assumption of Contracts, Assignment and Assumption of Leased Real Property, Bill of Sale, Deed, Transition Services Agreement, Escrow Agreement, Earn-Out Security Agreement, Permit Operating Agreement, Equity Commitment Letter, Ancillary Guarantee, Joint Use Agreement, Sublease of Ettenger Lease, and the other agreements, instruments and documents required to be delivered at the Closing.

"Transition Services Agreement" means the Transition Services Agreement among James C. Justice II, James C. Justice III, Seller Parent and the Purchaser to be executed and delivered at the Closing on the terms set forth in Exhibit L attached hereto.

"Treasury Regulations" means the regulations promulgated by the United States Treasury Department under the Code.

"<u>WARN Act</u>" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign Laws related to plant closings, relocations, mass layoffs and employment losses.

The following terms have the meanings defined for such terms in the Sections set forth below:

| | |
|---|---|
| Agreement | Preamble |
| Assets | Section 2.1 |
| Assignable Marketing Contracts | Section 5.28(a) |
| Assumed Liabilities | Section 2.3 |
| Back-to-Back Sales Agreement | Section 5.28(a) |
| Benefit Plan | Section 3.12(a) |
| Business Employees | Section 5.11(a) |
| Cap | Section 8.4(c)(i)(B) |
| Coal Personalty | Section 3.15 |
| CERCLIS | Section 3.17 |
| Closing | Section 2.9 |
| Closing Date | Section 2.9 |
| Collateral Source | Section 8.4(a) |
| Company Plans | Section 3.12(a) |
| Deductible | Section 8.4(c)(i)(A) |
| Disclosure Schedule | Section 9.12 |
| Earn-out Calculation | Section 2.8(c)(i) |
| Earn-out Calculation Objection Notice | Section 2.8(c)(ii) |
| Earn-out Calculation Statement | Section 2.8(c)(i) |
| Earn-out Payment | Section 2.8(a) |
| Earn-out Period | Section 2.8(a) |
| Earn-out Provisions | Section 2.8(i) |
| Earn-out Review Period | Section 2.8(c)(ii) |
| Earn-out Security Agreement | Section 2.8(i) |
| Effective Date | Preamble |
| Equity Commitment Letter | Section 4.6 |
| ERISA Affiliate | Section 3.12(e) |
| Excluded Assets | Section 2.2 |
| Excluded Environmental Liability | Section 2.4(f) |
| Financial Statements | Section 3.4 |
| Frontier | Recitals |
| Fundamental Representations | Section 8.1 |
| Indemnified Party | Section 8.3(a) |
| Interim Earn-out Payment Amount | Section 2.8(f) |
| Interim Period Marketing Contracts | Section 5.28(a) |
| Interim Reverse Earn-out Payment Amount | Section 2.8(f) |
| Interim Financial Statements | Section 3.4 |
| IRS | Section 3.12(b) |
| Litigation Control Conditions | Section 8.3(c) |
| Losses | Section 8.2(a) |

10

| | |
|---|---|
| Material Contracts | Section 3.7(a) |
| Material Customers | Section 3.23(a) |
| Material Leases | Section 3.14(a) |
| Material Suppliers | Section 3.23(b) |
| Non-Assignable Marketing Contracts | Section 5.28(a) |
| Non-Recourse Persons | Section 9.14 |
| NPL | Section 3.17 |
| NRI | Recitals |
| Parties | Preamble |
| Party | Preamble |
| Prior Agreement | Recitals |
| Purchase Price | Section 2.5 |
| Purchaser | Preamble |
| Purchaser Indemnitees | Section 8.2(a) |
| Purchaser-Paid Liabilities | Section 5.23 |
| Responsible Party | Section 8.3(a) |
| Retained Liabilities | Section 2.4 |
| Retained Permit Liabilities | Section 2.3(e) |
| Reverse Earn-Out Payment | Section 2.8(b) |
| Reverse Earn-Out Period | Section 2.8(b) |
| Sale Transaction | Section 2.8(j) |
| Schedule Supplement | Section 5.16 |
| Seller | Preamble |
| Seller Parent | Preamble |
| Seller's Bonds | Section 2.2(e) |
| Seller Indemnitees | Section 8.2(b) |
| Third Party Claim | Section 8.3(b) |
| Transfer Taxes | Section 5.17(e) |
| Transferred Employees | Section 5.11(a) |
| Year-End Financial Statements | Section 3.4 |

**Section 1.2    Interpretation.**  In this Agreement:

(a)    Unless the context otherwise requires, words describing the singular number shall include the plural and vice versa, and words denoting any gender shall include all genders.

(b)    The words "include", "includes," and "including" are not limiting.

(c)    The words "hereby," "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole, including the exhibits and Disclosure Schedules hereto, and not to any particular provision of this Agreement.

(d)    The phrase "to the knowledge of" and similar phrases relating to knowledge of (i) the Seller shall mean the knowledge, after reasonable inquiry, of those persons listed on Section 1.2(d)(i) of the Seller Disclosure Schedule and (ii) the Purchaser shall mean the actual knowledge of those persons listed on Section 1.2(d)(ii) of the Purchaser Disclosure Schedule.

(e)    Unless otherwise expressly noted to the contrary, all references in this Agreement to "dollars" or "$" shall mean United States dollars.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

**Section 2.1    Purchase and Sale of Assets.**   Subject to the terms and conditions set forth herein, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser shall purchase from the Seller, free and clear of all Liens other than Permitted Liens and liens addressed in accordance with Section 6.3(e)), all of the Seller's right, title and interest in, to and under all of the assets, properties, and rights of every kind and nature, whether real, personal or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired, which relate to, or are used or held for use in connection with, the Business, other than the Excluded Assets (collectively, the "Assets"), including all of the following with respect to the Business:

(a)    All Real Property and Leased Real Property, including the Real Property and Leased Real Property described in Section 2.1(a) of the Seller Disclosure Schedule and as set forth on the map attached as Annex A to Section 2.1(a) of the Seller Disclosure Schedule;

(b)    [Reserved].

(c)    All right, title and interest of the Seller now or hereafter existing, in, to and under (i) the Material Contracts, plus the Contracts listed in Section 2.1(c) of the Seller Disclosure Schedule and (ii) such other Contracts related to the Assets or the Business that are entered into by the Seller in the ordinary course of business after the Effective Date as permitted pursuant to Section 5.1;

(d)    All right, title and interest of the Seller now or hereafter existing, in, to and under all Leases, including those Leases listed Section 2.1(d) of the Seller Disclosure Schedule;

(e)    All fixtures, equipment, machinery, tools, vehicles, supplies, and other tangible personal property, including all such property described in Section 3.15 of the Seller Disclosure Schedule;

(f)    All patents, patent rights, trademarks, trademark rights, know how and proprietary information;

(g)    All Permits, including those Permits listed in Section 2.1(g) of the Seller Disclosure Schedule and as set forth on the map attached as Annex A to Section 2.1(g) of the Seller Disclosure Schedule;

(h)    All prepaid royalties, un-recouped minimum royalties and other advance payments under the Purchased Leased Real Property and all prepaid expenses;

(i)    All of Seller's rights under warranties, reimbursements, guarantees, indemnities and all similar rights against third parties, in each case, to the extent related to any Assets and not primarily related to any Retained Liabilities;

12

(j)     All proceeds paid under property or casualty insurance policies with respect to the Assets, arising from events or circumstances occurring on or after the Effective Date;

(k)     Originals, or where not available, copies, of all Records other than those items described in <u>Section 2.2(c)</u>; and

(l)     All goodwill and the going concern value of the Business.

It is the intention of the Parties that the Purchaser acquire all assets, properties and rights necessary for the operation of the Business as conducted, including all mining, coal reserves (whether or not currently being mined), transporting, marketing, and selling of coal and all reclamation activities, but excluding the Excluded Assets. If it is discovered that certain assets, properties or rights, including, rights under Contracts and fractional real property interests, owned, leased or subleased by the Seller, other than the Excluded Assets, were not included in the Assets to be sold to the Purchaser, and such assets, properties or rights are needed by the Purchaser in the operation of the Business, including all mining, transporting, marketing, and selling of coal and all reclamation activities, then the Seller shall assign, convey, lease or sublease, as applicable, such assets, properties, or rights to the Purchaser, in each case upon the reasonable request of the Purchaser, at no additional cost or expense to the Purchaser.

**Section 2.2     Excluded Assets.**  Notwithstanding the foregoing, the Assets shall not include the following assets (collectively, the "<u>Excluded Assets</u>"):

(a)     The corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of the Seller;

(b)     All of the Seller's cash and cash equivalents on hand and in banks, determined in accordance with GAAP and using the principles, methods and practices reflected in the preparation of the Financial Statements;

(c)     All Records and other data and information (including but not limited to data and information created or stored on or in computer, electronic or other media or format), but only to the extent related to the Excluded Assets or the Retained Liabilities;

(d)     All insurance policies and benefits of any kind (including but not limited to all rights and proceeds thereunder) other than those described in <u>Section 2.1(j)</u>;

(e)     All bonds or letters of credit (and deposits or other collateral posted with respect thereto) posted by the Seller or its Affiliates in connection with the Purchased Permits ("<u>Seller's Bonds</u>") listed on Section 2.2(e) of the Seller Disclosure Schedule and as set forth on the map attached as Annex A to Section 2.2(e) of the Seller Disclosure Schedule;

(f)     All collateral posted by Seller in connection with any Seller's Bond, whether or not such Seller's Bond is listed on Section 2.2(e) of the Seller Disclosure Schedule;

(g)     The sponsorship of, and all assets maintained pursuant to, in connection with or related to the Company Plans and any other benefit or compensation plan, program, policy, Contract, agreement or arrangement that is or was at any time sponsored, maintained, contributed

13

to or required to be contributed to by or on behalf of the Seller or any of its Affiliates or with respect to which the Seller or any of its Affiliates has any current or contingent liability or obligation;

(h)     All credits, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including, without duplication, any such item relating to the payment of Seller Taxes) other than those described in Section 2.1(h);

(i)     All accounts or notes receivable held by the Seller with respect to matters occurring prior to the Closing Date, and any security, claim, remedy or other right related to any of the foregoing;

(j)     All security deposits made in the ordinary course of business for rent, electricity, telephone or other utilities related to the operation of the Business prior to the Closing Date;

(k)     All rights to any Actions of any nature available to or being pursued by the Seller to the extent related to the Business, the Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise which relate to events or circumstances occurring before the Closing Date;

(l)     All inventory;

(m)     All Contracts for the marketing, transportation or sale of coal (which, for the avoidance of doubt, shall not be Purchased Contracts), other than any Assignable Marketing Contracts;

(n)     The assets, properties and rights specifically set forth on Section 2.2 of the Seller Disclosure Schedule; and

(o)     The rights that accrue or will accrue to the Seller under the Transaction Documents.

**Section 2.3     Assumed Liabilities.**     Except for the obligations and liabilities specifically assumed by the Purchaser in this Section 2.3, the Purchaser shall not be deemed to have assumed or agreed to be responsible for the Seller's, or any of its Affiliates', liabilities, whether or not arising out of the ownership and operation of the Assets or the Business.  Subject to the terms and conditions set forth herein, at the Closing, the Purchaser shall assume and agree to pay, discharge or perform any and all of the following liabilities and obligations of the Seller arising out of or relating to the Business or the Assets (collectively, the "Assumed Liabilities"), and no other liabilities and obligations:

(a)     Subject to Section 2.4(b), all liabilities and obligations arising under or relating to the Purchased Contracts after the Closing;

(b)     All liabilities and obligations of the Purchaser or its Affiliates relating to employee benefits and compensation provided to any Transferred Employee under benefit plans or compensation arrangements established by the Purchaser or its Affiliates for the Transferred Employees after the Closing;

14

(c)     All liabilities and obligations for Taxes relating to the Business, the Assets or the Assumed Liabilities solely for any taxable period ending after the Closing Date;

(d)     All Claims accruing or arising from circumstances, events or actions after the Closing Date, whether such circumstances, events or actions or Claims are foreseeable or unforeseeable, known or unknown, contingent or otherwise;

(e)     All liabilities and obligations arising out of, relating to or otherwise in any way in respect of, (i) the Purchased Permits, including all reclamation liabilities and Environmental Liabilities, whether accruing prior to, on or after Closing (but excluding any fines or penalties assessed as a result of any notices of violation that were written (x) as of the Closing or (y) after the Closing as a result of conditions, facts or circumstances first occurring or first existing during the period of ownership or operation of the Business or the Assets by the Seller, Mechel or their respective Affiliates; except for, in each case, any such fines or penalties that are attributable to the Purchaser's actions, failures to act or delays in acting following the Closing (such fines and penalties excluded in clauses (x) and (y) above, the "Retained Permit Liabilities")), or (ii) the Purchased Permits to the extent arising out of the ownership or operation of the Business or the Assets by the Purchaser after the Closing;

(f)     All Environmental Liabilities and Environmental Claims not related to a Purchased Permit that accrue prior to Closing, other than (i) the Excluded Environmental Liabilities and (ii) any Environmental Liabilities and any Environmental Claims arising out of the Consent Decree and retained by the Seller pursuant to Section 2.4(i);

(g)     All liabilities under the WARN Act arising from the failure to give a timely WARN Act notice to any employee of the Business terminated or laid off following the Closing Date; and

(h)     Liabilities set forth on Section 2.3 of the Seller Disclosure Schedule.

**Section 2.4     Retained Liabilities.**  Notwithstanding any provision in this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other obligation or liability of the Seller or any of its Affiliates of whatever nature, whether presently in existence or arising hereafter and whether or not related to the Assets or the Business.  The Purchaser shall not assume, and the Seller shall retain, all liabilities and obligations other than the Assumed Liabilities (collectively, the "Retained Liabilities"), including the following:

(a)     All liabilities arising out of or relating to the Excluded Assets whether accruing prior to, on or after Closing;

(b)     All liabilities under the Purchased Leased Real Property and Purchased Contracts to the extent arising out of or relating to instances of noncompliance, breaches or defaults thereunder occurring prior to the Closing Date;

(c)     All trade accounts payable of the Seller to third parties in connection with the Business that remain unpaid as of the Closing Date;

(d)       All liabilities arising during, or related to, any pre-Closing periods associated with any Liens, including Permitted Liens;

(e)       Seller Taxes;

(f)       All Environmental Liabilities and Environmental Claims not related to a Purchased Permit (other than any Retained Permit Liabilities) (i) to the extent based on conditions, facts or circumstances first occurring or first existing during the period of ownership or operation of the Business or the Assets by the Seller, Mechel or their respective Affiliates, or (ii) of which the Seller, Mechel or their respective Affiliates otherwise have knowledge (collectively, "Excluded Environmental Liabilities");

(g)       All liabilities or obligations at any time relating to or arising out of or in connection with the employment or service with the Seller or any of its Affiliates of any Person or the termination of employment or service of the employees of the Business or any other Person from employment or service with the Seller or any of its Affiliates (including all WARN Act liabilities arising from the failure to give a timely WARN Act notice to any employee of the Business terminated or laid off prior to the Closing Date);

(h)       All liabilities and obligations at any time arising under, with respect to or in connection with any Company Plan or any other benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored, contributed to or required to be contributed to by or on behalf of the Seller or any of its Affiliates or with respect to which the Seller or any of its Affiliates has any current or contingent liability or obligation;

(i)       All liabilities and obligations arising out of, or relating to, the Consent Decree, including any fines or penalties imposed thereunder and any remedial measures and associated costs imposed thereunder, including as a result of any audits conducted in connection therewith, whether accruing prior to, on or after Closing;

(j)       All liabilities, commitments or obligations arising out of or relating to any Contracts for the marketing, transportation or sale of coal, other than any Assignable Marketing Contracts; and

(k)       Liabilities set forth on Section 2.4 of the Seller Disclosure Schedule.

**Section 2.5     Purchase Price.**  The aggregate purchase price for the Business and the Assets shall be Ninety-Eight Million Nine Hundred Seventy-Five Thousand Dollars ($98,975,000), (the "Purchase Price"), plus the Earn-out Payments, if any, and the assumption of the Assumed Liabilities, less the Reverse Earn-out Payments, if any. At Closing, the Purchase Price shall be paid as follows:

(a)       The Purchase Price less the Escrow Amount shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to the Purchaser, such designation to be made no later than two Business Days prior to the Closing Date; and

(b)       the Escrow Amount shall be deposited by wire transfer of immediately available funds into accounts designated by the Escrow Agent and shall be held and distributed in

16

accordance with the terms of the Escrow Agreement (or other escrow agreement entered into with respect to the portion of the Escrow Amount escrowed at Closing pursuant Section 6.3(e) or Section 6.3(i), as applicable).

**Section 2.6    [Reserved].**

**Section 2.7    [Reserved].**

**Section 2.8    Earn-Out.**

(a)    Earn-out Payments. As an additional consideration for the Assets, during the five (5) year period beginning on the Closing Date (the "Earn-out Period"), if the Net Average Realized Price during a fiscal quarter exceeds One Hundred Dollars ($100) per ton, the Purchaser shall pay to the Seller an amount equal to the following calculation (each an "Earn-out Payment"):

fifty percent (50%) x ((Net Average Realized Price for such fiscal quarter less One Hundred Dollars ($100) per ton) x tons of metallurgical coal actually sold by the Business to the met market for which payment is actually received during such quarter);

*provided, however*, the aggregate Earn-out Payments made to the Seller during the Earn-out Period shall not exceed Fifty Million Dollars ($50,000,000) *plus* the cumulative amount of Reverse Earn-out Payments made to the Purchaser prior to the applicable fiscal quarter. If the Net Average Realized Price during a quarter is less than or equal to One Hundred Dollars ($100) per ton, no Earn-out Payment shall be due for such quarter; *provided* that if the Net Average Realized Price during a quarter is less than One Hundred Dollars ($100) per ton during the Reverse Earn-Out Period, the Reverse Earn-out Payment described in Section 2.8(b) shall apply.

(b)    Reverse Earn-Out Payments.  As an additional inducement to the Purchaser to enter into this Agreement, during the two (2) year period beginning on the Closing Date (the "Reverse Earn-out Period"), if the Net Average Realized Price during a fiscal quarter is less than One Hundred Dollars ($100) per ton, the Seller shall pay to the Purchaser an amount equal to the following calculation (each a "Reverse Earn-out Payment"):

fifty percent (50%) x ((One Hundred Dollars ($100) per ton less the Net Average Realized Price for such fiscal quarter) x tons of metallurgical coal actually sold by the Business to the met market for which payment is actually received during such quarter);

*provided, however*, the aggregate Reverse Earn-out Payments made to the Purchaser during the Reverse Earn-out Period shall not exceed Twenty-Five Million Dollars ($25,000,000) *plus* cumulative Earn-out Payments made to the Seller prior to the applicable fiscal quarter. If the Net Average Realized Price during a quarter is equal to or greater than One Hundred Dollars ($100) per ton, no Reverse Earn-out Payment shall be due for such quarter; *provided* that if the Net Average Realized Price during a quarter is greater than One Hundred Dollars ($100) per ton during the Earn-Out Period, the Earn-out Payment described in Section 2.8(a) shall apply.

(c)    Procedures Applicable to Determination of the Earn-out Payments and Reverse Earn-Out Payments.

(i)      On or before the date that is 45 days following the end of a quarter during the Earn-out Period, the Purchaser shall prepare and deliver to the Seller a written statement (in each case, an "Earn-out Calculation Statement") setting forth in reasonable detail the calculation of Net Average Realized Price for the prior quarter and its calculation of the resulting Earn-out Payment or Reverse Earn-Out Payment, as applicable (in each case, an "Earn-out Calculation"). The Purchaser shall provide the Seller and its representatives copies of such records and work papers used or created in connection with preparation of each Earn-out Calculation Statement which are reasonably required to support such Earn-out Calculation Statement; *provided* that the Seller shall, and shall cause its representatives to, maintain the strict confidentiality of any such information in accordance with Section 5.14. Notwithstanding the foregoing, it is understood that in connection with the Earn-out Calculation Statement and any related procedures and information, the Purchaser shall maintain the right at all times to withhold any information (or portion thereof) from the Seller and its representatives (but not the Independent Accountant) to the extent that the Purchaser reasonably determines that access to such information could result in disclosure of trade secrets, customer names or other competitively sensitive information.

(ii)      The Seller shall have thirty (30) days after receipt of the Earn-out Calculation Statement for each Earn-out Calculation Period (in each case, the "Earn-out Review Period") to review the Earn-out Calculation Statement and the Earn-out Calculation set forth therein. Subject to the terms and conditions of this Section 2.8(c)(ii), during the Earn-out Review Period, the Seller and its representatives shall have the right to inspect the Business' books and records during normal business hours at the Business' offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of the Earn-out Payment or Reverse Earn-Out Payment, as applicable, *provided*, that any such inspection shall be done in a manner that does not interfere with the normal business operations of the Purchaser or the Business. Prior to the expiration of the Earn-out Review Period, the Seller may, solely based on errors in the information provided to the Seller or errors in the mathematical calculation (i.e., the volume of metallurgical coal actually sold by the Business or the amount of cash actually received therefor) in the Purchaser's Earn-out Calculation, object to the Earn-out Calculation set forth in the Earn-out Calculation Statement for the applicable quarter by delivering a written notice of objection (an "Earn-out Calculation Objection Notice") to the Purchaser. Any Earn-out Calculation Objection Notice shall specify the items in the applicable Earn-out Calculation disputed by the Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If the Seller fails to deliver an Earn-out Calculation Objection Notice to the Purchaser prior to the expiration of the Earn-out Review Period, then the Earn-out Calculation set forth in the Earn-out Calculation Statement shall be final and binding on the Parties. If the Seller timely delivers an Earn-out Calculation Objection Notice, the Purchaser and the Seller may negotiate to resolve the disputed items and agree upon the resulting amount of the Earn-out Payment or Reverse Earn-out Payment, as applicable, for the applicable quarter. If the Purchaser and the Seller are unable to reach agreement within fifteen (15) days after such an Earn-out Calculation Objection Notice has been given, all unresolved disputed items shall be promptly referred to the Independent Accountant. The Independent Accountant shall be directed to render a written report on the unresolved disputed items with respect to the applicable Earn-out Calculation as promptly as practicable, but in no event greater than thirty (30) days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Earn-out Calculation Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, the Purchaser and the Seller shall each furnish to the Independent

18

Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Purchaser and the Seller, and not by independent review. The resolution of the dispute and the calculation of the Earn-out Payment or Reverse Earn-Out Payment, as applicable, that is the subject of the applicable Earn-out Calculation Objection Notice by the Independent Accountant shall be final and binding on the Parties. The fees and expenses of the Independent Accountant shall be shared equally by the Purchaser and the Seller.

(d)     Independence of Earn-out Payments and Reverse Earn-Out Payments. The Purchaser's obligation to pay each of the Earn-out Payments to the Seller in accordance with Section 2.8(a) is an independent obligation of the Purchaser and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Earn-out Payment. The Seller's obligation to pay each of the Reverse Earn-Out Payments in accordance with Section 2.8(b) shall be joint and several, and is an independent obligation of the Seller and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Reverse Earn-out Payment.

(e)     Timing of Payment. Subject to Section 2.8(f), any Earn-out Payment that the Purchaser is required to pay pursuant to Section 2.8(a) hereof and any Reverse Earn-out Payment that the Seller is required to pay pursuant to Section 2.8(b) hereof, in each case, shall be paid in full no later than five (5) Business Days following the date upon which the determination of the calculation of the Earn-out Payment or Reverse Earn-out Payment for the applicable quarter becomes final and binding upon the Parties as provided in Section 2.8(c) (including any final resolution of any dispute raised by the Seller in an Earn-out Calculation Objection Notice). The Purchaser shall pay to the Seller the applicable Earn-out Payment in cash by wire transfer of immediately available funds to the bank account for the Seller set forth on Section 2.8(e) of the Seller Disclosure Schedule or as otherwise directed in writing by the Seller.  The Seller shall pay to the Purchaser the applicable Reverse Earn-out Payment in cash by wire transfer of immediately available funds to the bank account designated in writing by the Purchaser.

(f)     Payment of Interim Earn-out Payment Amount. Notwithstanding anything contained in Section 2.8(e) to the contrary, if (i) the Seller timely delivers an Earn-out Calculation Objection Notice to the Purchaser and (ii)(A) the Purchaser's calculation of the Earn-out Payment for such quarter is in an amount sufficient for an Earn-out Payment to be paid for such quarter or (B) the Seller does not dispute the calculation of a portion of the Reverse Earn-Out Payment as calculated in the Purchaser's Earn-out Calculation Statement, then, within five (5) Business Days of the delivery to the Purchaser of such Earn-out Calculation Objection Notice, in the case of the preceding (ii)(A), the Purchaser shall pay to the Seller the undisputed portion of the Earn-out Payment set forth in the Purchaser's Earn-out Calculation Statement for such quarter (any such amount so paid, an "Interim Earn-out Payment Amount") and (2) in the case of the preceding (ii)(B), the Seller shall pay to the Purchaser the undisputed portion of the Reverse Earn-out Payment set forth in the Purchaser's Earn-out Calculation Statement for such quarter (any such amount so paid, an "Interim Reverse Earn-out Payment Amount"). Upon final determination of the appropriate amount of the Earn-out Payment or Reverse Earn-Out Payment for such quarter in accordance with Section 2.8(b), the Purchaser shall promptly pay to the Seller

19

the amount of the Earn-out Payment less the Interim Earn-out Payment Amount previously paid, or the Seller shall promptly pay to the Purchaser the amount of the Reverse Earn-out Payment less the Interim Reverse Earn-out Payment Amount previously paid, as applicable.  To the extent any Earn-out Payment or Interim Earn-out Payment Amount is not paid by the Purchaser to the Seller or any Reverse Earn-out Payment or Interim Reverse Earn-out Payment Amount is not paid by the Seller to the Purchaser, in each case, when due hereunder, such amount shall bear interest from and including the date such payment was due to and including the date of payment at a rate per annum equal to five percent (5%). Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

(g)     Direction of Business.  Following the Closing Date, nothing in this Agreement shall be deemed to limit or restrict, directly or indirectly, the direction of the Purchaser or any of its Affiliates, in directing the Business. The Seller acknowledges that any payments that may be payable pursuant to this Section 2.8 depend upon the performance of the Business and market conditions. The Seller further agrees and acknowledges that the Purchaser is not making any representations or warranties regarding the current or future performance of the Business or the coal markets and the Seller agrees that in no case shall the Seller have any claims against the Purchaser or any of its Affiliates based on the failure of the Business to meet any performance thresholds.  Notwithstanding the foregoing, the Purchaser hereby agrees during the Earn-out Period not to take any action which has the primary objective of circumventing the Earn-Out Payment.

(h)     Right of Set-off. The Purchaser shall have the right to withhold and set off against any amount otherwise due to be paid by the Purchaser pursuant to this Section 2.8 the amount of (i) any Losses, as finally determined in accordance with the provisions of ARTICLE 8 hereof, to which any Purchaser Indemnitee may be entitled under of this Agreement, (ii) any amounts due to be paid by the Seller as finally determined pursuant to this Section 2.8 which have not been paid when due and (iii) the amount of any Purchaser-Paid Liabilities (including interest thereon) which have not been reimbursed in accordance with Section 5.23.  The Seller shall have the right to withhold and set off against any amount otherwise due to be paid by the Seller pursuant to this Section 2.8 the amount of (i) any Losses, as finally determined in accordance with the provisions of ARTICLE 8 hereof, to which any Seller Indemnitee may be entitled under of this Agreement and (ii) any amounts due to be paid by the Purchaser as finally determined pursuant to this Section 2.8 which have not been paid when due.

(i)     Additional Reserves; Other Properties. In the event that, (i) during the Earn-Out Period, the Purchaser or its Affiliates acquire additional coal reserves through merger, stock purchase, asset purchase or otherwise or (ii) the Purchaser or any of its Affiliates otherwise owns coal reserves which are not or were not included in the Assets or the Business, the sale of metallurgical coal from such additional reserves shall be disregarded for calculation of any Earn-out Payment or any Reverse Earn-out Payment.

(j)     Security; Obligation of the Business.  At Closing, the Purchaser shall enter into that certain Earn-out Security Agreement in the form of Exhibit M attached hereto (the "Earn-out Security Agreement"), whereby the Purchaser grants to the Seller certain liens and security interests in favor of the Seller in and to all of its right, title and interest in and to the Business mining equipment, wherever located, whether now existing or hereafter from time to time arising

20

or acquired.  If the Purchaser desires to (i) sell, assign, lease, license, distribute or otherwise transfer, dispose of or convey all or substantially all of the Business or the Assets in one or more series of transactions, or (ii) enter into an agreement for, or consummate, any merger, consolidation or similar transaction in which the Purchaser does not survive (a "Sale Transaction") prior to the expiration of the Earn-out Period, the Purchaser shall provide to the Seller, at least ten (10) Business Days prior, written notice to the Seller of such proposed Sale Transaction, and the name and address of the proposed purchaser/transferee/survivor.  The Purchaser agrees that no Sale Transaction prior to the expiration of the Earn-out Period shall be made unless the proposed purchaser/transferee/survivor agrees in writing to be bound by the terms of this Section 2.8 related to the Earn-out Payments (the "Earn-out Provisions"), takes the Business under and subject to the Earn-out Provisions, and fully assumes the Purchaser's obligations with respect to the Earn-Out Provisions. Subject to, and upon satisfaction of, the foregoing, following a Sale Transaction, the Purchaser shall have no further obligation with respect to the Earn-out Payment.

Section 2.9    **Closing.**  Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place (i) at the offices of Frost Brown Todd LLC on the 3rd Business Day following the earliest date on which all of the conditions set forth in ARTICLE 6 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of those conditions) shall be fulfilled or waived in accordance herewith; or (ii) at such other time, date or place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "Closing Date."

Section 2.10   **Closing Deliveries**.

(a)     At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Seller, the following, each in form and substance reasonably satisfactory to the Seller:

(i)     a certificate, duly executed by an officer of the Purchaser, dated as of the Closing Date, certifying that the conditions specified in Section 6.2(a) and Section 6.2(d) have been fulfilled;

(ii)    a certificate, duly executed by an officer of the Purchaser, dated as of the Closing Date, to the effect that the resolutions adopted by the managers and members of the Purchaser authorizing the Purchaser's execution and delivery of, and performance of its obligations under, this Agreement and the consummation of the transactions contemplated hereby, as attached to such certificate, were duly adopted by all necessary action and remain in full force and effect, and have not been amended, rescinded or modified;

(iii)   a certificate, duly executed by an officer of the Purchaser, dated as of the Closing Date, certifying as to the incumbency of the officers executing this Agreement on behalf of the Purchaser and setting forth certified copies of the articles of organization, operating agreement and certificate of good standing of the Purchaser;

21

(iv)    a wire transfer of immediately available funds in an amount equal to the Purchase Price less the Escrow Amount to such accounts as shall be designated by the Seller in accordance with Section 2.5(a);

(v)    the Assignment and Assumption of Contracts, executed by the Purchaser or its designee;

(vi)    the Assignment and Assumption of Leased Real Property executed by the Purchaser or its designee;

(vii)    the Bill of Sale executed by the Purchaser or its designee;

(viii)    the Deeds executed by the Purchaser or its designee;

(ix)    the Escrow Agreement executed by the Purchaser or its designee;

(x)    the Transition Services Agreement executed by the Purchaser or its designee;

(xi)    the Permit Operating Agreement executed by the Purchaser or its designee;

(xii)    the Earn-out Security Agreement executed by the Purchaser or its designee;

(xiii)    the Ancillary Guarantee executed by the Purchaser or its designee;

(xiv)    the Sublease of Ettenger Lease and the Joint Use Agreement, each executed by the Purchaser or its designee

(xv)    to the extent necessary pursuant to Section 5.28, the Back-to-Back Sales Agreement, executed by the Purchaser; and

(xvi)    such other documents as are reasonably requested by the Seller prior to the Closing Date in order to consummate the transactions contemplated hereby.

(b)    At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Escrow Agent, a wire transfer of immediately available funds in an amount equal to the Escrow Amount.

(c)    At the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser the following, each in form and substance reasonably satisfactory to the Purchaser:

(i)    a certificate, duly executed by the Seller, dated as of the Closing Date, certifying that the conditions specified in Section 6.3 have been fulfilled;

(ii)    a certificate, duly executed by an officer of the Seller, dated as of the Closing Date, to the effect that the resolutions adopted by the board of directors authorizing the Seller's execution and delivery of, and performance of its obligations under, this Agreement and the consummation of the transactions contemplated hereby, as attached to such certificate, were

22

duly adopted by all necessary action and remain in full force and effect, and have not been amended, rescinded or modified;

(iii)    a certificate, duly executed by an officer of the Seller, dated as of the Closing Date, certifying as to the incumbency of the officers executing this Agreement on behalf of the Seller;

(iv)    fully executed originals of all consents and recorded Lease memoranda set forth on Section 6.3(d) of the Seller Disclosure Schedule;

(v)    subject to Section 6.3(e), evidence of the termination of all financing statements and the release of all Liens (other than Permitted Liens) filed or outstanding against the Assets;

(vi)    the Assignment and Assumption of Contracts executed by the Seller;

(vii)    the Assignment and Assumption of Leased Real Property executed by the Seller;

(viii)    the Bill of Sale executed by the Seller;

(ix)    the Deed executed by the Seller;

(x)    the Escrow Agreement executed by the Seller, Frontier and NRI;

(xi)    the Transition Services Agreement executed by the Seller and/or Seller's Affiliates that are parties thereto;

(xii)    the Permit Operating Agreement executed by Bluestone Mineral, Inc. and the Seller;

(xiii)    the Ancillary Guarantee executed by James C. Justice II;

(xiv)    the Sublease of Ettenger Lease and the Joint Use Agreement, each executed by the Seller;

(xv)    to the extent necessary pursuant to Section 5.28, the Back-to-Back Sales Agreement, executed by the Seller;

(xvi)    all Records (other the Records described in Section 2.2(c));

(xvii)    executed affidavits as required by Section 1445(b)(2) of the Code and Section 1.1445-2(b) of the Treasury Regulations stating, under penalties of perjury, the Seller's taxpayer identification number and that the Seller is not a foreign person; and

(xviii)    such other documents as are reasonably requested by the Purchaser prior to the Closing Date in order to consummate the transactions contemplated hereby.

(d)     At the Closing, the Seller shall deliver evidence acceptable to the Purchaser that CM Energy GP, LLC has been named as an additional insured (i) under each of Policy # MNG88108801, Policy # MNG880975-02 and Policy # M00982660001 set forth on Section 3.18 of the Seller Disclosure Schedule with respect to all claims covered thereby attributable to or arising out of the operation of the Business or the Assets by the Seller prior to the Closing, regardless of when any such claims shall be made, with substantially the same coverage terms, conditions, policy limits, and deductibles as exist prior to the Closing and, in any case, with a minimum coverage amount of Sixteen Million Dollars ($16,000,000) and (ii) under similar policies issued previous years, under identical terms and conditions.

**Section 2.11   Allocation of Purchase Price.**  Within sixty (60) days following Closing, the Purchaser shall deliver to the Seller a schedule reasonably acceptable to the Seller setting forth the allocation of the Purchase Price (and all other capitalized costs) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local, or non-U.S. Law, as appropriate).  In the event that the Purchaser and Seller cannot reasonably agree upon an allocation of the Purchase Price among the Assets, any unresolved disputed items shall be promptly referred to the Independent Accountant, who shall resolve such disputed items in a manner consistent with procedures and requirements set forth in the final six sentences of Section 2.8(c)(ii), *mutatis mutandis*.  The Purchaser and the Seller and their respective Affiliates shall report, act, and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all Tax purposes consistent with the final Purchase Price allocation.  Neither the Purchaser nor the Seller shall take any Tax position (whether in audits, Tax Returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.12   Allocation of Additional Costs**.   The Purchaser shall pay all costs associated with replacing the Seller's Bonds and posting any bonds or collateral associated with the foregoing, and shall provide evidence of the same to the Seller upon such recording or transfer completion.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

Except as set forth on the Seller Disclosure Schedule, the Seller hereby represents and warrants to the Purchaser that as of the Effective Date and as of the Closing Date (except where a different date is indicated):

**Section 3.1     Corporate Status**.  The Seller is a corporation duly organized, validly existing and in good standing under the Laws of its governing jurisdiction and (a) has all requisite corporate power and authority to enter into each of the Transaction Documents to which it is a party and to carry on its business as it is now being conducted and (b) is duly qualified to do business in each of the jurisdictions in which the ownership, operation or leasing of its properties and assets and the conduct of the business requires it to be so qualified.  The Seller has made available to the Purchaser true and complete copies of the Certificate of Incorporation, Articles of Incorporation and Bylaws of the Seller, as amended. The Seller is not in default under or in violation of any provision of its Articles of Incorporation or Bylaws.

**Section 3.2     Corporate Authorization**. The execution and delivery by the Seller of this Agreement and the other Transaction Documents to which it is a party and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by the Seller and no other corporate proceedings are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.

**Section 3.3     Binding Effect**.  This Agreement and each of the Transaction Documents to which the Seller is a party, when executed and delivered by the parties thereto, constitutes a valid and legally binding obligation of the Seller enforceable against the Seller in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, or moratorium Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

**Section 3.4     Financial Statements**.  True and complete copies of (a) the balance sheet of the Business as at December 31, 2015 and the related statements of income and retained earnings, stockholders' equity and cash flow for the year then ended (the "Year-End Financial Statements"), and (b) the unaudited financial statements consisting of the balance sheet of the Business as at September 30, 2016 and the related statements of income and retained earnings, stockholders' equity and cash flow for the six-month period then ended (the "Interim Financial Statements" and together with the Year-End Financial Statements, the "Financial Statements") are included in Section 3.4(a) of the Seller Disclosure Schedule.  Other than as set forth on Section 3.4(b) of the Seller Disclosure Schedule, the Financial Statements were prepared consistent with past practice, and, subject to (i) normal and recurring year-end adjustments and (ii) contingent liabilities, as that term is defined in accordance with GAAP, present fairly, in all material respects, the financial position and results of operations of the Business for the periods specified therein, subject to normal year-end adjustments.

**Section 3.5     No Breach; Approvals.**

(a)     The execution, delivery, and performance by the Seller of this Agreement and compliance with the terms and provisions hereof do not and will not violate or conflict in any material respect with, or result in a breach of, or require any consent under, or give rise to a right of termination, cancellation, suspension or acceleration of any obligation under (i) the Certificate of Incorporation, Articles of Incorporation or Bylaws of the Seller; or (ii) except for filings or approvals described in Section 3.5(b) and applicable consents or notices to be obtained pursuant to Section 6.3(d), any Lease or Material Contract; or (iii) any applicable Law, order, decree or injunction by which the Seller is bound or any Permit of the Seller; in each case, except as would not reasonably be expected to materially and adversely affect the Business or the Assets.

(b)     Except  as set forth in Section 3.5 of the Seller Disclosure Schedule, no material filing or registration with, or consent or approval of, any Governmental Authority is required in connection with the execution, delivery, or performance of this Agreement by the Seller, except for filings or approvals required in connection with the change of ownership and control with respect to the Seller's Permits or as would not reasonably be expected to result in a Business Material Adverse Effect.

**Section 3.6    Absence of Certain Changes.**   Since the Reference Date, except as contemplated by this Agreement, the Business has operated in the ordinary course of business in all material respects and there has not been any:

(a)    Business Material Adverse Effect;

(b)    any material change by the Seller in any of its accounting methods, principles or practices (except for changes required by GAAP or applicable Law or as disclosed in Financial Statements);

(c)    material change in the conduct of the Business, or any change in its method of purchase, sale, lease, management, marketing, promotion or operation;

(d)    sale, lease, sublease, assignment or transfer by the Seller of any material tangible or intangible assets (including the Assets);

(e)    incurrence, authorization or commitment to make any capital expenditure (or series of related capital expenditures) in respect of the Assets or the Business that would obligate the Purchaser to incur such expenditure after the Closing;

(f)    acquisition by the Seller by merger or consolidation with, or by purchase of a substantial portion of the assets or stock of, or by any other manner, any business or any Person or any division thereof;

(g)    adoption by the Seller of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(h)    physical damage, destruction, or other casualty loss affecting the Assets in an aggregate amount exceeding Three Hundred Thousand Dollars ($300,000), which is not covered by insurance or is outside of the ordinary course of business;

(i)    adoption, amendment, modification or termination of any bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, stock option, stock purchase or other benefit or compensation plan, program, agreement, policy, Contract or arrangement for the benefit of, any directors, officers or key employees or other service providers of the Business;

(j)    incurrence of an indebtedness, payables or liens on the Business or the Assets, other than trade and account payables incurred in the ordinary course of business;

(k)    termination, amendment, or failure to renew or preserve or to maintain in full force and effect any material Permit, Material Lease or Material Contract, or entry into any new Material Lease or Material Contract, except for amendments completed in the ordinary course of business;

(l)      failure to maintain in full force and effect any insurance policy in effect relating to the Assets or the Business, except for any policy replaced by a new or successor policy of substantially similar coverage;

(m)      agreement with any Governmental Authority or third party that would have the effect of restricting or prohibiting the present or contemplated operations of the Business or Assets; or

(n)      agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 3.7      Agreements.**

(a)      Section 3.7(a) of the Seller Disclosure Schedule lists (i) all of the written and oral Purchased Contracts related to the Business in excess of Fifty Thousand Dollars ($50,000) or that are material to the Business, including agreements with any shareholder, director or officer of the Seller, in each case, involving remaining consideration in excess of Fifty Thousand Dollars ($50,000), (ii) any collective bargaining agreement or other Contract of the Seller or the Business with any other labor organization; (iii) all Contracts of the Seller or the Business that are settlements, conciliations or similar agreements with any Governmental Authority or pursuant to which there will be outstanding obligations on the Assets or the Business after the Effective Date; (iv) any covenant not to compete that materially limits the conduct of the Business as presently conducted; (v) other than with respect to any arrangements that will be terminated at or before Closing, all Contracts with (A) the Seller or any of its Affiliates or (B) any officer, director or employee of the Seller or any Affiliate of the Seller (other than employment agreements covered by clause (i) above) (collectively, the "Material Contracts").

(b)      The Seller is not in violation of or in default under (nor does there exist any condition which with the passage of time or the giving of notice or both would cause such a violation of or default under) any Material Contract, except for such violations or defaults that would not have materially and adversely affect the Business or the Assets, either individually or taken together.

(c)      True and complete copies of all written Material Contracts and true and complete summaries of all unwritten Material Contracts have been made available to the Purchaser and there are no amendments to or modifications of, or other agreements of the Parties relating to, any such Material Contract which have not been made available to the Purchaser.

**Section 3.8      Undisclosed Liabilities**.  There are no material liabilities, commitments or obligations of the Seller of the type required to be reflected on a balance sheet prepared in accordance with GAAP, except (i) those which are adequately reflected or reserved against in the Financial Statements, (ii) those which have been incurred since the Reference Date in the ordinary course of business consistent with past practice, or (iii) those which, in the aggregate, would not reasonably be expected to materially affect the Business or the Assets, either individually or taken together.

**Section 3.9      Capital Commitments**.  Section 3.9 of the Seller Disclosure Schedule contains a complete and accurate list as of the Effective Date of (i) each authorization or

commitment for capital expenditures in respect of the Business or the Assets pursuant to any Contract to which the the Seller or its Affiliates is a party or by which the Business or any of the Assets is bound and (ii) all incurrences of liability for any capital expenditure in respect of the Business or the Assets which has not been paid in full.

**Section 3.10   Permits**.

(a)     The Purchased Permits are all the material Permits, or rights thereto, necessary for the current stage of development of the Business. True and complete copies, as of the Effective Date, of the following Purchased Permits have been made available to the Purchaser, including (i) all of the Purchased Permits issued pursuant to Sections 401, 402 or 404 of the Clean Water Act, and (ii) any pending applications for Purchased Permits to be issued pursuant to Sections 401, 402 or 404 of the Clean Water Act which have been submitted to any Governmental Authority (including revisions or modifications of existing Purchased Permits).  All Purchased Permits are valid and in full force and effect, and to the Seller's knowledge, no condition exists that, with the passage of time or otherwise will result in the termination, cancellation, forfeiture or revocation of the Purchased Permits prior to their stated expiration or termination date.  To the Seller's knowledge, no Purchased Permit will be terminated or materially impaired as a result of the transactions contemplated herein.  The Seller is in compliance with the Purchased Permits in all material respects.  Section 3.10(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list, as of the Effective Date, of the material Purchased Permits.

(b)     Neither the Seller, nor any Person "owned or controlled" by the Seller, nor any Person who "owns or controls" the Seller, has been notified in writing by any Governmental Authority administering SMCRA, or any comparable state statute, that such party is currently (i) ineligible to receive additional surface mining Permits, (i.e., "permit-blocked"), or (ii) under investigation to determine whether its eligibility to receive such Permits should be revoked.  As used in this Section 3.10, "owned or controlled" or "owns or controls" shall be defined as set forth in 30 C.F.R. Section 773.5 (2000).

(c)     Section 3.10(c) of the Seller Disclosure Schedule sets forth a true, complete and accurate list of all assets, bonds, letters of credit or other collateral pledged to any Governmental Authority as a requirement to obtaining the Permits listed in Section 3.10(a) of the Seller Disclosure Schedule.

**Section 3.11   Taxes**.

(a)     All material Tax Returns of the Seller that were required to be filed with any Governmental Authority (i) have been timely filed, (ii) are true, correct and complete in all material respects and (iii) were prepared in substantial compliance with applicable Laws and regulations.  Except as set forth on Section 3.11(a) of the Seller Disclosure Schedule, all material Taxes, due and payable (whether or not shown on any Tax Return), have been paid.

(b)     There is no audit, action, suit or proceeding now pending with respect to any Taxes owed by the Seller, and no written claim has even been made by any Governmental Authority in a jurisdiction where the Seller does not file any Tax Returns that the Seller is or may be subject to Tax in that jurisdiction.  Neither the Seller nor any director or officer of the Seller

(or employee responsible for Tax matters) expects any Governmental Authority to assess any additional Taxes relating to the Assets for any period for which Tax Returns have been filed.

(c)     The Seller has withheld all material Taxes required to have been withheld and collected by Law and have paid over such Taxes to the appropriate Governmental Authorities to the extent due and payable.

(d)     The Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, in each case with respect to any taxable period that remains open and excluding any extension that arises as a result of filing a Tax Return by the extended due date. The Seller currently are not the beneficiaries of any extension of time within which to file any Tax Return.

(e)     All of the Assets that are subject to property Taxes have been properly listed and described on the property Tax rolls of the appropriate taxing jurisdiction for all periods prior to the Closing Date, and no portion of such Assets constitutes omitted property for property Tax purposes.

(f)     Except as set disclosed in Section 3.11(f) of the Seller Disclosure Schedule, there are no liens for Taxes encumbering any of the Assets other than Permitted Liens.

(g)     None of the Assets is "tax exempt use property" within the meaning of Section 168(h) of the Code.

(h)     The representations and warranties set forth in this <u>Section 3.11</u> are the Seller's sole and exclusive representations and warranties regarding Tax matters.

**Section 3.12   ERISA**.

(a)     All material bonus (including transaction bonus), pension, profit sharing, deferred compensation, incentive compensation, stock option or other equity or equity-based award, phantom stock, retirement, dental, vacation, employment, severance, disability, sickness, accident, death benefit, hospitalization, medical, life insurance, supplemental retirement, supplemental unemployment, workers' compensation, apprenticeship, training, fringe benefit and other compensation or benefit plans, programs, policies, Contracts, arrangements and agreements (including any "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA) (each, a "<u>Benefit Plan</u>") (i) covering active, former or retired employees or other services providers of the Business (or any dependent or beneficiary thereof), (ii) which provide benefits to such active, former or retired employees or other service providers (or any dependent or beneficiary thereof), or (iii) under or with respect to which the Business has any current or contingent liability or obligation, are listed on Section 3.12(a) of the Seller Disclosure Schedule (the "<u>Company Plans</u>").  Each Company Plan which is funded through a policy of insurance is indicated by the word "insured."

(b)     True and complete copies of all (i) Company Plans (including all amendments thereto) and related trust agreements; (ii) policies, practices, agreements, arrangements and other documents relating to the Company Plans; (iii) summary plan descriptions (including all summaries of modification thereto) for the Company Plans; (iv) allocation or actuarial reports

29

prepared for each Company Plan for the most recent year; (v) insurance policies applicable to the Company Plans; (vi) communications in the last two years to or from the Internal Revenue Service (the "IRS") (including the last Form 5500 as filed) or the United States Department of Labor and other filings with any Governmental Authority with respect to the Company Plans, and (vii) current favorable determination or opinion letters from the IRS with respect to each Company Plan that is intended to be qualified under Section 401(a) of the Code, in the case of each of clauses (i) through (vii) above as applicable, have been made available by the Seller to the Purchaser.

(c)     Except as specifically provided in the documents made available to the Purchaser under Section 3.12(b), there are no amendments, modifications, extensions, changes in benefits or benefit structures, or other alterations which are currently in effect or which the Business has undertaken to become effective in the future, or which the Seller has knowledge of, to any of the Company Plans.

(d)     All Company Plans comply in all material respects in form with, and have been established, funded, administered and maintained in all material respects in accordance with, their terms and all applicable requirements of Law, including ERISA and the Code, as well as the requirements of any applicable collective bargaining agreements.

(e)     Each Company Plan that is intended to be qualified under Section 401(a) of the Code has obtained a current favorable determination, opinion, or advisory letter, as applicable, as to its qualified status (or the qualified status of the master or prototype form on which it is established) from the IRS, or an application for such letter is currently being processed by the IRS with respect thereto, and no fact or event has occurred that would reasonably be expected to materially and adversely affect such favorable determination or the qualified status of such plan. Except as set forth on Section 3.12(e) of the Seller Disclosure Schedule, no Company Plan is, and neither the Seller nor any Person that, together with the Seller, at any relevant time would be treated as a single employer under Section 414 of the Code (each, an "ERISA Affiliate") sponsors, maintains, contributes to or is required to contribute to or has any current or contingent liability or obligation under or with respect to, a Multiemployer Plan or a Pension Plan. Except as set forth on Section 3.12(e) of the Seller Disclosure Schedule, neither the Seller nor any ERISA Affiliate (i) has incurred or is reasonably expected to incur a withdrawal under Section 4203 or 4205 of ERISA or has any unsatisfied withdrawal liability within the meaning of Title IV of ERISA (whether or not asserted by a Multiemployer Plan and whether for a partial or complete withdrawal), or (ii) has engaged in any transaction (including the transactions contemplated by this Agreement) which has or could give rise to a liability of either of the Business or the Purchaser or any of its Affiliates under Section 4069 or Section 4212(c) of ERISA.  All contributions, distributions, accruals, reimbursements and premium payments due with respect to each Company Plan have been timely made and all contributions, distributions, accruals, reimbursements and premium payments for any period ending on or before the Closing Date that are not yet due have been made or properly accrued.  The Seller and its Affiliates have complied and are in compliance with the requirements of Section 4980B of the Code.  There has been no prohibited transaction (as defined in Section 4975 of the Code or Section 406 of ERISA) or any breach of fiduciary duty (as determined under ERISA) with respect to any Company Plan that could result in a material liability to the Purchaser or any of its Affiliates.

30

(f)     No Company Plan provides, and the Business does not have any liability or contingent liability or obligation for providing any post-retirement or post-termination medical, life insurance or other welfare-type benefits, other than statutory liability to offer group health plan continuation coverage under Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (for which the covered Person pays the full cost of coverage).

(g)     Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated hereby, either alone or in connection with any other event, will entitle any current or former director, officer, employee or other service provider of the Seller or any of its Affiliates to any compensation or benefits or any other payment or accelerate the time of payment, funding or vesting, or increase the amount of compensation or benefits due, to any such current or former director, officer, employee or other service provider of the Seller or any of its Affiliates.

(h)     Except as may be set forth in <u>Section 3.6(i)</u>, <u>Section 3.7(a)(ii)</u> and <u>Section 3.13</u>, the representations and warranties set forth in this <u>Section 3.12</u> are the Seller's sole and exclusive representations and warranties regarding employee benefit matters.

**Section 3.13   Employment and Labor**.

(a)     There are no written employment or severance agreements to which the Seller is a party with respect to any employee of the Business. Except as set forth on Section 3.13(c) of the Seller Disclosure Schedule, there are no grievances, complaints or charges against the Business pending or, to the knowledge of the Seller, threatened before the National Labor Relations Board or any similar state or local labor agency or Governmental Authority by or on behalf of any current or former employee of the Business or the United Mine Workers of America, nor have there been any such charges or complaints in the past eighteen (18) months.  Except as set forth on Section 3.13(a) of the Seller Disclosure Schedule, the Seller is not a party to any collective bargaining agreement, collective bargaining relationship, or any other agreement with a labor organization.  With respect to the transactions contemplated by this Agreement, the Seller is not in violation of any notice, consultation or bargaining obligations owed to its employees or representatives under applicative Law, collective bargaining agreement or other Contract.  Except as set forth in Schedule 3.13(a), to the knowledge of the Seller, no organizational effort is presently underway or threatened by or on behalf of any labor organization with respect to the Business Employees and no such activities have occurred within the past five (5) years.

(b)     Except as set forth on Section 3.13(c) of the Seller Disclosure Schedule, within the past eighteen (18) months, the Seller has not implemented any plant closing or layoff of employees implicating the WARN Act, nor is the Seller subject to any liability under the WARN Act.   No employee layoff, facility closure, or similar reduction in force is currently contemplated, planned, or announced that could affect the Business Employees.  Section 3.13(b) of the Seller Disclosure Schedule lists by date and location each Business Employee of the Seller whose employment was terminated within the 90-day period immediately preceding the Closing Date.   There are no existing or, to the knowledge of the Seller, threatened labor strikes, slowdowns, lockouts, work stoppages, grievances, disturbances or other disputes affecting operations at, or deliveries from or into, any operation or facility of the Business and there have been no such disputes within the past eighteen (18) months.

31

(c)      Except as set forth on Section 3.13(c) of the Seller Disclosure Schedule, (i) the Seller is and for the past three (3) years has been in compliance in all material respects with all applicable Laws pertaining to labor relations, unions, wage and hour, WARN Act, employment and employment practices, (ii) there are no Actions against the Seller pending, or to the knowledge of the Seller, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former employee of the Business, including any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment related matter arising under applicable Laws, and (iii) the Seller has paid all wages, salaries, bonuses, commissions, wage premiums, fees and other compensation that have become due and payable to its Business Employees, or other consultants, and independent contractors who performed services for the Business, pursuant to any Law, Contract, or policy of the Seller.

(d)      The Seller is not subject to, and does not have any liability under, the Coal Industry Retiree Health Benefit Act of 1992, as amended.

**Section 3.14   Rights in Properties; Liens**.

(a)      Section 3.14(a) of the Seller Disclosure Schedule sets forth a true, correct, and complete list, as of the Effective Date, of (i) the Real Property, and (ii) Leased Real Property involving total annual payments of at least Twenty Thousand Dollars ($20,000) ("Material Leases"), in each case, citing to the recording information for the source deed (in the case of the Real Property) and subsequent assignments thereof (in the case of the Material Leases). The Real Property and the Material Leases include all of the real property interests required to be owned or leased for the Business' operations as currently conducted or as contemplated under the Seller's current mine plans.

(b)      Section 3.14(b) of the Seller Disclosure Schedule sets forth a true and complete list of all agreements pursuant to which the Seller has leased or subleased any of the Real Property or the Leased Real Property to any Person (other than to another Seller).

(c)      Except those Liens that will be released on or before Closing or otherwise addressed in accordance with Section 6.3(e)), the Seller specially warrants its title to the Real Property and that the Real Property is free and clear of Liens (other than Permitted Liens), created by, through and under the Seller or the Seller's Affiliates, but not otherwise; *provided* that such warranty shall cover only that period of time that the Seller or one of its parent or subsidiaries owned the Real Property. The Seller's leasehold title with respect to each of the Material Leases is free and clear of Liens (other than Permitted Liens and liens set forth in Section 1.1(d) or Section 3.11(f) of the Seller Disclosure Schedule (which, at or prior to the Closing Date, will be addressed in accordance with Section 6.3(e))) created by, through and under the Seller's and the Seller's Affiliates. Since the time that the Seller acquired title to the Real Property and Material Leases, except for (i) matters set forth in this Agreement (including on any Schedule or Exhibit hereto), (ii) as contained within any Material Contracts or Material Leases and (iii) as set forth in Section 3.14(c) of the Seller Disclosure Schedule, with respect to each parcel of Real Property and Material Leases, there have been no agreements granting any other Person the right of entry, use or occupancy of any portion of such parcel. To the knowledge of the Seller, no third party has asserted that any improvements constituting part of

32

the Real Property or the Material Lease encroach on real property owned or leased by any other Person.

(d)     Since the time that Seller became a party to the Leases or Material Contracts, except for (i) matters set forth in this Agreement (including on any Schedule or Exhibit hereto), (ii) as contained within any of the Material Leases or Material Contracts and (iii) as set forth in Section 3.14(d) of the Seller Disclosure Schedule, none of the Material Leases have been assigned or subleased, and none of the Material Leases have been amended or otherwise modified.  Each Material Lease (x) constitutes a valid and binding obligation of, and is in full force and effect against, the Seller that is a party thereto and, to the knowledge of the Seller, the other parties thereto, and (y) assuming such Material Lease is a valid and binding obligation of, and enforceable against, the other parties thereto, is enforceable against the Seller that is a party thereto, except as limited by bankruptcy, insolvency, reorganization, moratorium or other similar applicable Laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity). The Seller is not, and has not received written notice, nor has knowledge of any oral notice, that it is, in breach or default under any Material Lease and, to the Seller's knowledge, no other party to any Material Lease is, or is alleged in writing to be, in breach or default thereunder.  The Seller has not committed or permitted to exist and, to the Seller's knowledge, no other party to any Material Lease has committed or permitted to exist, any event or circumstance which, with due notice or lapse of time or both, would (A) constitute a breach or default by the Seller or any other party thereto, or (B) result in the termination, or (C) cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit, under any Material Lease.  Neither the Seller nor any of its Affiliates have received any written notice, and the Seller has no knowledge, that any counterparty will cancel, terminate, fail to perform or fail to renew its obligations under any Material Lease.

(e)     No Person has any right to purchase, or holds any right of first refusal to purchase, or right of first offer with respect to, any Purchased Real Property.

(f)     Section 3.14(f) of the Seller Disclosure Schedule contains a true and complete list of all prepaid royalties and unrecouped minimum royalties for each Material Lease as of the Effective Date.

(g)     Section 3.14(g) of the Seller Disclosure Schedule (together with the map included therewith) identifies the existence and location of all oil or gas wells, pipelines and power lines situated on any portion of the Real Property or, to the Seller's knowledge, the Material Leases. The location and operation of all such oil and gas wells, pipelines and power lines situated on the Real Property or the Material Leases will not materially interfere with conduct of the Business as of or following the Closing under the current mine plans.

(h)     Neither the Seller nor any of its Affiliates have received written notice from any third party of any additional covenants, conditions, permits, approvals or restrictions affecting the Leased Real Property under any Lease, and, other than applicable Law, there are no obligations or restrictions affecting any Leased Real Property which are not expressly set forth in the applicable Lease other than as set forth in any Contract listed in the Seller Disclosure Schedule.

33

**Section 3.15   Equipment and Other Personalty**.  The equipment, machinery, vehicles and other tangible personal property (other than inventories) used by the Seller in the Business is defined as the "Coal Personalty".  Section 3.15 of the Seller Disclosure Schedule contains a list of all Coal Personalty owned or leased by the Seller with an individual book value of over Fifty Thousand Dollars ($50,000) and indicates for each such item of Coal Personalty whether it is owned or leased and its approximate lifetime hours of operation, if applicable, through the Effective Date,.  The Seller has good and marketable title to the owned Coal Personalty, free and clear of all Liens other than Permitted Liens and liens set forth in Section 1.1(d) or Section 3.11(f) of the Seller Disclosure Schedule (which, at or prior to the Closing Date, will be addressed in accordance with Section 6.3(e)).  Except as set forth in Section 3.15 of the Seller Disclosure Schedules, the Coal Personalty are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  Except as set forth in Section 3.15 of the Seller Disclosure Schedule, all Coal Personalty has been fully paid for by the Seller, and there are no current or future payments or obligations owing by the Seller or its Affiliates with respect to any Coal Personalty.

**Section 3.16   Sufficiency of the Assets**.  Except for the assets being transferred pursuant to the Prep Plant PSA, the Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.  Other than as set forth in Section 3.16 of the Seller Disclosure Schedule, the Seller owns good and valid title to all of the Assets other than the Real Property and Leased Real Property, free and clear of all Liens (other than Permitted Liens and liens set forth in Section 1.1(d) or Section 3.11(f) of the Seller Disclosure Schedule (which, at or prior to the Closing Date, will be addressed in accordance with Section 6.3(e))).  Upon consummation of the transactions contemplated hereby, the Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Assets other than the Real Property and Leased Real Property, free and clear of all Liens (other than Permitted Liens and liens set forth in Section 1.1(d) or Section 3.11(f) of the Seller Disclosure Schedule (which, at or prior to the Closing Date, will be addressed in accordance with Section 6.3(e))).

**Section 3.17   Environmental Matters.**  Except for such matters set forth in Section 3.17 of the Seller Disclosure Schedule: (i) other than routine violations in the ordinary course of business that have been abated, no Environmental Claim has been received or filed or, to the knowledge of the Seller, threatened against the Business, the Assets or the Seller, with respect to the Business or the Assets; (ii) all Permits required under any applicable Environmental Laws have been duly obtained or filed and are in full force and effect, and the Business, the Assets and the Seller, with respect to the Business or the Assets, are, and, during the past three (3) years, have been in compliance in all material respects with the terms and conditions of all such Permits and with all Environmental Laws; (iii) there has been no Release, treatment, storage, disposal, handling, transportation or arrangement for the disposal or transportation of, or exposure of any Person to, Hazardous Substances in violation of or so as to give rise to any material liability under any Environmental Laws by the Business, the Assets or any of the Seller with respect to the Business or the Assets or, to the knowledge of the Seller, by any other Person, at, on, in,

34

from, under, over or in any way affecting any of the Purchased Real Property or Purchased Leased Real Property; (iv) all of the Purchased Real Property and Purchased Leased Real Property is free of all Hazardous Substances, except for such Hazardous Substances that have not and will not result in material liability under applicable Environmental Laws; (v) the Business and the Seller, with respect to the Business or the Assets, have not assumed, become subject to, or otherwise provided an indemnity with respect to, any material liability of any other Person relating to any Environmental Law; (vi) other than routine violations in the ordinary course of business that have been abated, there are no pending or threatened Claims, Actions, orders, complaints, directives, citations, notices of non-compliance, notices of violation, revocation proceedings, or cessation orders from any Governmental Authority pending or, to knowledge of the Seller, threatened against, the Business, the Assets or the Seller, or related to the Business, the Assets or the Seller (whether or not arising prior to the Seller's ownership of the Assets and Business), and arising under any Environmental Laws; (vii) the Business has (a) in the amounts and forms required by any Environmental Laws, obtained all performance bonds, surety bonds, insurance and any other financial assurances required under Environmental Laws for reclamation or otherwise, and (b) obtained or acquired all mining, surface or other rights necessary for access, water, plant sites, tailings disposal, waste dumps, ore dumps, abandoned heaps, or ancillary facilities required under Environmental Laws or other Laws in connection with the operation of any mines, and all such rights are sufficient in scope and substance for the operation of each mine owned or operated by the Business or the Seller, with respect to the Business; and (viii) the Seller has not received any written notification from any source advising either the Seller or the Business that it is a potentially responsible party under CERCLA or any other applicable Environmental Laws, with respect to any real property that is identified or proposed for listing as a federal National Priorities List ("NPL") (or state-equivalent) site or a Comprehensive Environmental Response, Compensation and Liability Information System ("CERCLIS") (or state-equivalent) site, or any facility to which it currently transports or otherwise arranges for or to which it has transported or arranged for the disposal of Hazardous Substances, which is identified or proposed for listing as an NPL (or state-equivalent) site or CERCLIS (or state-equivalent) site.  The Seller has furnished to the Purchaser copies of all material information, environmental assessments, audits, reports and other documents in its possession or under its control relating to the Business, the Assets or any of its current properties, facilities or operations (including the Purchased Real Property or the Purchased Leased Real Property).

**Section 3.18   Insurance.**  Section 3.18 of the Seller Disclosure Schedule sets forth a summary of all existing insurance policies held by the Seller or its Affiliates relating to the Assets or the Business.  Each such policy is in full force and effect, and the Seller has not received any written notice of cancellation, termination or non-renewal of such policies (or that cancellation, termination or non-renewal of such policies is threatened, including notice that any material modification of the terms of policy of insurance will be or is threatened to be required as a condition of renewal) or refusal of coverage under such policies or that the Seller is in default under such policies.  As of the Effective Date, there is no claim by the Seller or its Affiliate relating to the Business or the Assets pending under such polices as to which coverage has been denied or disputed in writing by the applicable insurers or in respect of which there is an outstanding reservation of rights.  All premiums, deductibles and retention amounts due and payable under such polices have been paid and the Seller is in material compliance with the terms and conditions of such polices.

**Section 3.19   Compliance with Law.**  The Seller's conduct of the Business as presently conducted does not, and did not, for the past three (3) years, materially violate or conflict with any Law or order applicable to the Seller.   The Seller has not received, and to the Seller's knowledge, the Seller's predecessor to the Assets did not receive, written notice during the past three (3) years of any material violation of any Law or order applicable to the Seller that has not been abated or otherwise resolved.

**Section 3.20   Litigation and Judgments.**  Except as set forth on Section 3.20 of the Seller Disclosure Schedule, there is not (and during the past three (3) years there has not been) any Action before or by any Governmental Authority pending (in respect of which process has been served on the Business), or, to the knowledge of the Seller, threatened against or affecting the Business seeking injunctive or equitable relief or damages in excess of Two Hundred Fifty Thousand Dollars ($250,000), and there are no judgments, decrees, injunctions or orders of any Governmental Authority outstanding against the Business or any of the Assets.   To the knowledge of the Seller, there is no reasonable basis for any of the foregoing.

**Section 3.21   No Undisclosed Relationship**.  Except as set forth in Section 3.21 of the Seller Disclosure Schedule, there are no agreements related to the Business between (a) the Seller, on the one hand, and (b) the Seller's Affiliates or any of its or their respective officers or directors, on the other hand.

**Section 3.22   No Brokers.**   There are no contracts, agreements or understandings between the Seller and any Person that would give rise to a valid claim against the Seller for a brokerage commission, finder's fee or other like payment in connection with the transactions contemplated by this Agreement.

**Section 3.23   Customers and Suppliers.**

(a)   Section 3.23(a) of the Seller Disclosure Schedules sets forth with respect to the Business each customer who has paid aggregate consideration to the Seller for goods or services rendered in an amount greater than or equal to Two Hundred Fifty Thousand Dollars ($250,000) for each of the two (2) most recent fiscal years (collectively, the "Material Customers"). The Seller has not received any notice, and has no reason to believe, that any of the Material Customers has ceased, or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

(b)   Section 3.23(b) of the Seller Disclosure Schedules sets forth with respect to the Business each supplier to whom Seller has paid consideration for goods or services rendered in an amount greater than or equal to Two Hundred Fifty Thousand Dollars ($250,000) for each of the two (2) most recent fiscal years (collectively, the "Material Suppliers").  The Seller has not received any notice, and has no reason to believe, that any of the Material Suppliers has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

**Section 3.24   No Other Representations and Warranties**. Except for the representations and warranties contained in this ARTICLE 3 (including the related portions of the Seller Disclosure Schedule) and those representations and warranties expressly set forth in

36

the other Transaction Documents, neither the Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business furnished or made available to the Purchaser and its Representatives (including any information, documents or material made available to the Purchaser in the Data Room, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF
## THE PURCHASER

Except as set forth in the Purchaser Disclosure Schedule, the Purchaser hereby represents and warrants to the Seller that, as of the Effective Date and as of the Closing Date (except where a different date is indicated):

**Section 4.1     Status**.  The Purchaser is a Delaware limited partnership organized, validly existing and in good standing under the Laws of its governing jurisdiction and (a) has all requisite corporate power and authority to enter into each of the Transaction Documents to which it is a party and to carry on its business as it is now being conducted and (b) is duly qualified to do business in each of the jurisdictions in which the ownership, operation or leasing of its properties and assets and the conduct of the business requires it to be so qualified.  The Purchaser has made available to the Seller true and complete copies of the Articles of Organization and Operating Agreement of the Purchaser, as amended.

**Section 4.2     Authorization**. The execution and delivery by the Purchaser of this Agreement and the other Transaction Documents to which it is a party and the consummation by the Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized by the Purchaser and no other corporate or organizational proceedings are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.

**Section 4.3     Binding Effect**.  This Agreement and each of the Transaction Documents to which the Purchaser is a party, when executed and delivered by the parties thereto, constitutes a valid and legally binding obligation of the Purchaser enforceable against the Purchaser in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, or moratorium Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

**Section 4.4     No Breach; Approvals**.

(a)     The execution, delivery, and performance by the Purchaser of this Agreement and compliance with the terms and provisions hereof do not and will not violate or conflict with (with or without notice or lapse of time or both), or result in a breach of, or require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of benefit under, (i) articles of organization, operating agreement or other organizational

37

documents of the Purchaser, (ii) except for filings or approvals described in Section 4.4(b), any applicable Law, order, decree or injunction or any Permit or (iii) any contract, agreement, undertaking or license to which the Purchaser is a party or by which the Purchaser or its properties are bound or subject.

(b)     No material filing or registration with, or consent or approval of, any Governmental Authority is or will be necessary for the execution, delivery, or performance of this Agreement by the Purchaser or the validity or enforceability thereof, except for filings or approvals required in connection with the HSR Act or the change of ownership and control with respect to the Seller's Permits.

Section 4.5     No Brokers.     There are no contracts, agreements or understandings between the Purchaser, on the one hand, and any Person, on the other hand, that would give rise to a valid claim against the Seller for a brokerage commission, finder's fee or other like payment in connection with the transactions contemplated by this Agreement.

Section 4.6     Financing.     The Purchaser has delivered to the Seller an executed equity commitment letter, dated as of the Effective Date (the "Equity Commitment Letter"), pursuant to which the parties identified therein have committed, upon the terms and subject to the conditions thereof, to invest the cash amounts set forth therein. The amount of funds contemplated to be provided pursuant to the Equity Commitment Letter is sufficient to satisfy the Purchase Price. The Equity Commitment Letter, in the form so delivered by to the Seller on the Effective Date, is in full force and effect and constitutes a legal, valid and binding obligation of the  Purchaser and the other parties identified therein, in each case except as that enforceability may be (a) limited by any applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and (b) subject to the general principles of equity (regardless of whether that enforceability is considered in a proceeding in equity or at law).  The commitments contained in the Equity Commitment Letter have not been withdrawn or rescinded in any respect (and no party thereto has indicated an intent to so withdraw or rescind) or otherwise amended or modified in any respect. The Purchaser is not in breach of any of the terms or conditions set forth in the Equity Commitment Letter and no event has occurred which, with or without notice, lapse of time or both, could reasonably be expected to constitute a breach by the Purchaser or failure by the Purchaser to satisfy a condition precedent set forth therein. The Purchaser has fully paid any and all commitment fees or other fees on the dates and to the extent required by the Equity Commitment Letter. There are no conditions precedent or other contingencies relating to the funding of the full amount of the proceeds of such Equity Commitment Letter except as stated in the Equity Commitment Letter.

Section 4.7     Permit Blocking.     Neither the Purchaser, nor any Person "owned or controlled" by the Purchaser, has been notified by any Governmental Authority administering the Federal Surface Mining Control and Reclamation Act of 1977, as amended, or any comparable state statute, that such party is currently (a) ineligible to receive additional surface mining Permits, (b) under investigation to determine whether its eligibility to receive such Permits should be revoked, or (c) listed on the Applicant Violator System.  As used in this Section 4.7, "owned or controlled" shall be defined as set forth in 30 C.F.R. Section 773.5 (2000).

**Section 4.8    Legal Proceedings**.  There are no actions, suits, claims, investigations or other legal proceedings pending or, to the Purchaser's knowledge, threatened against or by the Purchaser or any Affiliate of the Purchaser that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.9    Independent Investigation**.   The Purchaser has conducted its own independent investigation, review and analysis of the Business, results of operations, prospects, and condition (financial or otherwise) of the Assets, and acknowledges that it has been provided access to the personnel, properties, assets, premises, books and records, and other documents and data of the Business for such purpose. The Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, the Purchaser has relied solely upon its own investigation and the express representations and warranties of the Seller set forth in ARTICLE 3 of this Agreement (including the related portions of the Seller Disclosure Schedule) and in the other Transaction Documents; and (b) neither the Seller, nor any other Person has made any representation or warranty as to the Assets, the Business or this Agreement, and Purchaser has specifically disclaimed any representation or warranty as to the Seller, the Assets, or the Business, except as expressly set forth in ARTICLE 3 of this Agreement (including the related portions of the Seller Disclosure Schedules) and in the other Transaction Documents. The Purchaser acknowledges that, should the Closing occur, the Purchaser shall acquire the Assets in an "as is" condition and on a "where is" basis, except as otherwise expressly set forth in this Agreement.  In connection with the Purchaser's investigation of the Seller and its business, assets and operations, the Purchaser and its representatives have received from the Seller or its representatives certain projections and other forecasts for the Seller and certain estimates, plans and budget information.  The Purchaser acknowledges and agrees that there are uncertainties inherent in attempting to make such projections, forecasts, estimates, plans and budgets; that the Purchaser is fully responsible for making its own evaluation of the Seller including as to the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it or its representatives, and that the Seller does not make any representations regarding such estimates, projections, forecasts, plans and budgets.

**ARTICLE 5**
**COVENANTS**

**Section 5.1    Conduct Of Business.**  Prior to the Closing, except as set forth in Section 5.1 of the Seller Disclosure Schedule, as otherwise required by applicable Law or as consented to in writing by the Purchaser, the Seller shall conduct the Business in the ordinary course of business consistent with past practices.  Prior to the Closing, the Seller shall use commercially reasonable efforts to (a) preserve the existing business relationship with third parties, and (b) keep and preserve the Business existing on the Effective Date, including maintaining the Assets in as good working order and condition as at present, ordinary wear and tear excepted and not introducing any material new method of management or operation.  Without limiting the generality of the foregoing, between the Effective Date and the Closing or other termination or expiration hereof, the Seller and its Affiliates shall not (i) take any action (or fail to take any action) with respect to the Business described in Section 3.6 hereunder; (ii) increase the salary or other base compensation of any employee, consultant, or other service provider of the Business, including any Transferred Employees; (iii) hire or otherwise enter into any employment or

39

consulting agreement or arrangement with any person or terminate any employee, consultant, or other service provider whose compensation would exceed, on an annualized basis, One Hundred Thousand Dollars ($100,000); (iv) implement any employee layoffs implicating the WARN Act; or (v) enter into, amend or terminate any collective bargaining agreement or other Contract with any labor organization, in each case, without the prior written consent of the Purchaser.

**Section 5.2    Filings**.

(a)    Subject to the terms and conditions herein provided, the Seller and the Purchaser, as applicable, shall:

(i)    use their commercially reasonable efforts to cooperate with one another in (A) determining which filings are required to be made prior to or after the Closing with, and which consents, approvals, permits or authorizations are required to be obtained prior to or after the Closing from Governmental Authorities in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; and (B) timely making all such filings and timely seeking all such consents, approvals, permits or authorizations, including the filing of change of ownership and control notices with respect to Purchased Permits;

(ii)    Subject to applicable legal limitations and the instructions of any Governmental Authority, promptly notify each other of any communication concerning this Agreement or the transactions contemplated hereby to that Party from any Governmental Authority and permit counsel for the other Parties to review in advance any proposed communication (other than HSR Act filings and competitively sensitive documents) concerning this Agreement or the transactions contemplated hereby to any Governmental Authority;

(iii)    subject to applicable legal limitations, not agree to participate in any meeting or discussion with any Governmental Authority in respect of any filings, investigation or other inquiry concerning this Agreement or the transactions contemplated hereby unless it consults with the other Parties hereto in advance and, to the extent permitted by such Governmental Authority, gives the other Parties hereto or their representatives the opportunity to attend and participate in such meeting or discussion;

(iv)    subject to applicable legal limitations and the instructions of any Governmental Authority, furnish the other Parties hereto with copies of all correspondence and communications (other than HSR Act filings and competitively sensitive documents) between them and their Affiliates and their respective representatives on the one hand, and any Governmental Authority or members or their respective staffs on the other hand, with respect to this Agreement and the transactions contemplated hereby; and

(v)    furnish the other Parties hereto with such necessary information and reasonable assistance as such other Parties and their respective Affiliates may reasonably request in connection with their preparation of necessary filings, registrations or submissions of information to any Governmental Authorities, including any filings necessary or appropriate under the provisions of the HSR Act.

(b)     Notwithstanding the forgoing or anything in this Agreement to the contrary, "commercially reasonable efforts" for purposes of this Agreement shall in no event or circumstance require the Seller, the Purchaser or any of their respective Affiliates to (i) execute any settlements, undertakings, consent decrees, stipulations or other agreements, (ii) sell, divest, hold separate or otherwise convey any particular assets or categories of assets or businesses of the Purchaser and its Affiliates, (iii) agree to sell, divest, hold separate or otherwise convey any particular assets or categories of assets or businesses contemporaneously with or subsequent to the Closing, (iv) permit the Seller and its Affiliates, or the Purchaser and its Affiliates, as the case may be, to sell, divest or otherwise convey any particular assets or categories of assets or properties of the Seller and its Affiliates, or the Purchaser and its Affiliates, as the case may be, related to the Business prior to the Closing, (v) otherwise take or commit to take actions that after the Closing Date would limit the freedom of action of the Purchaser or its Affiliates or the Seller or its Affiliates, as the case may be, with respect to, or its or their ability to retain, one or more of its or their businesses or assets, (vi) defend through litigation on the merits any claim asserted in court by any Person, (vii) accept any amendment to the terms of any Purchased Permit or any additional conditions with respect to any Purchased Permit, or (viii) make to any Person any payment with respect to obtaining any approvals, consents, registrations, permits, authorizations and other confirmations (other than de minimis payments made by the Seller as may be required in connection with obtaining the consents set forth on Section 6.3(d) of the Seller Disclosure Schedule).

### Section 5.3     Commercially Reasonable Efforts.

(a)     Subject to the terms and conditions set forth in this Agreement, the Seller and the Purchaser shall use commercially reasonable efforts (subject to, and in accordance with, applicable Law and Section 5.2(b)) to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties hereto in doing, all things necessary, proper or advisable under applicable Laws to consummate, and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, and no Party hereto shall take or cause to be taken any action which would reasonably be expected to prevent, impede or delay the consummation of the transactions contemplated by this Agreement.

(b)     Without limiting the foregoing, promptly following the Closing, the Seller and the Purchaser shall use commercially reasonable efforts (which in no event shall be construed to require the Purchaser to make any payments to any other Person) to obtain all consents set forth on Section 6.3(d) of the Seller Disclosure Schedule, including using commercially reasonable efforts to:

(i)     provide financial statements as may be reasonably requested by the other Party;

(ii)     cooperate with the other Party in approaching the holders of any such consents, including (A) consulting with the other Party as to the appropriate strategy to obtain such consents prior to approaching any holder of such consents and (B) if requested by the other Party, including such Party in any negotiation with a holder of such consent; and

41

(iii)     promptly notify the other Party of any communication (whether written or oral) concerning this Agreement or the transactions contemplated hereby to that Party from any holder of such consent.

**Section 5.4     Notification**.

(a)     At all times until the earlier of the termination of this Agreement pursuant to ARTICLE 7 and the Closing, the Seller and the Purchaser shall give prompt notice to the other Party:

(i)     upon becoming aware that any representation or warranty made by it in this Agreement has become untrue or inaccurate in any material respect, or of any occurrence, event or matter that could reasonably lead to the non-satisfaction by such Party of any of the conditions to the transactions contemplated by this Agreement set forth in ARTICLE 6; *provided*, that no such notification shall affect any of the representations, warranties, covenants, rights or remedies, or the conditions to the obligations of, the Parties hereunder;

(ii)     of any notice or other communication received by it from any Governmental Authority in connection with the transactions contemplated by this Agreement, or from any Person, subsequent to the Effective Date, alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; and

(iii)     of the institution of any material litigation or material governmental complaints, investigations or hearings (or communications in writing indicating the same may be contemplated) relating to this Agreement, the Business, the Assets, any of the Purchased Permits or the transactions contemplated hereby.

**Section 5.5     Inspection.**  From the Effective Date to the Closing, the Seller shall (a) allow all designated officers, attorneys, accountants and other representatives of the Purchaser reasonable access at all reasonable times upon reasonable notice to the books, records, financial and operating data and other information related to the Business and the Assets and (b) fully cooperate with the Purchaser and its Affiliates, and their respective employees, consultants, or other representatives, and any other Persons acting on their behalf, in connection with any sampling, drilling, testing, removal of material, or other similar investigation at any property or facility connected with the Business which the Purchaser reasonably requests to conduct. Notwithstanding the foregoing, no Party shall be required to provide any information which it may not provide to any other Party by reason of applicable Law, rules or regulations, which constitutes information protected by attorney/client privilege (*provided* that such Party reasonably believes that failure to preserve such attorney/client privilege would be materially adverse to such Party), or which it is required to keep confidential by reason of contract or agreement with third parties.  All nonpublic information obtained pursuant to this Section 5.5 or in connection with the transactions contemplated by this Agreement shall be governed by the Confidentiality Agreement.

**Section 5.6     Publicity.**  The Seller and the Purchaser will consult with each other and will mutually agree upon any press releases or public announcements pertaining to this Agreement or the transactions contemplated hereby and shall not issue any such press releases or

make any such public announcements prior to such consultation and agreement, except as may be required by applicable Law, in which case the Party proposing to issue such press release or make such public announcement shall use commercially reasonable efforts to consult with the other Parties before issuing any such press releases or making any such public announcements. Notwithstanding the foregoing or the provisions of Section 5.14, the Purchaser shall be allowed to disclose the terms of this Agreement and the transactions contemplated hereby (a) to authorized representatives and employees of the Purchaser or its Affiliates, (b) to its and its Affiliates' investors in connection with summary information about the Purchaser's or any of its Affiliates' financial condition, (c) to any of the Purchaser's Affiliates, auditors, attorneys, financing sources, investors, potential investors or other agents or any other Person to whom an affiliate of the Purchaser discloses such information in the ordinary course of business, and (d) following the Closing, to any bona fide prospective purchaser of the equity or assets of the Purchaser of its affiliates; *provided,* that in the case of disclosures made pursuant to clauses (a) through (d), the recipient is informed of the confidential nature of such information.

**Section 5.7     Expenses.**  Except as expressly set forth herein, each Party hereto shall bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers, and accountants; *provided, however*, the Seller and the Purchaser shall each pay fifty percent (50%) of the fees and expenses of Norwest Engineering, Inc., Cardno USA, Inc. and their respective Affiliates with respect to the transaction contemplated by this Agreement.  Except for HSR filing fees (if any) which shall be paid by the Seller, any regulatory filing, notification, registration or similar fee required to be paid by any Party in connection with this Agreement and the transactions contemplated hereby under any Law shall be paid by the Purchaser.

**Section 5.8     Records.**  The Purchaser agrees to maintain, or, if not in the possession or under the control of the Purchaser, to use reasonable efforts to cause to be maintained, the Records in existence on the Closing Date until the sixth (6th) anniversary of the Closing Date (or for such longer period of time as the Seller shall reasonably advise the Purchaser is necessary to have the Records available with respect to open years for Tax audit purposes).  After the Closing Date, the Purchaser shall provide the Seller and its representatives, during normal business hours and upon reasonable notice, access to, and the right to copy, the Records, at the Seller's cost and expense and provided that such access shall be in a manner that does not interfere with the normal business operations of the Purchaser or the Business, for the purposes of:

(a)     complying with any applicable Law affecting the Seller's ownership of the Business and Assets prior to the Closing Date;

(b)     preparing Tax Returns or filing Tax refunds;

(c)     responding to or disputing any Tax audit; or

(d)     asserting, defending or otherwise dealing with any inquiry, investigation, claim or dispute under this Agreement or with respect to the Business or the Assets.

**Section 5.9    Discussions with Other Purchasers**.  Between the Effective Date and the Closing Date, none of the Seller, its Affiliates nor any of their respective directors, officers, shareholders, agents or employees shall solicit, authorize the solicitation of, or enter into any discussions with, any Person (a) to directly or indirectly purchase the Business or any of the Assets (whether through a purchase of assets, equity interests or otherwise), other than the sale of inventory in the ordinary course of business consistent with past practice; or (b) to merge, consolidate, engage in a share exchange or otherwise combine with the Seller.  The Parties acknowledge and agree that the Seller shall not be responsible for any attempts by third parties to try to communicate with the Seller and shall have the right to inform third parties initiating communication with any of them that the Seller is not able at such time to discuss any potential sale of the Seller or its assets with or to any Person.

**Section 5.10    Cooperation Regarding Excluded Assets and Retained Liabilities**.

(a)    The Purchaser and the Seller shall cooperate fully, as and to the extent reasonably requested by the other Party hereto, in connection with the Records, and other information and documentation, related to the Excluded Assets and Retained Liabilities.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to the Excluded Assets and Retained Liabilities and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Seller agrees (A) to retain all books and records with respect to the Excluded Assets and the Retained Liabilities for a period of six (6) years from the Closing Date, and (B) to give the other Parties hereto reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, the Purchaser or the Seller, as the case may be, shall allow the other Party to take possession of such books and records.

(b)    The Purchaser and the Seller further agree, upon reasonable request, to provide the other Party with all information available to it that either Party may be required to disclose related to the Excluded Assets or the Retained Liabilities.

**Section 5.11    Employee Matters**.  Subject to the terms, conditions and rights pursuant to any applicable collective bargaining agreement:

(a)    The Seller shall terminate, effective as of immediately prior to the Closing, the individuals employed by them that are listed in Section 5.11(a) of the Seller Disclosure Schedule, as such Section may be updated from time to time prior to the Closing; *provided, however*, that Section 5.11(a) of the Seller Disclosure Schedule may be updated only to reflect individuals hired or terminated in the ordinary course of business or terminated for "cause", (the individuals listed in Section 5.11(a) of the Seller Disclosure Schedule, as it may be updated pursuant to this Section 5.11(a), are referred to herein as the "Business Employees").  Prior to the Closing Date, the Purchaser, one of its Affiliates or a third-party operating entity designated by the Purchaser (such Person making the offer of employment, the "Employing Entity") shall make offers of employment to each of the Business Employees.   Such employment offers shall include compensation and benefits (other than defined benefit pension benefits, nonqualified deferred compensation, retiree or post-termination health or welfare benefits, and equity or equity-based compensation or benefits) that are substantially comparable in the aggregate to the compensation

and benefits (other than defined benefit pension benefits, nonqualified deferred compensation, retiree or post-termination health or welfare benefits, and equity or equity-based compensation or benefits) provided to such Business Employees immediately prior to the Effective Date, and to the extent such Business Employees remain employed by the Employing Entity, such compensation and benefits shall not be reduced for at least 180 days following the Closing.  The Business Employees who accept the offer from the Employing Entity and actually commence employment with the Employing Entity on the Closing Date are referred to herein as the "Transferred Employees".   Notwithstanding the foregoing or any other provision of this Agreement, each Business Employee who is not actively at work and is receiving or is eligible to receive short-term or long-term disability benefits as of the Closing Date shall become and remain an employee of the Seller or its Affiliates until and unless the employee presents himself or herself to the Employing Entity for active employment within 180 days following the Closing Date.

(b)     Once a Business Employee accepts the offer of employment from the Employing Entity, such Employing Entity shall retain such Transferred Employee for at least 90 days after the Closing Date; provided that, the Employing Entity may terminate the employment of any Transferred Employee for "cause."   For purposes of this Section 5.11, the term for "cause" means (i) any act of theft, misappropriation, embezzlement, fraud or similar conduct by the Transferred Employee involving the Employing Entity, the Purchaser, one of its Affiliates or the Business; (ii) any damage of a material nature to the Business, Assets or other property of the Employing Entity, the Purchaser or one of their respective Affiliates caused by the Transferred Employee's willful or grossly negligent conduct; (iii) intentional misconduct or gross negligence which is reasonably likely to be materially damaging to the Employing Entity, the Purchaser, one of their respective Affiliates or the Business; (iv) the continued failure to substantially perform such Transferred Employee's duties (other than as a result of physical or mental incapacity) or (v) the indictment for, conviction, plea of guilty or the plea of nolo contendere or the equivalent in respect of a misdemeanor involving an act of moral turpitude or fraud or any felony.

(c)     After the Closing, the Employing Entity shall take all necessary actions so that each Transferred Employee shall receive a credit during the calendar year in which the Closing occurs for the unused sick leave credited to such employee through the Closing under the applicable Company Plans that are sick leave policies and as set forth on Section 5.11(b) of the Seller Disclosure Schedules, and the Employing Entity shall permit such employees to use such credited sick leave during the calendar year in which the Closing occurs in accordance with the terms of the Employing Entity's sick leave policy.

(d)     In addition, the Employing Entity shall take all necessary actions so that, for purposes of eligibility and vesting (but not benefit accrual) under each Benefit Plan (other than any equity or equity-based plan or arrangement) maintained by the Employing Entity or any of its Affiliates in which Transferred Employees become eligible to participate during the calendar year in which the Closing occurs, each Transferred Employee shall be given credit for all service prior to the Closing with the Seller and its Affiliates to the same extent and for the same purpose that such service was credited under a similar Company Plan immediately prior to the Closing Date and provided such credit would not result in a duplication of benefits or compensation.

45

(e)     For the calendar year in which the Closing occurs, the Employing Entity shall use commercially reasonable efforts to: (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Transferred Employees under any Benefit Plans that are a group health, dental, vision, and prescription drug plans of the Employing Entity in which such Transferred Employees are eligible to participate after the Closing and in such calendar year, other than limitations or waiting periods that are in effect with respect to such Transferred Employees and that have not been satisfied under the corresponding Company Plans that are group health, dental, vision, and prescription drug plans in which the Transferred Employees participated immediately prior to the Closing, and (ii) count any deductibles or co-payments made by the Transferred Employees under the Company Plans that are group health, dental, vision, and prescription drug plans toward satisfaction of deductibles and co-payments under such Benefit Plans of the Employing Entity that are group health, dental, vision, and prescription drug plans.

(f)     Effective as of the Closing, each Transferred Employee shall cease to participate in any Company Plan except as may be otherwise provided by the terms of such Company Plan or applicable Law.  To the extent not contrary to or inconsistent with the terms of any applicable Company Plan, as of the Closing Date, all Transferred Employees shall become fully vested in their benefits under each Company Plan that is a defined contribution plan subject to Section 401(k) of the Code and the Seller and its Affiliates shall make all employer contributions to such Company Plan that would have been made on behalf of the Transferred Employees had the transactions contemplated by this Agreement not occurred (regardless of any service or end-of-year employment requirements) but prorated for the portion of the plan year that ends on the Closing Date.  Without limiting the generality of Section 2.4, the Seller and its Affiliates shall assume and retain sponsorship of and be solely responsible for all current and contingent liabilities and obligations relating to or at any time arising under or in connection with any Company Plan, any Benefit Plan or any other compensation or benefit plan, program, agreement, Contract, policy or arrangement of any kind at any time maintained, sponsored or contributed to or required to be contributed to by or on behalf of the Seller or any of its Affiliates or under or with respect to which the Seller or any of its Affiliates has any current or contingent liability or obligation.

(g)     Without limiting the generality of Section 2.4, all claims and liabilities with respect to qualified beneficiaries, including former employees and their dependents, Transferred Employees and their dependents who are receiving, or have the right, as of the Closing, to receive, continued health coverage under a Company Plan pursuant to the requirements of COBRA shall be retained by, and shall be the sole responsibility of, the Seller, including all obligations under Section 4980B of the Code with respect to all "M&A qualified beneficiaries" as defined in Treasury Regulation Section 54.4980B-9.

(h)     Nothing contained in this Section 5.11 shall, (i) except as set forth in Section 5.11(a), limit the ability of the Employing Entity to terminate the employment of any Person at any time for any or no reason, (ii) be considered to establish, amend, or modify any Company Plan or any other benefit or compensation plan, program, policy, agreement, arrangement, or Contract, (iii) prohibit or limit the ability of the Employing Entity to amend, modify or terminate any benefit or compensation plan, program, policy, agreement, arrangement, or Contract at any

46

time assumed, established sponsored or maintained by any of them or (iv) confer any rights or benefits including any third-party beneficiary rights on any Person other than the Parties.

**Section 5.12   Non-Solicitation of Employees**.  During the period of three (3) years commencing on the Closing Date, the Seller and its Affiliates shall not hire or solicit any Transferred Employees or employees of the Business (including employees of any independent contractor entity tasked with servicing the Business) or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this Section shall prevent Seller or any of its Affiliates from hiring any such employee whose employment has been terminated by the Purchaser or such employee, in any case, after 180 days from the date of such termination of employment.

**Section 5.13   Non-disparagement**.  Other than as required by law or by order of a court or other competent authority, the Seller will not, and shall cause its Affiliates not to, make or publish, or cause any other Person to make or publish, any statement that is disparaging or that reflects negatively upon the Business. or the Purchaser or its Affiliates, or that is or reasonably would be expected to be damaging to the reputation or business of the Business, the Purchaser or its Affiliates.

**Section 5.14   Confidentiality**.  From the Effective Date until the Closing, the Parties shall, and shall cause their respective Affiliates to, not disclose the terms of this Agreement or the fact that the Parties are considering the transactions described herein, to any third-party, other than such Party's respective Representatives on a need-to-know basis; *provided, however*, that (a) the Parties or their Representatives are permitted to contact third-parties to obtain consents or approval or provide notices that are necessary to satisfy the conditions to Closing or as otherwise set forth herein and to make any disclosures required under applicable Law and (b) the Purchaser shall be allowed to disclose the terms of this Agreement or the transactions contemplated hereby to the investors and limited partners of its controlling Affiliates.  From and after the Closing, the Seller shall, and shall cause its Affiliates to, hold, and shall use commercially reasonable efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that the Seller can show that such information (a) is generally available to and known by the public through no fault of the Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by the Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If the Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller shall (i) promptly notify the Purchaser in writing, (ii) if requested by the Purchaser, use commercially reasonable efforts to assist the Purchaser to resist or narrow such request and (iii) shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed.

**Section 5.15   [Reserved]**.

**Section 5.16   Supplement to Seller Disclosure Schedule**. From time to time prior to the Closing, the Seller shall have the right (but not the obligation) to supplement or amend the

Seller Disclosure Schedule hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "Schedule Supplement"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the indemnification or termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 6.3 have been satisfied; *provided, however*, that if the Purchaser has the right to, but does not elect to, terminate this Agreement within five (5) Business Days of its receipt of such Schedule Supplement as a result of a matter disclosed on such Schedule Supplement, then the Purchaser shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter, and, further, shall have irrevocably waived its right to indemnification under Section 8.2 with respect to such matter.

**Section 5.17   Tax Matters**.

(a)    Notwithstanding any other provision in this Agreement, the Seller shall be allocated and bear all Asset Taxes attributable to any Pre-Closing Tax Period, and the Purchaser shall be allocated and bear all Asset Taxes attributable to any taxable period other than a Pre-Closing Tax Period. For purposes of determining the allocations described in this Section 5.17(a), (i) Asset Taxes that are attributable to severance or production Taxes shall be allocated to the period in which the severance or production giving rise to such Asset Taxes occurred, (ii) Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (i)) shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred, and (iii) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the Pre-Closing Tax Period and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the Pre-Closing Tax Period, on the one hand, and the number of days in such Straddle Period that occur after the Closing Date, on the other hand.

(b)    To the extent the actual amount of any Asset Tax for a Straddle Period is not determinable as of the Closing Date, (i) the Parties shall utilize the most recent information available in estimating the amount of such Asset Tax, (ii) the Seller shall pay the Purchaser an amount equal to the Seller's share of the estimated amount (as determined under Section 5.17(a)) at Closing, and (iii) upon a later determination of the actual amount of such Asset Tax, timely payments will be made from one Party to the other in accordance with Section 5.17(c) to the extent necessary such that each Party bears the amount of such Asset Tax that is allocable to such Party under Section 5.17(a).

(c)    If a Party pays any Tax agreed to be borne by the other Party under this Agreement, such other Party shall promptly (and in any event no later than fifteen (15) days after receipt of notice thereof) reimburse the paying Party for the amounts so paid.  If any Party receives any Tax refund or credit applicable to a Tax paid by the other Party, the receiving party shall promptly (and in any event no later than fifteen (15) days after receipt of notice thereof) pay an amount equal to such Tax refund or credit to the Party entitled thereto.

(d)    After the Closing Date, each Party shall provide such assistance as the other Party may from time to time reasonably request in connection with the preparation of Tax Returns

required to be filed, any audit or other examination relating to Taxes by any Governmental Authority, any judicial or administrative proceeding relating to liability for Taxes, or any claim for refund in respect of Taxes or in connection with any litigation, proceedings or liabilities related to the Assets or Assumed Liabilities, including making available employees for interviews, litigation preparation and testimony. The requesting Party shall reimburse the assisting Party for any reasonable out-of-pocket costs incurred by the assisting Party after having received the prior written approval therefor from the requesting Party; *provided*, *however*, that the Seller shall bear the cost of filing all Tax Returns for Taxes imposed on or with respect to the ownership or operation of the Assets for any Pre-Closing Tax Period.

(e)      The Seller shall pay all sales, transfer and use Taxes arising out of the transactions contemplated by this Agreement (including the grantor's tax for recording real estate conveyance documents) ("Transfer Taxes") and all costs and expenses (including recording fees and real estate transfer Taxes) incurred in connection with the Purchaser obtaining or recording title to the Assets. The Seller shall reasonably cooperate with the Purchaser in the filing of any Tax Returns relating to any such Taxes or other costs.

(f)      Any payments from the Purchaser to the Seller pursuant to this Agreement shall be made free and clear of, and without deduction or withholding for, any Taxes unless such deduction or withholding is required by applicable Law.  To the extent any deduction or withholding is required by applicable Law, any amounts that are required to be deducted or withheld shall be treated for all purposes under this Agreement as having been paid to the Seller.

(g)      The Parties shall treat any payments made pursuant to Section 2.8, Section 5.17(c) or ARTICLE 8 as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 5.18   Segregation and Removal of Excluded Assets.**  Within ninety (90) days after the Closing Date, the Seller shall segregate and remove from the Purchased Real Property and Purchased Leased Real Property all Excluded Assets that are reasonably removable, including the inventory contemplated by Section 2.2(l), if applicable.  The Seller shall remove such items at the Seller's sole cost and expense in a manner so as not to unreasonably interfere with the Purchaser's operations on the Purchased Real Property and Purchased Leased Real Property, and the Seller shall bear full liability for any and all claims related to or arising from such Excluded Assets and their removal; *provided* that the Purchaser, in its sole discretion and only upon the prior request of the Seller, may assist with, and dedicate resources to, any such removal process, but only to the extent that the Seller reimburses the Purchaser for the full amount of any direct or indirect costs and expenses incurred by the Purchaser in connection therewith.  The Purchaser shall provide the Seller with reasonable access and coordination to remove such Excluded Assets**.**

**Section 5.19   Certain Payments or Instruments Received from Third Parties**.  To the extent that, after the Closing Date, (a) the Purchaser receives any payment or instrument that is for the account of the Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Seller other than the Business, the Purchaser shall promptly deliver such amount or instrument to the relevant Seller, and (a) the Seller or any of its Affiliates receives any payment that is for the account of the Purchaser according to the

terms of any Transaction Document or relates primarily to the Business, the Seller shall, and shall cause its Affiliates to, promptly deliver such amount or instrument to the Purchaser.  All amounts due and payable under this Section 5.19 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party.  Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.  Any payments received under this Section 5.19 by the applicable Party will be treated by the other Party as being received by the applicable Party in its capacity as an agent for the other Party solely for U.S. federal income tax purposes.

Section 5.20   Release; Acknowledgements.   (a) Notwithstanding anything to the contrary contained herein, effective as of the Closing, (i) the Seller (individually and on behalf of its Affiliates) hereby releases and forever discharges the Purchaser and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees and agents of each of them from any and all actual or potential claims, causes of action, proceedings, liabilities, damages, expenses and/or Losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Party had, has, or may have in the future to the extent relating to the Excluded Assets or the Retained Liabilities and (ii) the Purchaser (individually and on behalf of its Affiliates) hereby releases and forever discharges the Seller and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees and agents of each of them from any and all actual or potential claims, causes of action, proceedings, liabilities, damages, expenses and/or Losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Party had, has, or may have in the future to the extent relating to the Assets or the Assumed Liabilities; provided, that nothing in this Agreement shall be construed to release any Person from any of its contractual obligations under (i) this Agreement and the Transaction Documents, including its obligations in respect of the Assets, Assumed Liabilities, Excluded Assets and Retained Liabilities, as the case may be, or (ii) the Prep Plant PSA, the other agreements entered into connection therewith and the transactions contemplated thereby, each of which shall remain fully effective and enforceable from and after the Closing Date.

Section 5.21   Financing.  The Purchaser shall use its commercially reasonable efforts to cause the financing contemplated by the Equity Commitment Letter, subject to the terms and conditions set forth therein, to be available at the Closing; provided, however, that if funds in the amounts set forth in the Equity Commitment Letter become unavailable to the Purchaser on the terms and conditions set forth therein, the Purchaser shall use its commercially reasonable efforts to obtain the funds necessary to consummate the transactions contemplated by this Agreement to the extent available on substantially similar terms and conditions as set forth in the Equity Commitment Letter.

Section 5.22   Consent Decree.

(a)     The Seller has (i) delivered, or caused to be delivered, to the United States (as defined in the Consent Decree) each of the items set forth in clauses (a) through (d) of Section III

50

(Applicability), Paragraph 9 of the Consent Decree, a copy of which is attached at <u>Section 5.22</u> of the Disclosure Schedule and (ii) sought a waiver or reduction of the waiting periods contemplated thereby.  Promptly following the Effective Date, the Seller and the Purchaser shall jointly prepare and deliver an introductory notice to the United States (as defined in the Consent Decree) in regard to the Purchaser and its Affiliates.  Further, the Seller shall, and shall cause its Affiliates to, at no expense or cost to the Purchaser or its Affiliates, use reasonable best efforts to satisfy or cause to be waived by the applicable Governmental Authority all of the conditions set forth in the Consent Decree, including Section III (Applicability), Paragraph 10, clause (b) thereof, to be satisfied prior to a transfer of the Assets as soon as is practicable following the Effective Date, including undertaking all required implementations and audits contemplated by the Consent Decree with respect to the Assets.

(b)      Prior to making any material decision or taking any material action related to the Consent Decree with respect to the Assets (other than undertaking any express obligations of the Defendants set forth in the Consent Decree as provided therein), the Seller and Seller Parent shall consult with the Purchaser with respect to such decision or action.

(c)      The Seller shall promptly provide the Purchaser with copies of any material written notices, reports or other documents delivered by, or other material communication initiated by, any Defendant to any Plaintiff, to the extent such material documents or communications relate to any obligations imposed on the Assets under the Consent Decree or the release of the Assets from the Consent Decree. The Seller shall promptly deliver or otherwise make available to the Purchaser copies of any material written notices and other documented material communication from any Plaintiff to the Defendants and reports, notices, notes, working papers, database entries, plans for alterations, maintenance and/or corrective measures and other documents related to or prepared in connection with any Environmental Audit or Treatment System Audit (each as defined in the Consent Decree) or any other audit conducted under or in connection with the Consent Decree, in either case, under the Consent Decree with respect to the Assets.

(d)      The Seller shall, and shall cause its Affiliates to, maintain in effect (i) the Letter of Credit (as defined in the Consent Decree), (ii) the Standby Trust Agreement (as defined in the Consent Decree) and (iii) any other financial assurance required under Section VIII (Financial Assurance) of the Consent Decree in accordance with the terms thereof.

**Section 5.23  Payment of Liabilities**.  Following the Closing, the Seller and Seller Parent shall promptly pay, cause to be paid or make adequate provision for the payment of, any Retained Liabilities and other liabilities of the Seller owing under this Agreement in full when due. In the event that any such amounts are not paid or provided for when due, and such nonpayment impairs the Purchaser's use and enjoyment of the Assets or the conduct of the Business, then the Purchaser may pay or cause to be paid such amounts on behalf of the Seller ("<u>Purchaser-Paid Liabilities</u>"). The Seller shall promptly reimburse (or cause to be reimbursed) the Purchaser for the amount of any Purchaser-Paid Liabilities.  The amount of any Purchaser-Paid Liabilities shall bear interest from and including the date such payment was due to and including the date of reimbursement of such amounts by the Seller at a rate per annum equal to five percent (5%).

**Section 5.24   Access by Seller**.  Subject to any limitations, conditions, or requirements set forth in this Agreement, upon reasonable advance written notice by the Seller to the Purchaser, the Purchaser shall make the Assets available to the Seller and its representatives from and after the Closing Date insofar as reasonable or necessary for the Seller to perform its obligations relating to the Retained Liabilities, including access to perform any testing, inspection, construction, remediation, reclamation or other improvements required as part of the resolution of any Action or order of any Governmental Authority; provided that in conducting such activities the Seller shall:

(a)      conduct all such action by the Seller or its representatives at the Seller's sole risk and expense;

(b)      conduct its operations or activities during normal business hours and in a manner that does not materially interfere with or delay the Purchaser's use of the Assets;

(c)      coordinate and, unless prohibited by applicable Law, fully share with the Purchaser all information reasonably requested by the Purchaser regarding the Seller's activities on the Assets; and

(d)      indemnify, defend, and hold harmless the Purchaser Indemnitees from any and all Losses with respect to such activities conducted under this Section 5.24.

The Purchaser and the Seller each agree to use commercially reasonable efforts to accommodate the other Party in performing their respective activities contemplated in this Section 5.24 and the satisfaction of the Retained Liabilities.

**Section 5.25   Wind Up and Dissolution**.  For a period of five (5) years following the Closing Date, the Seller and Seller Parent shall not wind up, liquidate or dissolve any member of the Seller Group.

**Section 5.26   Sufficient Capital**.  For a period of five (5) years following the Closing Date, Seller Parent shall maintain sufficient capital to fully and finally satisfy, fulfill and extinguish all of its liabilities and obligations, including all Retained Liabilities.

**Section 5.27   Asset Sales; Distributions**.  For a period of five (5) years following the Closing Date and other than the transactions contemplated hereby, without the prior written consent of the Purchaser, the Seller and Seller Parent shall not, and shall cause their respective direct and indirect subsidiaries not to, (a) sell, assign, transfer, lease, license, distribute or otherwise dispose of any assets or properties of any member of the Seller Group or (b) declare, make or pay any dividend or other distribution, or make any redemption, purchase or other acquisition of any of its shares or other ownership interests, in each case, unless the Seller has provided the Purchaser with 30 days' prior written notice thereof and, in the Purchaser's reasonable discretion, the pro forma capitalization of the Seller Group following such transaction will be sufficient to fully and finally satisfy, fulfill and extinguish all liabilities and obligations of the Seller Group, including any Retained Liabilities.  Concurrently with the delivery of the foregoing notice, the Seller shall deliver to the Purchaser the information reasonably necessary for the Purchaser to make its determination with respect to the pro forma capitalization of the

Seller Group following such transaction, and shall make any such other information available as the Purchaser reasonably requests thereafter in connection with making such determination. The Purchaser must deliver written notice of such determination to the Seller within 10 Business Days after the Purchaser receives notice of such transaction, and if the Purchaser does not deliver such written notice within 10 days then the Purchaser shall be deemed to have consented to the transaction. If the Purchaser and the Seller disagree, in their respective reasonable discretion, whether or not the pro forma capitalization of the Seller Group following such transaction will be sufficient to fully and finally satisfy, fulfill and extinguish all liabilities and obligations of the Seller Group, including any Retained Liabilities, then the Seller may elect to submit such issue to the Independent Accountant, whose determination shall be final and binding on the Purchaser and the Seller. The costs and expenses of the Independent Accountant incurred in connection with making such determination shall be paid by the non-prevailing party. Notwithstanding the foregoing, this Section 5.27 shall not apply to (i) sales of inventory in the ordinary course of business, (ii) the disposition or distribution of the cash proceeds received by the Seller under this Agreement, with the exception of Thirty Million Dollars ($30,000,000) worth of proceeds (*i.e.,* proceeds from the residual of the Purchase Price, less the Escrow Amount, less the amount of any escrow established in accordance with Section 6.3(e), less any amounts paid pursuant to Section 6.3(h)) which shall remain in the Seller Group, but may be used to pay third-party obligations of the Seller Group, (iii) transfers or dispositions of assets which are obsolete or immaterial to the business of such Person, (iv) transfers or dispositions of assets or dividends or distributions to another member of the Seller Group to the extent retained within the Seller Group, (v) the sale of all or substantially all of the assets and liabilities of the Seller Group in a single transaction, (vi) sales of the equity interests of Seller Parent or (vii) mergers, consolidations and similar transactions solely among members of the Seller Group. Promptly following the Closing, the Seller shall use its best efforts to file in the applicable Secretary of State (i.e., a cautionary UCC filing) and Wyoming County Clerk records a notice that: (i) indicates that a Purchase Agreement has been signed and closed, and (ii) attaches to the filing the restrictions agreed in this Section 5.27 of this Agreement so that a potential purchaser has notice of such restrictions.

**Section 5.28   Interim Period Marketing**.

(a)     The Seller and the Purchaser shall coordinate with each other in respect of their efforts to enter into Contracts following the Effective Date for the marketing, transportation or sale of coal by or on account of the Business for sales and deliveries following January 31, 2016, including (i) keeping the other Party apprised of any discussions and negotiations to enter into such Contracts (including the status thereof and the third parties with whom such negotiations are occurring) and (ii) allowing such other Party to become involved in such negotiations upon such other Party's reasonable request. Subject to the foregoing, each Party shall have the right, but not the obligation, and with the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), to cause the Seller to enter into Contracts for the marketing, transportation or sale of coal by or on account for the Business; *provided*, that, any such sales and deliveries thereunder with respect to any Contract proposed by the Purchaser shall occur no earlier than February 1, 2017 (any such Contracts entered into by the Seller, "Interim Period Marketing Contracts"). Approval shall be deemed to be granted if a Party does not respond to the requesting Party within five (5) Business Days after receiving notice. In the event any Interim Period Marketing Contracts are able to be assigned to the Purchaser at Closing

("Assignable Marketing Contract"), such Assignable Marketing Contracts shall be assigned to the Purchaser in connection therewith. In the event any Interim Period Marketing Contracts are unable to be assigned to the Purchaser at Closing pursuant to their terms ("Non-Assignable Marketing Contracts"), such Non-Assignable Marketing Contracts shall be retained by the Seller at Closing, and the Seller and the Purchaser shall use their commercially reasonable efforts and work in good faith to enter into at Closing a mutually agreeable back-to-back sales agreement (the "Back-to-Back Sales Agreement") pursuant to which the Purchaser shall be required to sell to the Seller the coal required to be sold and delivered to third parties under the Non-Assignable Marketing Contracts on substantially the same terms and conditions as the underlying Non-Assignable Marketing Contracts.

(b)     The Seller shall be obligated to perform its obligations under all Assignable Marketing Contracts up and until the Closing Date, including in the event the Closing has not occurred prior to the date any deliveries under such Contracts are to be made, if any.  Any deliveries made under Assignable Marketing Contracts prior to the Closing Date shall be for the account of the Seller, and the Seller shall be entitled to all revenues, profits and receivables associated with such deliveries, and shall be responsible for all costs, expenses and fees due under or incurred in connection with such deliveries. Any deliveries made under Assignable Marketing Contracts on or after to the Closing Date shall be for the account of the Purchaser, and the Purchaser shall be entitled to all revenues, profits and receivables associated with such deliveries, and shall be responsible for all costs, expenses and fees due under or incurred in connection with such deliveries.

**Section 5.29   Services Agreements**. Following the Effective Date, the Seller and Seller Parent shall use commercially reasonable efforts to negotiate prior to the Closing the Transition Services Agreement on the terms set forth in Exhibit L attached hereto and such other mutually agreeable terms.

## ARTICLE 6
## CONDITIONS

**Section 6.1     Conditions to Each Party's Obligations under this Agreement.**  The respective obligations of each Party to affect the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver in writing by mutual agreement of the Parties at or prior to the Closing Date of the following conditions:

(a)     (i) To the extent a filing under the HSR Act is required, the waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated by this Agreement shall have expired or been terminated under the HSR Act, and (ii) any mandatory waiting period or required consent under any other applicable Law shall have expired or been obtained except where the failure to observe such waiting period or obtain a consent referred to in this clause (ii) would not reasonably be expected to delay or prevent the consummation of the transactions contemplated by this Agreement or have an adverse effect on the expected benefits of the transactions contemplated hereby to the Seller or the Purchaser.

(b)     None of the Parties shall be subject to any decree, order or injunction of a United States federal or state court or foreign court of competent jurisdiction, which prohibits the

consummation of the transactions contemplated by this Agreement, and no statute, rule or regulation shall have been enacted by any Governmental Authority which prohibits or makes unlawful the consummation of the transactions contemplated by this Agreement.

(c)     No action, suit, investigation or proceeding before any Governmental Authority seeking to prevent or prohibit the consummation of the transactions contemplated by this Agreement shall be pending.

**Section 6.2     Conditions to Obligations of the Seller under this Agreement.**  The obligation of the Seller to effect the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver in writing by the Seller at or prior to the Closing Date of the following conditions:

(a)     (i) The Purchaser shall have performed in all material respects its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date and (ii) the representations and warranties of the Purchaser contained in this Agreement and in any document delivered in connection herewith, disregarding any qualification by a Purchaser Material Adverse Effect or any other materiality qualification for purposes of this Section 6.2(a), shall be true and correct in all material respects as of the Closing Date (except for representations and warranties made as of a specified date, which need be true and correct only as of the specified date).

(b)     The Purchaser shall have made all deliveries required by Section 2.10(a) and Section 2.10(b) of this Agreement.

(c)     The Seller shall have obtained all consents set forth on Section 6.3(d) of the Seller Disclosure Schedule.

(d)     Since the Effective Date, there shall not have occurred and be continuing any Purchaser Material Adverse Effect.

**Section 6.3     Conditions to Obligations of the Purchaser under this Agreement.**  The obligation of the Purchaser to effect the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver in writing by the Purchaser at or prior to the Closing Date of the following conditions:

(a)     (i) The Seller shall have performed in all material respects its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date and (ii) the representations and warranties of the Seller contained in this Agreement and in any document delivered in connection herewith, disregarding any qualification by a Business Material Adverse Effect or any other materiality qualification for purposes of this Section 6.3(a), shall be true and correct in all material respects as of the Closing Date (except for representations and warranties made as of a specified date, which need be true and correct only as of the specified date).

(b)     Since the Effective Date, there shall not have occurred and be continuing any Business Material Adverse Effect.

(c)      The Seller shall have made, or caused to have been made, all deliveries required by Section 2.10(c) and Section 2.10(d) of this Agreement.

(d)      The Seller shall have obtained all consents and given all notices set forth on Section 6.3(d) of the Seller Disclosure Schedule, and the Seller shall have obtained and recorded in the real estate records of the appropriate county recorder's office fully-executed memoranda of each Lease identified on Section 6.3(d) of the Seller Disclosure Schedule.

(e)      All Assets shall be free and clear of all Liens, other than the Permitted Liens; *provided, however*, that to the extent that this condition cannot be satisfied due to outstanding Liens remaining on the Assets (including, without duplication, (w) Liens for any items set forth on Section 1.1(d) of the Seller Disclosure Schedule, (x) Liens for unpaid Seller Taxes, (y) Liens for any items set forth on Section 3.11(a) of the Seller Disclosure Schedule and (z) Liens for any items set forth on Section 3.11(f) of the Seller Disclosure Schedule) and the aggregate amount of the obligations underlying such Liens is less than Twelve Million Five Hundred Thousand Dollars ($12,500,000), as reasonably determined by the Purchaser, then (i) the Purchaser will waive this condition in exchange for escrowing an additional portion of the Purchase Price (in an amount equal to the obligations secured by such collateral) with the Escrow Agent at Closing rather than paying such amount to the Seller, (ii) the Seller shall continue to pursue the release of any such remaining liens following the Closing, and (iii) upon the release of any such remaining lien, the escrowed amounts corresponding to such lien shall be released to the Seller by the Escrow Agent; *provided* that any amounts remaining in such escrow upon the first anniversary of the Closing Date shall be released to the Purchaser by the Escrow Agent and the fees and expenses of the Escrow Agent associated with such escrow shall be the responsibility of the Seller.

(f)      [Reserved].

(g)      The Purchaser shall have been assigned at or prior to Closing all of the rights, title and interest of "Grantor" under the Pardee ROW.

(h)      On the Closing Date, the Seller shall have paid to Mechel or its Affiliates the amount stipulated to be paid by the Seller or its Affiliates in connection with the sale of the Assets in accordance with the Mechel Purchase Agreement.

(i)      The conditions to the transfer of the Assets to the Purchaser set forth in Section III (Applicability), Paragraphs 9 and 10 of the Consent Decree have been satisfied or waived by the applicable Governmental Authority in all respects, including the completion of the Environmental Audit and Treatment System Audit (each as defined in the Consent Decree) and any alterations, maintenance and/or corrective measures required in connection therewith, in each case, in accordance with the terms of the Consent Decree, and immediately following Closing, none of the Assets shall remain subject to the obligations under the Consent Decree; *provided* that if the foregoing requirement to complete any such alterations, maintenance and/or corrective measures has not been fully met and the other conditions to Closing have either been met or are capable of being met, then (i) the Purchaser may, in its sole discretion, waive this condition in exchange for escrowing an additional portion of the Purchase Price (in an amount equal to a reasonable estimate of the remaining costs associated with any such alterations,

56

maintenance and/or corrective measures) with the Escrow Agent at Closing rather than paying such amount to the Seller, (ii) the Seller shall continue to promptly pursue any such alterations, maintenance and/or corrective measures, the cost of which shall be reimbursed from such escrow for so long as funds remain available therefor, and (iii) upon the completion of all such alterations, maintenance and/or corrective measures, any remaining amounts escrowed pursuant to the preceding clause (i) shall be released to the Seller by the Escrow Agent; *provided, further,* that any amounts remaining in such escrow upon the first anniversary of the Closing Date shall be released to the Purchaser by the Escrow Agent and the fees and expenses of the Escrow Agent associated with such escrow shall be the responsibility of the Seller.

(j)       The Prep Plant Closing shall have occurred or shall occur substantially concurrently with the Closing hereunder.

## ARTICLE 7
## TERMINATION

**Section 7.1      Termination by Mutual Consent.**  This Agreement may be terminated at any time prior to the Closing by the mutual written agreement of the Seller and the Purchaser.

**Section 7.2      Termination by the Seller or the Purchaser.**  At any time prior to the Closing, this Agreement may be terminated by the Seller or the Purchaser, if:

(a)       a United States federal or state court of competent jurisdiction or United States Governmental Authority shall have issued an order, decree or ruling or taken any other action (including the enactment of any statute, rule, regulation, decree or executive order) permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action (including the enactment of any statute, rule, regulation, decree or executive order) shall have become final and non-appealable; *provided, however,* that the Party seeking to terminate this Agreement pursuant to this Section 7.2 shall have complied in all material respects with Section 5.2 and Section 5.3 and shall have used its commercially reasonable efforts to remove such injunction, order or decree; or

(b)       the Closing shall not have occurred by March 1, 2016; *provided* that if the Closing has not occurred solely as a result of the applicable waiting period in the Consent Decree having not been satisfied, then such date shall automatically be extended to the date that is five (5) Business Days following the expiration of such waiting period.

**Section 7.3      Termination by the Seller.**  At any time prior to the Closing, this Agreement may be terminated by the Seller if (i) there has been a breach by the Purchaser of any representation, warranty, covenant or agreement set forth in this Agreement or if any representation or warranty of the Purchaser shall have become untrue, in either case, such that the conditions set forth in Section 6.2(a) would not be satisfied and (ii) such breach is not curable, or, if curable, is not cured within thirty (30) days after written notice of such breach is given to the Purchaser by the Seller; *provided, however,* that the right to terminate this Agreement pursuant to this Section 7.3 shall not be available to the Seller if it, at such time, is in breach of any representation, warranty, covenant or agreement set forth in this Agreement such that the conditions set forth in Section 6.3(a) shall not be satisfied.

**Section 7.4    Termination by the Purchaser.**  At any time prior to the Closing, this Agreement may be terminated by the Purchaser if (A) the Seller or its Affiliates shall not have delivered to the United States (as defined in the Consent Decree) each of the items set forth in clauses (a) through (d) of Section III (Applicability), Paragraph 9 of the Consent Decree by the date that is five (5) Business Days days following the Effective Date or (B)(i) there has been a breach by the Seller of any representation, warranty, covenant or agreement set forth in this Agreement or if any representation or warranty of the Seller shall have become untrue, in either case, such that the conditions set forth in Section 6.3(a) would not be satisfied and (ii) such breach is not curable, or, if curable, is not cured within thirty (30) days after written notice of such breach is given to the Seller by the Purchaser; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 7.4(B) shall not be available to the Purchaser if the Purchaser, at such time, is in breach of any representation, warranty, covenant or agreement set forth in this Agreement such that the conditions set forth in Section 6.2(a) shall not be satisfied.

**Section 7.5    Effect of Termination.**  In the event of termination of this Agreement pursuant to this ARTICLE 7, all rights and obligations of the Parties shall terminate, except (i) the obligations of the Parties pursuant to Section 5.7 (Expenses) and except for the provisions of Section 1.2 (Interpretation), this Section 7.5 (Effect of Termination), Section 9.1 (Notices), Section 9.2 (Assignment; Binding Effect), Section 9.3 (No Third Party Beneficiaries), Section 9.4 (Entire Agreement), Section 9.6 (Governing Law), Section 9.7 (Headings), Section 9.8 (Waiver), Section 9.9 (Severability), Section 9.10 (Jurisdiction), Section 9.11 (No Presumption), Section 9.14 (No Recourse), Section 9.15 (Counterparts), Section 9.16 (No Consequential or Punitive Damages), Section 9.17 (Waiver of Trial by Jury) and Section 9.18 (Specific Performance), (ii) the obligations of the Parties pursuant to the Confidentiality Agreement, and (iii) for rights and remedies under applicable Law with respect to a breach of any representation, warranty, covenant, or agreement set forth in this Agreement or to any other obligation of a Party with respect to this Agreement or the transactions contemplated hereby. Each Party's right of termination under ARTICLE 7 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies.

### ARTICLE 8
### INDEMNIFICATION

**Section 8.1    Survival.**  Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is two (2) years from the Closing Date; *provided,* that the representations and warranties in Section 3.1 (Corporate Status), Section 3.2 (Corporate Authorization), Section 3.3 (Binding Effect), Section 3.5 (No Breach; Approvals), Section 3.11 (Taxes), Section 3.14 (Rights in Properties, Liens), Section 3.16 (Sufficiency of the Assets), Section 3.17 (Environmental Matters), Section 3.22 (No Brokers), Section 4.1 (Status), Section 4.2 (Authorization), Section 4.3 (Binding Effect), Section 4.5 (No Brokers) (collectively, the "Fundamental Representations") shall survive for the longer of: (i) a period of six (6) years after the Closing, or (ii) the full period of all applicable statutes of limitations (taking into account any extensions thereof) plus sixty (60) days. Notwithstanding the foregoing, any representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate, if written notice of the inaccuracy

58

thereof giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time. This <u>Section 8.1</u> shall not limit any covenant or agreement of the Parties that by its nature contemplates performance after the Closing.

### Section 8.2    Indemnification.

(a)    Subject to the limitations set forth in this <u>ARTICLE 8</u>, from and after the Closing Date, the Seller and Seller Parent, jointly and severally, shall indemnify and hold harmless, the Purchaser and its officers, directors, stockholders and members, employees, agents, representatives, affiliates, successors and assigns (collectively, the "<u>Purchaser Indemnitees</u>") from, against and in respect of any losses, damages, fines, penalties, obligations, interest, awards, liabilities, or expenses (including reasonable attorneys' fees) ("<u>Losses</u>") incurred by the Purchaser Indemnitees as a result of: (i) any breach of, or inaccuracy in, any representation or warranty made by the Seller for the period such representation or warranty survives; (ii) any breach by the Seller of any covenant or agreement of the Seller in this Agreement or any Transaction Document; (iii) the Excluded Assets and Retained Liabilities; (iv) any Action by any Governmental Authority seeking to enforce the Consent Decree against the Purchaser; and (v) the Seller's expenses incurred in connection with this Agreement and the transactions contemplated hereby.

(b)    Subject to the limitations set forth in this <u>ARTICLE 8</u>, from and after the Closing Date, the Purchaser shall indemnify and hold harmless, the Seller and its officers, directors, stockholders, employees, agents, representatives, affiliates, successors and assigns (collectively, the "<u>Seller Indemnitees</u>") from, against and in respect of Losses incurred as a result of: (i) any breach of, or inaccuracy in, any representation or warranty made by the Purchaser in this Agreement; (ii) any breach by the Purchaser of any covenant or agreement of the Purchaser in this Agreement or any Transaction Document, (iii) the Assumed Liabilities; and (iv) the Purchaser's expenses incurred in connection with this Agreement and the transactions contemplated hereby.

### Section 8.3    Procedures.

(a)    Any Person desiring indemnification under this <u>ARTICLE 8</u> and entitled thereto (an "<u>Indemnified Party</u>") shall, within the relevant limitation period provided for in <u>Section 8.1</u>, promptly upon becoming aware thereof, give written notice thereof to the Party obligated to indemnify such Indemnified Party (such notified Party, the "<u>Responsible Party</u>").  Such notice by such Indemnified Party shall state the amount of the claim, if known, and the method of computation thereof, the nature of such claim and a reference to the provision of this Agreement upon which such claim is based, all with reasonable particularity.

(b)    If a claim, action, suit or proceeding by a Person other than a Party hereto or its respective Affiliates (a "<u>Third Party Claim</u>") is made against any Indemnified Party, and if such Indemnified Party intends to seek indemnification with respect thereto under this <u>ARTICLE 8</u>, such Indemnified Party shall promptly notify the Responsible Party of such claims; *provided* that the failure to so notify shall not relieve the Responsible Party of its obligations hereunder, except to the extent that the Responsible Party is actually prejudiced thereby.

59

(c)     The Responsible Party shall have thirty (30) days after receipt of such notice to assume the conduct and control, at the expense of the Responsible Party, of the settlement or defense thereof, and the Indemnified Party shall cooperate with it in connection therewith; *provided* that the Responsible Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by such Indemnified Party and the fees and expenses of such counsel shall be borne by the Indemnified Party.   Notwithstanding the foregoing, the Responsible Party shall not be entitled to assume control of the defense as to any matter, and if subject to indemnification under this ARTICLE 8, shall pay the reasonable fees and expenses of counsel selected and retained by the Indemnified Party, if: (i) the Responsible Party does not undertake the defense of such Third Party Claim within thirty (30) days after the receipt of the Indemnified Party's notice of a claim for indemnification hereunder; (ii) the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, allegations or investigation against the Indemnified Party; (iii) the Indemnified Party reasonably shall have concluded (upon written advice of its counsel) that, with respect to such claims, the Indemnified Party and the Responsible Party may have conflicting interests; (iv) the claim seeks an injunction or equitable relief against the Indemnified Party; (v) upon petition by the Indemnified Party, an appropriate claims court rules that the Responsible Party failed or is failing to vigorously prosecute or defend such Third Party Claim; (vi) the Indemnified Party reasonably believes that the Responsible Party lacks the financial resources to satisfy the Losses relating to the claim for indemnification or (vii) the Indemnified Party reasonably believes that the Losses relating to the claim for indemnification could exceed the maximum amount the Indemnified Party could then be entitled to recover under the applicable provisions of Section 8.4 by an amount that the Responsible Party could then be required to pay under the applicable provisions of Section 8.4 (collectively, the "Litigation Control Conditions").   If the Indemnified Party assumes the control of the defense of such claim because the claim meets one or more of the Litigation Control Conditions, the Indemnified Party shall have the right to assume control of the defense of the claim but shall not thereby waive any right to indemnification therefor pursuant to this Agreement; *provided*, *however*, that the Indemnified Party shall not consent to an entry of judgment or settle such claim without the prior written consent of the Responsible Party. The Responsible Party shall be permitted independently to consent to an entry of judgment or settle any Third Party Claim, *provided* that in the event such judgment or settlement includes any obligation being imposed on the Indemnified Party other than the payment of cash, then such judgment or settlement shall not be entered into without the prior written consent of the Indemnified Party.

(d)     Any Indemnified Party shall cooperate in all reasonable respects with the Responsible Party and its attorneys in the investigation, trial and defense of any Third Party Claim and any appeal arising therefrom and, at the expense of the Responsible Party, shall furnish such books, records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith.  Such cooperation shall include access during normal business hours afforded to the Responsible Party and its agents and representatives to, and reasonable retention by the Indemnified Party of, books, records and information which have been identified by the Responsible Party as being reasonably relevant to such Third Party Claim.  The Parties shall cooperate with each other in any notifications to insurers.

(e)     Subject to the Purchaser's right to set off in Section 2.8(h), any indemnification of the Purchaser Indemnitees or the Seller Indemnitees pursuant to Section 8.2 shall be effected by wire transfer of immediately available funds from the Seller and/or Seller Parent (on a joint and several basis) or the Purchaser, as the case may be, to an account designated in writing by the applicable Purchaser Indemnitees or the Seller Indemnitees, as the case may be, within 10 Business Days after a final and non-appealable determination that is binding on such Responsible Party.

**Section 8.4     Limitations on Indemnification Obligations.**     The rights of the Purchaser Indemnitees and the Seller Indemnitees to indemnification pursuant to the provisions of Section 8.2 are subject to the following limitations:

(a)     The amount of any and all Losses will be determined net of (i) any amounts actually recovered by the Indemnified Party under indemnification agreements or arrangements with third parties or under insurance policies (net of out-of-pocket costs of collecting such insurance proceeds and costs of recovering under arrangements with third parties) with respect to such Losses (each such source named in this clause (i) a "Collateral Source"), and (ii) any Tax savings (whether in the form of a refund, credit, expense, deduction, loss or other reduction) actually received or realized by the Indemnified Party that is attributable to any deduction, loss, credit or other Tax benefit resulting from or arising out of such Losses.  For purposes of this Section 8.4(a), the Indemnified Party shall be deemed to recognize all other items of income, gain, loss, deduction or credit for Tax purposes before recognizing any item resulting from or arising out of such Losses.

(b)     The Indemnified Party agrees to use reasonable efforts to obtain recovery from any Collateral Source or Governmental Authority, although the Indemnified Party does not have to seek such recovery prior to making a claim for indemnification by the Responsible Party.  If the amount to be netted hereunder from any payment required under Section 8.2 is determined, recovered, realized or otherwise received after payment of any amount otherwise required to be paid to an Indemnified Party under this ARTICLE 8, the Indemnified Party shall repay to the Responsible Parties, promptly after such determination, recovery, realization or other receipt, any amount that the Responsible Parties would not have had to pay pursuant to this ARTICLE 8 had such determination, recovery, realization or other receipt occurred at the time of such payment.

(c)     Notwithstanding anything in this Agreement to the contrary,

(i)     (A) The Purchaser Indemnitees shall not be entitled to recover Losses pursuant to Section 8.2(a)(i) until the total amount which the Purchaser Indemnitees would recover under such Section (as limited by the other provisions of Section 8.4), when taken together with the total amount the Prep Plant Purchaser Indemnitees would recover pursuant to Section 8.2(a)(i) of the Prep Plant PSA, exceeds $625,000 (the "Deductible") and then only for the excess over the Deductible and (B) subject to Section 8.4(d), the Purchaser Indemnitees shall not be entitled to recover pursuant to Section 8.2(a)(i) an aggregate amount, when taken together with the aggregate amount of Losses recovered by the Prep Plant Purchaser Indemnitees pursuant to Section 8.2(a)(i) of the Prep Plant PSA, in excess of Eighteen Million Seven Hundred Fifty Thousand Dollars ($18,750,000) (the "Cap").

61

(ii)      (A) The Seller Indemnitees shall not be entitled to recover Losses pursuant to Section 8.2(b)(i) until the total amount which the Seller Indemnitees would recover under such Section (as limited by the other provisions of Section 8.4), when taken together with the total amount the Prep Plant Seller Indemnitees would recover pursuant to Section 8.2(b)(i) of the Prep Plant PSA, exceeds the Deductible and then only for the excess over the Deductible and (B) subject to Section 8.4(d), the Seller Indemnitees shall not be entitled to recover pursuant to Section 8.2(b)(i) an aggregate amount, when taken together with the aggregate amount of Losses recovered by the Prep Plant Seller Indemnitees pursuant to Section 8.2(b)(i) of the Prep Plant PSA in excess of the Cap.

(d)      The provisions of Section 8.4(c) shall not apply to (i) Losses asserted under Section 8.2(a)(ii)-(v) or Section 8.2(b)(ii)-(iv), (ii) Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any Fundamental Representation or (iii) Losses arising out of the fraud or intentional misrepresentation of any Party.

(e)      For purposes of this ARTICLE 8, any inaccuracy in or breach of any representation or warranty and the amount of any Losses arising therefrom shall be determined without regard to any materiality, Business Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty.

(f)      The representations, warranties and covenants of the Parties (whether set forth in this Agreement or any other Transaction Document, or any Schedule, agreement, certificate or other document delivered in connection herewith) shall in no event be affected by any investigation, inquiry or examination made for or on behalf of any party, or the knowledge of any Party's officers, directors, equity holders, employees, agents or representatives or the acceptance by any party of any certificate hereunder.

**Section 8.5    Exclusive Remedy.**  Notwithstanding anything else contained in this Agreement to the contrary, after the Closing, except in the case of any equitable remedies as provided in Section 9.18, (a) indemnification pursuant to the provisions of this ARTICLE 8 shall be the Parties' exclusive remedy for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement or in any certificate delivered pursuant hereto and (b) in furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action it may have pursuant to this Agreement against any Person arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this ARTICLE 8 and except for any rights, claims or causes of action arising out of the fraud or intentional misrepresentation of any Party.

## ARTICLE 9
## GENERAL PROVISIONS

**Section 9.1    Notices.**  Any notice required to be given hereunder shall be sufficient if in writing, and sent by personal delivery, facsimile transmission, overnight courier service (with proof of service), electronic mail,  certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

(a)      if to the Seller:

Dynamic Energy, Inc.
302 S. Jefferson Street
Roanoke VA, 24011
Facsimile:  (540) 301-5919
Attention:  James C. Justice III, Executive Vice President
e-mail address: jcj3@bluestoneindustries.com

with a copy to:

Frost Brown Todd LLC
250 West Main Street
Suite 2800
Lexington, KY 40507
Facsimile:  (859) 231-0011
Attention:  Paul Sullivan
e-mail address:  psullivan@fbtlaw.com

(b)     if to the Seller Parent:

Bluestone Resources Inc.
302 S. Jefferson Street
Roanoke VA, 24011
Facsimile:  (540) 301-5919
Attention:  James C. Justice III, Executive Vice President
e-mail address: jcj3@bluestoneindustries.com

with a copy to:

Frost Brown Todd LLC
250 West Main Street
Suite 2800
Lexington, KY 40507
Facsimile:  (859) 231-0011
Attention:  Paul Sullivan
e-mail address:  psullivan@fbtlaw.com

(c)     if to the Purchaser at any time:

CM Energy Holdings, LP
c/o Energy Capital Partners III, LLC
11943 El Camino Real, Suite 220
San Diego, CA 92130
Facsimile:  (858) 703-4401
Attention: Rahman D'Argenio
e-mail address: rdargenio@ecpartners.com

with a copy to:

63

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, TX 77002
Facsimile:  (713) 835-3601
Attention:  Andrew Calder, P.C.
William J. Benitez
e-mail address: andrew.calder@kirkland.com
william.benitez@kirkland.com

or to such other address as any Party shall specify by written notice so given.  Any such notice shall be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of facsimile or electronic mail, on the date sent if confirmation of receipt is received and such notice is also promptly mailed by registered or certified mail (return receipt requested and first-class postage prepaid) or by nationally-recognized overnight courier who guarantees next Business Day delivery, (c) in the case of a nationally-recognized overnight courier who guarantees next Business Day delivery, on the next Business Day after the date when sent and (d) in the case of registered or certified mail, on the third Business Day following that on which the mail containing such communication is posted.

Section 9.2    **Assignment; Binding Effect.**    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto (whether by operation of law or otherwise) without the prior written consent of the other Party; *provided*, *however*, that the Seller may assign this Agreement and any or all rights, or obligations hereunder (including the Seller's rights to seek indemnification hereunder) to any Affiliate of the Seller; *provided, further*, the Purchaser may assign its rights and obligations hereunder (including the Purchaser's right to purchase the Assets), in whole or in part, to any of its Affiliates without the consent of the Seller.  Subject to the foregoing, no assignment shall relieve the Seller or the Purchaser from any obligations hereunder.  Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to such assignee unless the context otherwise requires.  Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

Section 9.3    **No Third Party Beneficiaries.**    Except as otherwise provided in ARTICLE 8 and Section 9.14 of this Agreement, notwithstanding anything else contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties hereto any claims, rights, remedies, obligations or liabilities under or by reason of this Agreement.  The representations and warranties in this Agreement are the product of negotiations among the Parties hereto and are for the sole benefit of the Parties.  Persons other than the Parties hereto, the Purchaser Indemnitees and the Seller Indemnitees may not rely upon the representations and warranties in this Agreement.  Any breach of such representations and warranties are subject to waiver by the Parties hereto without notice or liability to any other Person.  Without limiting the foregoing, it is expressly agreed that, except as otherwise provided in ARTICLE 8 of this Agreement, no employee of any of the Parties to this Agreement or other Person shall have any rights or remedies pursuant to this Agreement (including any right of employment or any right under any employee benefit plan), and no Person is intended to be a third party beneficiary thereunder.

64

  **Section 9.4** **Entire Agreement**.  This Agreement, the other Transaction Documents and any other agreements contemplated hereby constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior written or oral agreements and understandings among the Parties with respect thereto, including the Prior Agreement.  No addition to or modification of any provision of this Agreement shall be binding upon any Party hereto unless made in writing and signed by all Parties.

  **Section 9.5** **Amendments.**  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

  **Section 9.6** **Governing Law.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAW.

  **Section 9.7** **Headings.**  Headings of the Articles and Sections of this Agreement are for the convenience of the Parties only, and shall be given no substantive or interpretative effect whatsoever.

  **Section 9.8** **Waiver.**  Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by the Party waiving such term or condition.  No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

  **Section 9.9** **Severability.**  Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable, and the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the fullest extent possible.

  **Section 9.10** **Jurisdiction.**  Each Party irrevocably submits to the exclusive jurisdiction of the state and federal courts located in the State of Delaware, and the related appellate courts for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each Party agrees to commence any such action, suit or proceeding either in the state or federal courts located in the State of Delaware. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction in this Section 9.10.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the aforementioned courts and the related appellate courts, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in

any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 9.11   **No Presumption.**   Each Party has agreed to the use of the particular language in the provisions of this Agreement, and any questions of doubtful interpretation shall not be resolved by any rule or interpretation against the draftsman, but rather in accordance with the intention of the Parties with respect thereto, having due regard to the benefits and rights intended to be conferred upon the Parties and the limitations and restrictions upon such rights and benefits intended to be provided.

Section 9.12   **Disclosure Schedules.**   Notwithstanding anything to the contrary contained elsewhere, Seller Disclosure Schedule and Purchaser Disclosure Schedule dated as of the date of this Agreement shall constitute the "Seller Disclosure Schedule" and the "Purchaser Disclosure Schedule" for purposes of the Agreement, and the Parties acknowledge and agree that in the event of any inconsistency between the statements in the body of this Agreement and those in the Seller Disclosure Schedule and/or the Purchaser Disclosure Schedule (each a "Disclosure Schedule"), the statements in the body of this Agreement will control. If any Disclosure Schedule discloses in any section or schedule thereof an item or information and it is reasonably apparent that such item or information also relates to another section or schedule of such Disclosure Schedule, such item or information shall be deemed to have been disclosed in such other section or schedule of such Disclosure Schedule, notwithstanding the omission of a cross-reference to such other section or schedule.

Section 9.13   **Further Assurances.**   Each Party shall, at any time and from time to time on and after the Closing Date, upon request by any other Party, take or cause to be taken such actions and execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments, documents, transfers and conveyances as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

Section 9.14   **No Recourse.**   This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement may only be brought against an entity that is expressly named herein as a Party and then only with respect to the specific obligations set forth herein with respect to such Party.  Except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement and not otherwise), no past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or the respective Affiliates of the Seller or the Purchaser (such Persons, the "Non-Recourse Persons") shall have any liability (whether in contract or tort) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of the Seller or the Purchaser under this Agreement (whether for indemnification or otherwise) or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement other than claims for fraud or intentional misrepresentation. The Non-Recourse Persons are express third-party beneficiaries of this Section 9.14 and should be entitled to enforce the provisions hereof.

**Section 9.15    Counterparts.**    This Agreement may be executed in two or more counterparts (including by electronic means), each of which shall be deemed to be an original, but all of which together shall be deemed to be one and the same instrument.

**Section 9.16    No Consequential or Punitive Damages.**    No Party shall be liable to any other Party for any special, indirect, consequential or punitive damages arising out of a breach by such Party of this Agreement, in each case, that are not the natural, probable or reasonably foreseeable result of such breach.

**Section 9.17    Waiver of Trial by Jury.**    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 9.18    Specific Performance.**    The Parties hereto hereby agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages. Accordingly, the Parties hereto acknowledge and hereby (a) agree that, in the event of any breach or threatened breach by the Seller or the Purchaser of any of their respective covenants or obligations set forth in this Agreement, the Seller and the Purchaser shall be entitled to an injunction or injunctions to prevent or restrain breaches or threatened breaches of this Agreement by the other party (as applicable), and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other party under this Agreement, and (b) waive any requirement for security or the posting of any bond in connection with any such remedy. The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by any Party, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any Party, under this Agreement. The Parties hereto further agree that (x) by seeking the remedies provided for in this Section 9.18 a party shall not in any respect waive its right to any other form of relief that may be available to a party under this Agreement (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 9.18 are not available or otherwise are not granted, and (y) nothing set forth in this Section 9.18 shall

67

require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 9.18 prior or as a condition to exercising any termination right under ARTICLE 7 (and pursuing damages after such termination), nor shall the commencement of any proceeding pursuant to this Section 9.18 or anything set forth in this Section 9.18 restrict or limit any party's right to terminate this Agreement in accordance with the terms of ARTICLE 7 or pursue any other remedies under this Agreement that may be available then or thereafter.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement and caused the same to be duly delivered on their behalf on the date first written above.

**SELLER:**

DYNAMIC ENERGY, INC.

By: _____

Name: James C. Justice III

Title: Exec. VP

**SELLER PARENT:**

BLUESTONE RESOURCES INC.

By: _____

Name: James C. Justice III

Title: Exec. VP

*Signature Page to Purchase Agreement*

**PURCHASER:**                                    CM ENERGY HOLDINGS, LP

                                                 By: CM Energy GP, LLC
                                                 Its: General Partner

                                                 By: _____

                                                 Name: Rahman D'Argenio

                                                 Title: Chairman

Agreed and acknowledged as of the date first written above:

FRONTIER COAL COMPANY

By: _____

Name: _James C. Justice III_____

Title: _Exec. VP_____


NATIONAL RESOURCES, INC.

By: _____

Name: _James C. Justice III_____

Title: _Exec. VP_____